ZIMMERMAN REED LLP
Caleb Marker (SBN 269721)
 E-mail: caleb.marker@zimmreed.com
Flinn T. Milligan (SBN 323042)
 Email: flinn.milligan@zimmreed.com
Arielle Canepa (SBN 329546)
 Email: arielle.canepa@zimmreed.com
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

*Attorneys for Plaintiff Frederick Sims*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| FREDERICK SIMS, an individual, on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>OPPORTUNITY FINANCIAL, LLC, a Delaware Company, d/b/a OPPLOANS, FINWISE BANK, a Utah Corporation, and DOES 1-100, inclusive,<br><br>Defendants. | CASE NO.: 4:20-cv-04730-PJH<br><br>*Assigned to the Honorable Phyllis J. Hamilton*<br><br>**FIRST AMENDED COMPLAINT**<br><br>1. Violation of Cal. UCL (Unlawful Conduct, Cal. Bus. & Prof. Code § 17200 *et seq.*;<br>2. Violation of Cal. UCL (Unfair Conduct), Cal. Bus. & Prof. Code § 17200 *et seq.*;<br>3. Violation of Cal. UCL (Fraudulent Conduct), Cal. Bus. & Prof. Code § 17200 *et seq.*;<br>4. Declaratory Relief<br>5. Violation of Utah Code § 70C-7-106;<br>6. Violation of Utah Code § 15-1-1(2);<br>7. Violation of Utah Code § 70C-7-201; and<br>8. Violation of the EFTA, 15 U.S.C. § 1693k *et seq.*<br><br>Date Action Filed: May 11, 2020<br>Date Removed:     July 15, 2020<br>Courtroom:       3, 3rd Floor<br><br>Trial Date:         TBD |

Plaintiff Frederick Sims ("Plaintiff or "Sims"), on behalf of himself and the California general public ("general public"), hereby commences this legal proceeding against Defendants OPPORTUNITY FINANCIAL, LLC, d/b/a/ OPPLOANS, FINWISE BANK, and DOES 1-100, inclusive (hereinafter collectively "Defendants"). Plaintiff makes the following allegations based upon personal knowledge, information and belief, and his attorneys' reasonable investigative efforts as to Defendants' actions and misconduct, and states and alleges as follows:

## I. **PRELIMINARY STATEMENT**

1.     This case challenges Defendants' conduct contracting with Plaintiff and other members of the general public for consumer installment loans, auto title loans, vehicle secured loans and other loans (hereinafter collectively referred to as "Consumer Loans") in which usurious, excessive, unfair, unconscionable, and unlawful interest rates and other charges are imposed in violation of California and Utah law. Cal. Fin. Code. §§ 22750, 22302; 22303; Cal. Civ. Code § 1670.5; Utah Code §§ 15-1-1, 70A-2-302, 70C-7-106, 70C-7-201. Because the Consumer Loans Defendants provided Plaintiff and the general public all carry annual percentage rates ("APRs") that exceed California's and Utah's usury rates and other limits, including any unconscionability standard, such Consumer Loans are null and void and neither Defendants nor any third party may collect, obtain, or receive any further principal, interest, or charges on the loans. Fin. Code § 22750; Utah Code §§ 15-1-1, 70A-2-302, 70C-7-106, 70C-7-201. Defendants' actions, described herein, have injured and caused financial loss to Plaintiff and the members of the public and threaten to cause further harm in the future unless enjoined and declared unlawful. Through this action, Plaintiff seeks damages on an individual basis only, along with public injunctive relief and a declaratory judgement, including but not limited to, a declaration that the Consumer Loans provided by Defendants to Plaintiff and other members of the general public at unconscionable rates (above 36%, plus the Federal Funds rate) are void and unenforceable and no further principal, interest, or other charges are due and owing by Plaintiff and other members of the general public. Plaintiff is a member of the general public and seeks the same prospective public injunctive relief as is sought for the general public. Any further amounts Defendants collect from Plaintiff or any other member of the general public after the date of service of this Complaint, putting Defendants on notice

of their violations, should be placed in a constructive trust or other account for the benefit of Plaintiff and the general public.

## II. **THE PARTIES**

2.      Plaintiff is an individual residing in Oakland, California. Plaintiff is a citizen of the state of California.

3.      Plaintiff is a retired veteran of the United States Army living on a fixed income consisting of pension, social security and/or disability benefits. Plaintiff is disabled as a matter of law under Cal. Civ. Code § 1761(g). A substantial portion of Plaintiff's monthly pension, social security and/or disability benefits goes to pay Consumer Loans, including that obtained from Defendants on or about February 14, 2020 at an unconscionable interest rate exceeding 160%, as described below, causing financial injury and out-of-pocket loss. Paying interest at excessive and unconscionable rates creates financial hardship for Plaintiff and threatens to create additional hardship in the future unless enjoined. Creditors like Defendants cannot garnish or seize Social Security benefits, whether it is retirement, disability, survivor's benefits, or SSI. *See e.g.*, 42 U.S.C. § 407, 10 U.S.C. § 1440; CCP §704.110.

4.      Cal. Civ. Code § 1780(b)(1) provides: "Any consumer who is a senior citizen or a disabled person, as defined in subdivisions (f) and (g) of Section 1761, as part of an action under subdivision (a), may seek and be awarded, in addition to the remedies specified therein, up to five thousand dollars ($5,000) where the trier of fact does all of the following: (A) Finds that the consumer has suffered substantial physical, emotional, or economic damage resulting from the defendant's conduct; (B) Makes an affirmative finding in regard to one or more of the factors set forth in subdivision (b) of Section 3345; (C) Finds that an additional award is appropriate." Such relief is appropriately granted and demanded by Plaintiff. Cal. Civil Code section 3345(b) is satisfied. Based on the facts alleged herein, the trier of fact should determine: 1) Defendants knew or should have known that their conduct was directed to one or more senior citizens or disabled persons; (2) Defendants' conduct caused one or more senior citizens or disabled persons to suffer: loss or encumbrance of a primary residence, principal employment, or source of income; substantial loss of property set aside for retirement, or for personal or family care and maintenance; or substantial loss of payments received under a pension or retirement plan or a government benefits program, or assets essential to the health or welfare of the

senior citizen or disabled person; (3) one or more senior citizens or disabled persons are substantially more vulnerable than other members of the public to the Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered substantial physical, emotional, or economic damage resulting from the Defendants' conduct. Knowledge of Plaintiff's disability and resulting economic damage from having to pay over 160% interest should have become known to Defendants during the loan approval process.

5.    Plaintiff asserts the claims below on his own behalf and on behalf of the California general public, which includes persons who have obtained similar Consumer Loans from Defendants with unconscionable interest rates exceeding 30% (on loans between $300 and $2,500) and 36% (plus the Federal Funds rate) (on loans between $2,500 and $10,000), and remain at risk of obtaining similar Consumer Loans from Defendants with unconscionable interest rates exceeding those rates in the future.

6.    Plaintiff has obtained at least one loan from Defendants with unconscionable interest rates exceeding 160%. The proceeds of the Consumer Loan obtained by Plaintiff were intended to be used primarily for personal, family, and household purposes. On or about February 14, 2020, Plaintiff obtained a Consumer Loan with a principal of $1,500 from Defendants with an interest rate described in the "Federal Truth-In Lending Disclosure Statement" as an Annual Percentage Rate of 160.65%, bearing a "Finance Charge" (described as "The dollar amount the credit will cost you") of $979.74. *See* Promissory Note and Disclosure Statement and Federal Truth In Lending Disclosure Statement, effective 2/18/2020, copy attached hereto as Exhibit A ("Promissory Note" or "Agreement"). The "Lender" box on the top of the first page of the "Promissory Note and Disclosure Statement" identifies both "FinWise Bank" and "Opportunity Financial, LLC." *Id.* This same disclosure provides that the "Total of Payments" (described as "The amount you will have paid after you have made all payments as schedules") would be $2,479.74. $2,479.75 is, in reality, 165.316% of $1,500. *Id.* Later in the terms of the Promissory Note, the interest rate is stated as "the agreed annual rate of (160.0%), rounded to two decimal places." The payment schedule called for of monthly payments of $275.52 beginning March 1, 2020 and with a final payment due on November 1, 2020. *Id.* According to the terms of the Promissory Note and Disclosure Statement, but outside of the "Federal Truth-In Lending Disclosure Statement," the Agreement states that "[a]ll payments received shall be applied first to the accrued interest, then to

any outstanding charges or fees, and then to the reduction of the unpaid principal," and "[s]imple interest will accrue from day to day on the outstanding principal balance at a "Daily Rate" equal to 1/365 of the agreed annual rate of (160.0%), rounded to two decimal places." *Id.*

7.     Principal, interest, and/or other charges in unlawful amounts were demanded by Defendants under the Consumer Loan Plaintiff obtained. Unless the laws set forth below are enforced, violations are enjoined, and unconscionable conduct declared unlawful and void, Plaintiff (along with the members of the general public) is at risk of falling victim to continued usurious, unconscionable, and unlawful lending practices from Defendants, resulting in further financial damage, injury, and out-of-pocket loss. As such, injunctive and declaratory relief is appropriate and immediately necessary to protect Plaintiff and the general public. Due to his financial circumstances, Plaintiff remains at risk of needing additional Consumer Loans in the future, including from Defendants. Defendants' conduct is capable of repetition and unless enforced in this action will evade review because Defendants' common and ongoing business practice involves the provision of high interest rate Consumer Loans to California consumers and the public at large, well above the state usury rate and any other interest rate that could be considered reasonable and conscionable.[1] Unless the laws set forth below are enforced, violations are enjoined, and unconscionable conduct declared unlawful and void, Plaintiff (along with the members of the general public) is at risk of falling victim to usurious and unlawful lending practices in the future, including from Defendants, resulting in further financial loss. As such, injunctive and declaratory relief is appropriate and necessary to protect Plaintiff and the general public from still ongoing practices at issue.

8.     Plaintiff brings this action not only on his own behalf, but also for the benefit of the general public (including but not limited to all other persons with active Consumer Loans from Defendants with interest rates exceeding 36% (plus the Federal Funds rate)), many of whom are low-income residents of this state, in dire need of credit and particularly vulnerable to companies attempting to exploit their financial situations and vulnerabilities for profit through high-rate Consumer Loans

---

[1] For example, the Fair Access to Credit Act (AB 539), limits the rate of interest on installment loans with a principal amount between $2,500 and $10,000 to 36 percent plus the federal funds rate. Fin. Code, § 22000 *et seq*. That rate cap, therefore, sets a standard for what rates exceeding that amount are unconscionable.

4835-1837-4601, v. 1

presented as easy to obtain but which often lead to aggressive collection techniques and a mounting cycle of debt. Plaintiff seeks the same public injunctive relief for the general public as he seeks for himself.

9.    Plaintiff timely opted-out of any arbitration agreement in the Promissory Note and Disclosure Statement applicable to the loan obtained on February 18, 2020 both by mail to OppLoans, One Prudential Plaza, 130 E. Randolph St., Suite 3400, Chicago, IL 60601 and by email to compliance@opploans.com.

10.    Defendants are in the business of providing Consumer Loans including but not limited to "consumer installment" loans to consumers for personal, family, or household purposes, in the State of California and other states.

11.    Most, if not all of Defendants' consumer installment loan transactions, including those with Plaintiff, are generated over the internet.

12.    Defendants' Consumer Loans include all loans for general personal, family and household use, and come in various forms including payday loans (also known as "deferred deposit" loans, in which the entire amount plus fees and interest are due on a particular date, usually the borrower's next payday), and consumer installment loans (in which the balance plus fees and interest are repaid in installments, usually monthly).

13.    Defendant Opportunity Financial, LLC ("Opportunity") is a Delaware company with its principal place of business at 130 E Randolph St., Suite 3400, Chicago, IL 60601. Opportunity does business in California under the business name "OppLoans". *See* Opportunity Financial, LLC Homepage, www.opploans.com (last visited Aug. 27, 2020).

14.     At relevant times, Defendant Opportunity has conducted business in the state of California as a lender, marketing, originating, approving, and disbursing consumer loans and collecting consumer debts as defined by Civ. Code § 1788.2(f). Opportunity's registered agent for service in California is COGENCY GLOBAL INC., a Delaware corporation whose registered agent for service is Erin Upchurch, 1325 J Street, Suite 1550, Sacramento, CA 95814. Opportunity's Chief Executive Officer is Jared Kaplan.

4835-1837-4601, v. 1

15.     Defendant Opportunity is in the business of making consumer loans to borrowers such as Plaintiff. As defined in Fin. Code § 22203, " 'Consumer loan' means a loan, whether secured by either real or personal property, or both, or unsecured, the proceeds of which are intended by the borrower for use primarily for personal, family, or household purposes."

16.     Defendant Opportunity is a "finance lender" as defined by Fin. Code § 22009 (" 'Finance lender' includes any person who is engaged in the business of making consumer loans or making commercial loans. The business of making consumer loans or commercial loans may include lending money and taking, in the name of the lender, *or in any other name*, in whole or in part, as security for a loan, any contract or obligation involving the forfeiture of rights in or to personal property, the use and possession of which property is retained by other than the mortgagee or lender, or any lien on, assignment of, or power of attorney relative to wages, salary, earnings, income, or commission. It is the intent of the Legislature that the definition of finance lender shall be interpreted to include a personal property broker as referenced in Section 1 of Article XV of the California Constitution.").

17.     Defendant Opportunity is licensed by the Department of Business Oversight as a "finance lender" (California Finance Lenders License No. 603-K647). *See also* Consent Order Before the Department of Business Oversight (Jan. 24, 2020), https://dbo.ca.gov/wp-content/uploads/sites/296/2020/01/Consent-Order-Opportunity-Financial-LLC.pdf.

18.     As such, Defendant Opportunity is also a "licensee" as defined by Fin. Code § 22007.

19.     Opportunity's website confirms that its lowest rate for installment loans over $500 is 99%. Opportunity Financial, LLC, https://www.opploans.com/personal-loans/installment-loans/ ("Typical OppLoans Installment Loan, Loan Amount: $500-$4,000; APR 99%-199%, Term: 6-36 months") (last visited Aug. 27, 2020). Thus, Defendant Opportunity typically, commonly, and repeatedly violates California limits on interest rates and routinely charges unconscionably high interest rates under California and Utah law.

20.     Defendant FinWise Bank ("FinWise") is a wholly owned subsidiary of All West Bancorp and located at 820 East 9400 South, Sandy, Utah. All West Bancorp is a bank holding company located in Sandy, Utah. On all transactions FinWise's registered agent for service is R. Gary Winger, 50 East South Temple, Suite 400, Salt Lake City, Utah, 84111.

21.     Defendants Opportunity and FinWise have entered into a partnership, conspiracy and/or other business arrangement aimed at charging consumers unconscionably high interest rates and ignoring state laws limiting them. Defendants conspire to misrepresent the "finance lender" under Fin. Code § 22009 on installment loan transactions without disclosure to the borrower of the effect that has on interest rates changed. Opportunity serves as the "finance lender" under Fin. Code § 22009 on transactions like Plaintiff's and FinWise is a mere conduit to launder transactions to make it appear that it is acting as a lender.

22.     The relationship between Opportunity and FinWise is designed to avoid, evade, and skirt interest rate limits by deceptively and misleadingly presenting FinWise as the nominal "lender" on loan agreements for a short instant, when Opportunity and/or its affiliates actually serve as the "finance lender" under Fin. Code § 22009 and have a pre-arranged deal to immediately purchase or otherwise obtain the loan they processed, arranged, and made. This is typically referred to as a "rent-a-bank" relationship and is a sham arrangement designed to deceive the borrower and the state. *See* Jean Eaglesham et al., *Rent A Banks Defy States Growing Efforts to Curb High Cost Lending*, Wall Street Journal (March 11, 2020 5:30 AM ET), https://www.wsj.com/articles/rent-a-banks-defy-states-growing-efforts-to-curb-high-cost-lending-11583435510.

23.     Regardless of any relationship between Opportunity and FinWise, it remains unlawful for a finance lender such as Opportunity to engage in the business of making any consumer loans with interest rates in excess of the statutory maximum.

24.     Opportunity served as the "finance lender" under Fin. Code § 22009 on loans such as Plaintiff's. Opportunity is regulated by the DBO and subject to the California Financial Code. With regards to Plaintiff and the general public, Opportunity is the finance lender as it makes consumer loans. Opportunity markets the loan and provides all (or the vast majority) of the substantive lending, underwriting, approval, applications, administrative, customer service, technology, marketing, website/internet support, loan servicing (collection of scheduled payments and related account administration), default management and collections, ancillary and other functions according to guidelines and policies it develops, approves and controls. Opportunity may "license" its technology and programs to FinWise, but remains the finance lender controlling the loan marketing, advertising,

FIRST AMENDED COMPLAINT

application, approval, funding and servicing process. To the extent FinWise advances any money to fund the high interest rate loan, it is promptly repaid in a prearranged transaction(s) where the loan is immediately "sold" to Opportunity and/or an affiliate of Opportunity, minimizing any actual risk to FinWise. To fund the loans/purchases, Opportunity and/or an affiliate of it borrows money at a fraction of the unconscionably high interest rates it charges borrowers like Plaintiff. Opportunity then benefits from most of the high-interest repayments that consumers like Plaintiff make. In short, the transaction is a sham where funds are passed through FinWise in a circular arrangement to give the appearance for a short moment that Opportunity is not the finance lender, when in reality it is. The arrangement is described in greater detail in contracts between Defendants and/or their affiliates. Further evidence that this deceptive "rent-a-bank" arrangement disguises the finance lender on transactions, and that FinWise never intends to conduct actual lender functions, FinWise engages in similar "rent-a-bank" transactions with competitors of Opportunity in the payday / high interest installment loan business. FinWise Bank does not offer triple-digit-rate consumer installment loans directly to California consumers on its own website. Buried on its "Strategic Partnerships" page, the bank provides links to the outside websites of high interest lenders where consumers can apply for installment loans. The FinWise list of its "Strategic Partnerships" in 2020 includes American First Finance, ForwardLine, LendingPoint, OppLoans, Upstart and RISE (Elevate). *See* FinWise Bank, https://www.finwisebank.com/strategicpartnership-products/ (last visited April 7, 2020) ("In some circumstances, FinWise Bank may rely on lending arrangements that depend on third parties to perform aspects of the lending process through technology provided by the third party ('Strategic Partners')").

25.     All of the acts alleged herein were conducted by Defendants intentionally. Defendants through their acts, statements, omissions, deception and conduct, described further herein, also acted in bad faith.

26.     Defendants adopted and carried out the ongoing and continuing business policies challenged in this action, injuring Plaintiff and other members of the general public throughout the state of California, as well as other states.

27.     Plaintiff does not know the true names of Defendants DOES 1 through 100, inclusive, and therefore sues them by those fictitious names.

## III. JURISDICTION & VENUE

28. Venue is proper in this District because a substantial part of the events and omissions giving rise to this action occurred in this District. Plaintiff's transaction with Defendants occurred over the internet from a location in this District, where Plaintiff resides.

29. Through this complaint, Plaintiff seeks predominantly prospective, public injunctive relief in order to protect the general public from continuing deceptive and unlawful business practices from which both Plaintiff and the general public remain at risk of further injury. Such rights cannot be waived through class action or other collective action waivers or arbitration agreements. Pursuant to California law, claims seeking public injunctive relief are properly asserted and adjudicated, irrespective of contrary language in the loan contracts attempting to foreclose or waive such claims. *See McGill v. Citibank*, N.A., 2 Cal. 5th 945, 956, 961 (Cal. 2017). Any such waiver is unlawful, unconscionable and invalid.

30. Plaintiff additionally seeks damages, restitution and monetary and injunctive relief under California, Utah, and federal law, on an individual basis.

## IV. FACTUAL ALLEGATIONS

31. An interest rate is the price charged over a given time period for lending a particular amount of money to a given individual or entity. As with any other price term in an agreement governed by California law, an interest rate may be deemed unconscionable.

32. "Usury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations." Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381, 1381 (1966). California, which was founded in 1850, has regulated maximum interest rates since 1872. *See id.* at 1385. Utah, founded in 1896, regulated usury at a rate of 12% within a decade of achieving statehood, before reverting to an unconscionability standard with a default "reasonable rate" of 10% for cases in which no lawful and enforceable rate is present in the contract. Chris Peterson, *Failed Markets, Failing Government, or Both? Learning from the Unintended Consequences of Utah Consumer Credit Law on Vulnerable Debtors*, 2001 Utah L. Rev. 543, 548 (2001); Utah Code §§ 15-1-1, 70A-2-302, 70C-7-106, 70C-7-201.

4835-1837-4601, v. 1

33.     Thus, in addition to any technical and/or legal meanings, such as those contained within the California Constitution, the Utah Code, and interpreting cases, "usury" is the accepted definition of the conduct of Defendants both legally and in plain speech. For example, Black's Law Dictionary, Tenth Ed., defined "usury" as follows:

> (14c)   1. Historically, the lending of money with interest.
> 2. Today, the charging of an illegal rate of interest as a condition to lending money.
> 3. An illegally high rate of interest.
> Black's Law Dictionary, 1778 (10th ed., 2009).

Similarly, Merriam-Webster defines "usury" as follows:

> 1. The lending of money with an interest charge for its use *especially:* the lending of money at exorbitant interest rates.
> 2. An unconscionable or exorbitant rate or amount of interest *specifically:* interest in excess of a legal rate charged to a borrower for the use of money.
> 3. Archaic: interest.
> Merriam-Webster, available at www.merriam-webster.com/dictionary/usury (last visited Mar. 31, 2020)[emphasis in original].[2]

Finally, Investopedia defines "usury" as follows:

> Usury is the act of lending money at an interest rate that is considered unreasonably high or that is higher than the rate permitted by law. Usury first became common in England under King Henry VIII and originally pertained to charging any amount of interest on loaned funds. Over time it evolved to mean charging excess interest, but in some religions and parts of the world charging any interest is considered illegal.
> Investopedia, www.investopedia.com/terms/u/usury.asp (last visited Mar. 31, 2020).

## A.     California's Usury and Unconscionability Laws

34.     Currently, the law of usury in California is based primarily upon California Constitution article XV, section 1, which limits the interest payable for any loan or forbearance of any money. However, usury law in California is in reality a creature of multiple sources of law, including multiple sections of the Financial Code (Cal. Fin. Code § 22302, 22303, etc.), the Penal Code (*see e.g.* Cal. Pen. Code. § 487), the Civil Code (Cal. Civ. Code § 1670.5), administrative provisions, common law (*see e.g. De La Torre v. CashCall, Inc.* 5 Cal. 5th 966, 976, 422 P.3d 1004 (2018)), and federal law. *See*

---

[2]  Of additional note, a search for "usury" on the Merriam-Webster thesaurus states that "[t]he word you've entered isn't in the thesaurus". Likewise, "usurious". *See* Marriam-Webster Thesaurus, www.merriam-webster.com/thesaurus/usurious and www.merriam-webster.com/thesaurus/usury (both sites last visited Mar. 31, 2020).

4835-1837-4601, v. 1

*generally Wishnev v. The Nw. Mut. Life Ins. Co.*, 8 Cal.5th 199, 206 (2019). Additionally, while the California Constitution, article XV is entitled "Usury," neither it nor any section therein defines "usury."

35.     The California Constitution's maximum annual interest rate of 10% for loans used "primarily for personal, family, or household purposes." Cal. Const. art. XV, § 1.

36.     Lenders like Defendants who are licensed under the California Finance Lenders Law are generally exempt from the Constitutional 10% limit, and are instead subject to California statutory provisions providing that parties may: "... contract for the payment and receipt of a rate of interest not exceeding twelve dollars on the one hundred dollars for one year and not exceeding that rate for a greater or less sum or for a longer or shorter time, in which case such rate exceeding seven dollars on one hundred dollars shall be clearly expressed in writing." Cal. Civ. Code § 1916-1. Cal. Fin. Code § 22303.

37.     Pursuant to the California Finance Lenders Law, Cal. Fin. Code § 22001(a):

This division shall be liberally construed and applied to promote its underlying purposes and policies, which are:

(1) To ensure an adequate supply of credit to borrowers in this state.
(2) To simplify, clarify, and modernize the law governing loans made by finance lenders.
(3) To foster competition among finance lenders.
(4) To protect borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders.
(5) To permit and encourage the development of fair and economically sound lending practices.
(6) To encourage and foster a sound economic climate in this state.

38.     Pursuant to Financial Code § 22303, installment loans with principal balances between $300 and $2,499 have maximum interest rates of approximately 30% - more than five times lower than the rate on Plaintiff's Consumer Loan as well as most or all Consumer Loans funded by Defendants. *See, e.g.,* Amrita Jayakumar, *OppLoans Installment Loans: 2020 Review*, NerdWallet (Jan. 3, 2020), https://www.nerdwallet.com/reviews/loans/personal-loans/opploans-personal-loans ("The average OppLoans customer . . . borrows $1,400 at an average annual percentage rate of 140%, according to the company.").

39.     In addition to any statutory caps, California law contains restrictions on the interest rates that can be charged by lenders. Courts can declare unconscionable an interest rate on a loan of $2,500 or more. *De La Torre*, 5 Cal. 5th at 976 ("An interest rate on a loan is the price of that loan, and 'it is

4835-1837-4601, v. 1

clear that the price term, like any other term in a contract, may be unconscionable.'... As with any other price term in an agreement governed by California law, an interest rate may be deemed unconscionable.").

40.     Under California law, a contract to pay interest in excess of the lawful maximum is void and the lender may not recover principal, interest or other fees and charges in relation to the loan. Furthermore, if the borrower actually pays interest at a usurious or unconscionable rate he may recover the amount so paid in an action brought for that purpose. *See*, Cal. Civ. Code § 1670.5; Cal. Fin. Code § 22302.

41.     California's usury laws are primarily designed to penalize those who take advantage of "unwary and necessitous borrowers," *Del Mar v. Caspe*, 222 Cal. App. 3d 1316, 1326 (Cal. Ct. App. 1990), and its consumer and borrower protections support a robust and longstanding public policy against the types of unconscionable and usurious loans funded by Defendants. California law does not allow Defendants to charge interest rates exceeding 36% (plus the Federal Funds rate) annually, far less loans at rates of 160% and more. As above, the California statutory scheme is "liberally construed and applied to promote its underlying purposes and policies" including "to protect borrowers against unfair practices by some lenders," and "encourage the development of fair and economically sound lending practices." Cal. Fin. Code § 22001(a).

## B.     Utah's Usury and Unconscionability Laws

42.     Utah's usury and unconscionability laws are likewise derived from a variety of statutory and common law sources. Both before and after 1985 when the usury rate cap was repealed in favor of the "lawful contract" rule and default "reasonable rate" of 10% APR (Utah Code § 15-1-1), Utah law regarding interest rate limits has been a hybrid of usury and unconscionability law.

43.     As early as one hundred years ago, the Utah Supreme Court held loan contracts for exorbitant interest rates to be unconscionable and uncollectible, or "paid in full," without regard to the then-extant statutory usury caps. *See, e.g., Carter v. West*, 38 Utah 381, 381 (1911) (60% APR on promissory note lent to an individual with little business experience or literacy unconscionable, and finding a debt fully paid where "the plaintiff received the full amount of money loaned to the defendant and interest at the rate of 15 per cent. per annum."); *Engert v. Chadwick*, 40 Utah 239, 239 (1912) (120%

APR interest on a private promissory note for $50 "unjust, and unreasonable, and an unconscionable rate" and "against public policy and good morals to hold otherwise and to countenance such transactions").

44.     Today, despite moving towards a standard of unconscionability more similar to that of California, involving a procedural and a substantive element,[3] it is still good law in Utah to find that "an unconscionable consideration 'is, in law, no consideration'" leading to the unusual Utah remedy of reforming the contract at issue to the default "reasonable rate" of its surviving usury law, Utah Code § 15-1-1. *See, e.g., Sheedy v. BSB Properties, LC*, No. 2:13-CV-00290-JNP, 2016 WL 6902513, at *5 (D. Utah Mar. 1, 2016) (citing *Engert*, 40 Utah at 239).

45.     Additionally, under Utah's statutory unconscionability provision, Utah Code § 70C-7-106(2) "[i]f it is claimed or appears to a court that a consumer credit agreement or any part of it may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its setting, purpose, and effect to aid the court in making the determination." As discussed by the court in *O'Brien*, "[t]his provision mandates that "the trial court consider relevant facts before holding that a contractual provision in a consumer credit contract is unenforceable due to unconscionability.'" *O'Brien v. Am. Exp. Co.*, No. 11-CV-1822-BTM BGS, 2012 WL 1609957, at *4 (S.D. Cal. May 8, 2012), *objections overruled,* No. 11CV01822 BTM BGS, 2012 WL 3628667 (S.D. Cal. Aug. 21, 2012). Courts have held this requirement to entitle a plaintiff to discovery when claiming unconscionability. *Id.*

**C.     Defendants' Business Operations.**

46.     Defendants are in the business of making Consumer Loans in California for the borrower's personal, family or household use.

47.     Defendants approve, set terms, process and fund the Consumer Loans provided to Plaintiff and the general public in California.

---

[3] *See, e.g., O'Brien v. Am. Exp. Co*., No. 11-CV-1822-BTM BGS, 2012 WL 1609957, at *4 (S.D. Cal. May 8, 2012), *objections overruled,* No. 11CV01822 BTM BGS, 2012 WL 3628667 (S.D. Cal. Aug. 21, 2012) ("As in California, a two-pronged analysis is used to determine whether a contract is unconscionable – substantive and procedural unconscionability.") (citing *Ryan v. Dan's Food Stores, Inc*., 972 P.2d 395, 402 (Utah 1998)).

4835-1837-4601, v. 1

48. Defendants routinely charge borrowers like Plaintiff usurious, unconscionable, and unlawful interest rates well above 36% (plus the Federal Fund Rate) on the Consumer Loans they fund.

49. Finance charges of 36% (plus the Federal Fund Rate) and above are usurious, unfair, unconscionable, and unlawful.

50. All finance charges that are charged on the Consumer Loans Defendants provided Plaintiff and other members of the general public are usurious, unfair, unconscionable, and unlawful.

51. It is well understood that short-term high-interest loans such as the Consumer Loans offered by Defendants harm the general public – including those who never take out such a loan themselves – through the illegal expropriation of millions of dollars from primarily low-income communities in the form of usurious interest and extortionate fees.[4] Low-income individuals typically spend most of their income, and do so primarily in their local communities, benefiting local economies by keeping cash in circulation. However, the statewide (and nationwide) effect of predation by large lenders such as Defendants have devastated local economies by expropriating wealth that would otherwise circulate in communities.

52. A 2011 study by the Insight Center for Community Economic Development found that the "payday" lending industry[5] had a net negative impact on the national economy of almost one billion dollars, resulting in a net loss of 14,094 jobs, with those losses focused in sectors such as healthcare, education, and retail which employ large numbers of low-income community members, further devastating those communities. Tim Lohrentz, *The Net Economic Impact of Payday Lending in the U.S.*, Insight Ctr. for Cmty. Econ. Dev. 3 (Mar. 2013),

---

[4] *See, e.g.*, Senate Judiciary Committee, AB 539 (July 9, 2019), available at http://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200AB539.

[5] It is reasonable to expect identical effects from other forms of short-term high-interest loans such as the Consumer Loans offered by Defendant. *See, e.g.*, *Payday Lenders Are Making Bank On New, High-Interest Products,* Am. Banker (June 5, 2018), https://www.americanbanker.com/articles/payday-lenders-are-making-bank-on-new-high-interest-products (last visited Nov. 20, 2019) ("'It's the same predatory lending schemes in a different package,' said Diane Standaert, director of state policy at the Center for Responsible Lending. 'What has remained unchanged for all these years is that the debt trap remains the core of the business model.'") This article also notes that between 2012 and 2016 the revenue from traditional "payday" lending shrank from $9.2 billion to $6 billion nationwide (a loss of $2.8 billion), and the revenue from other short-term high-interest lending grew from $4.3 billion to $6.5 billion (an increase of $2.2 billion).

http://ww1.insightcced.org/uploads/assets/Net%20Economic%20Impact%20of%20Payday%20Lending.pdf (last visited Nov. 20, 2019). In 2011 the economic loss in California alone attributed to the payday lending industry was calculated as $135 million, or nearly 2,000 jobs. *Id.* A more recent study showed that borrowers paid over $4.1 billion just in fees in 2016, with the highest fee drains in Texas, California, Mississippi, Illinois and Ohio. Diane Standaert & Delvin Davis, *Payday and Car Title Lenders Drain $8 Billion in Fees Every Year*, Ctr. for Responsible Lending , https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl_statebystate_fee_drain_may2016_0.pdf (last updated Jan. 2017). This figure is merely the amount paid in fees, and does not include increased expenditures by taxpayers on social assistance, bankruptcies, increased healthcare costs, criminal justice expenditures, or the cost of homelessness.

53.    The 2011 study also found that the industry drained over $2.5 million dollars from the economy each day, and that 38 people lose their job every single day due to the economic drain of payday lending. Lohrentz *supra* ¶41 at 5.

54.    A number of studies found that borrowers were around twice as likely to file for bankruptcy than the rest of the population, causing economic harm not only to that family and community, but to legitimate lenders forced to compete with illegal payday loans. *See, e.g.*, Paige Marta Skiba & Jeremy Tobacman*, Do Payday Loans Cause Bankruptcy?*, Vanderbilt Law and Economics Working Paper No. 11-13, https://law.yale.edu/sites/default/files/area/workshop/leo/document/J.Tobacman.pdf (last updated 1 Dec. 2011).

55.    The ripple effect of these losses harms the general public, as people are forced into increasing dependence on government services, have less money for preventative healthcare and so depend more on expensive emergency healthcare, have less ability to invest in personal development and small business, are less able to spend on child development, education, and nutrition, and generally spend less in their local communities. For example, recent studies have even shown that borrowers have increased reliance on SNAP and reduced payments towards child support than the public in general. Brian T. Melzer, *Payday Loans Increase SNAP, Reduce Child Support Payments*, Ctr. for Poverty

Research, Policy Br. (Dec. 2016), https://poverty.ucdavis.edu/policy-brief/payday-loans-increase-snap-reduce-child-support-payments.

56.     Magnifying this harm is the fact that, as observed by the California Department of Business Oversight ("DBO"), the majority of short-term loan borrowers take out many such loans at one time. Indeed, the DBO found that in 2015 the number of payday loan customers with ten transactions outnumbered those with just one, and that of subsequent loans to the same borrower, 47.2 percent were made on the same day, and that for every dollar borrowed in a payday loan, 83.1 cents are borrowed as part of subsequent "rollover" loans. Press Release, *Payday Loan Customers with 10 Transactions Outnumbered Those with One in 2015: DBO Report Shows Repeat Customers' Prominence in Sector*, Dep't Bus. Oversight (Jul. 30, 2016), https://dbo.ca.gov/wp-content/uploads/sites/296/2019/02/2016-CDDTL-Annual-Report-and-Industry-Survey-Press-Release-07-06-16.pdf.

57.     The most recent report of the DBO shows that the number of Consumer Loans originated in California in 2018 increased by 9.05% over 2017 to 1,618,634. The largest category of loans was the $2,500-$44,999 range, of which 55.51% carried annual percentage rates of 100 percent or higher. *Annual Report: Operation of Finance Companies Licensed under the California Financing Law*, Dep't Bus. Oversight 2 (2018), https://dbo.ca.gov/wp-content/uploads/sites/296/2019/08/CFL-Annual-Report-2018-FINAL-8-8-19.pdf. In other words, the small-dollar, high-interest loan industry is continuing to evolve in its attempts to thwart regulation, and part of that evolution is the move from the traditional "payday" loan to the "consumer installment" loans of the type offered by Defendants. *See* Press Release, *California Payday Loan Industry Appears to be Moving Toward Large Consumer Installment Loans*, Dep't Bus. Oversight (Aug. 8, 2019), https://dbo.ca.gov/wp-content/uploads/sites/296/2019/08/Payday-CFL-reports-2018-news-release-8-8-19.pdf (finding a 3.1 percent increase in the number of consumer loans made online).

58.     Given that predatory lending is on the rise, it is reasonable to anticipate the harms observed in 2011, including loss of jobs, to be worse in 2020, and to continue to worsen as these practices continue unabated. These studies demonstrate the fact that California as a whole is being harmed by the ongoing illegal activity of Defendants and demonstrate the necessity of a public injunction to prevent

4835-1837-4601, v. 1

the continued drain of scarce funds and jobs from low-income communities, and the consequent huge cost to the state.

**D. California Has a Longstanding Public Policy Against Charging and Collecting Excessive and Unconscionable Interest Rates.**

59. For years, payday and other Consumer Loan lenders, like Defendants, have lent money to financially vulnerable borrowers in California at extremely high annual interest rates, often exceeding 36% (plus the Federal Funds rate), and often many multiples of that, as in Plaintiff's case. In a "payday" loan, a consumer who can't afford to wait until their next payday receives a cash advance and, in exchange, the lender subtracts a larger amount from the consumer's paycheck or other deferred deposit, such as a postdated check. In similar transactions, lenders may extend funds through a "consumer installment" loan, payable over a longer period of time. In both situations, borrowers very often renew or extend the loans when they are unable to pay them off, creating a cycle of mounting debt due to the compounding of extremely high interest rate.

60. Over the past decade, high-interest Consumer Loan lending operations have become "one of the fastest growing segments of the consumer credit industry," and as of 2005, "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday and Lenders & Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 759 (2012) (quoting Karen Francis, Note, *Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

61. California policymakers are aware of the serious threat posed to the general public through the predatory lending activities, and have recently reaffirmed California's robust state policy against such unconscionable lending practices. As explained by the Senate Judiciary Committee in July 2019, the charging of rates above 36% (plus the Federal Funds rate) is unconscionable, unfair and violates consumer protection standards.

> This bill seeks to promote affordable and accessible credit for consumers and give responsible lenders confidence in the regulatory stability in California so they can expand and offer safer loan alternatives to consumers. The lack of guidance from the Legislature on allowable interest rates for loans of $2,500 - $10,000 has led to a "wild west" where unscrupulous lenders are charging interest rates from 100% to more than 200% on these

larger installment loans. Consumers are struggling under these egregious terms, and at least one out of three consumers default on these debts.

These high default rates and unconscionable interest rates have caused turmoil in the regulatory environment. In recent years, the Legislature has considered bills designed to address this problem, but which also would have restricted access to carefully underwritten loans made by responsible lenders. Meanwhile, the ongoing class action lawsuit against high-cost lender, CashCall, led to a unanimous California Supreme Court opinion in August 2018 that decided that these sky-high interest rates may be considered "unconscionable."

…

**2. Consumer protection and the CFL**
The Legislature has long considered consumer protection to be a matter of high importance. State law is replete with statutes aimed at protecting California consumers from unfair, dishonest, or harmful market practices. For example, the Consumer Legal Remedies Act was enacted "to protect the statute's beneficiaries from deceptive and unfair business practices," and to provide aggrieved consumers with "strong remedial provisions for violations of the statute." (Am. Online, Inc. v. Superior Court (2001) 90 Cal.App.4th 1, 11.) Similarly, for over 70 years, California's Unfair Practices Act (Bus. & Prof. Code § 17000, et seq.) has protected California consumers from "unlawful, unfair or fraudulent business act[s] or practice[s]." (Bus. & Prof. Code § 17200.) Consumer protection in the banking and finance sector is no less a matter of fundamental public policy. The CFL (Fin. Code § 22000 et seq.) declares that it "shall be liberally construed and applied to promote its underlying purposes and policies," which is, among other things, "[t]o protect borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders." (Fin. Code § 22001.)

**3. Protecting consumers: a Goldilocks interest rate cap and other protections**
This Committee has viewed an annualized interest rate cap of 36 percent on small dollar loans as an appropriate consumer safeguard. The benchmark 36 percent rate cap for small dollar lending emerged in the first half of the twentieth century as a mechanism to control the then-extant "black market for illegal usurious small loans[] run by loan sharks." As of 2013, "over 35 jurisdictions – 70 [percent] of states – still provide for annual interest rate caps at the 36 [percent] benchmark or less within their statutory schemes governing small-dollar installment loans by nonbank lenders." Many other states have therefore already outlawed risky, triple-digit annual percentage rate (APR) loans for various loan amount ranges. The 36 percent rate cap has endured because it works on a practical level. A 36 percent interest rate cap results in payments that borrowers are more likely to be able to make while actually paying off the loan, and also forces lenders to offer longer term loans with a more affordable structure and to more carefully consider ability to pay to avoid write offs prior to lending. As stated by one lender, OneMain Financial, writing in support of the bill, 36 percent is considered the "Goldilocks rate," the level at which "lenders can offer robust underwriting protections and consumers can access credit affordably."

This bill installs the 36 percent Goldilocks rate cap for loans of at least $2,500 but less than $10,000. This strong, sensible consumer protection is arguably needed now more than ever. According to data from the DBO, the largest category of consumer loans by volume that originated in 2017 was the $2,500-$4,999 range, totaling 547,002.2 The report indicates that 58.8 percent, or 321,423, of the loans carried APRs of 100 percent or higher.

Senate Judiciary Committee, AB 539(July 9, 2019), available at http://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200AB539.

FIRST AMENDED COMPLAINT

4835-1837-4601, v. 1

62.     The state has confirmed that 36% (plus the Federal Funds Rate) is a reasonable threshold and that interest rates that are charged above that amount are unconscionable.

63.     These same considerations, standards, limits and concerns existed long prior to 2020 and establish that the rates at issue here, exceeding 36% (plus the Federal Funds rate), have always been unconscionable as a matter of state policy.

**E.     Defendants Have Charged Excessive And Unconscionable Interest Rates And Intend To Continue To Do So, Making Public Injunctive Relief Important.**

64.     On information and belief, Opportunity conspires with certain third parties, including FinWise Bank, to skirt California state lending laws through a fraudulent "rent a bank" enterprise. These schemes, which have led to federal criminal convictions for violations of the Racketeer Influenced Corrupt Organization ("RICO") Act, as well as various civil and regulatory consequences, usually take the following form:

65.     First, a lender, such as Opportunity, desires to evade state law interest rate caps, such as the recently reaffirmed unconscionability standard that is a longstanding part of California law, or the strict statutory limits that have long applied to loans in the amount Plaintiff and other members of the general public obtained. *See* Cal Fin. Code, § 22000 *et seq.*; *See also* Fin. Code 23302-22303; Cal. Civ. Code § 1670.5.

66.     Second, the lender contacts a bank, such as FinWise, based in a state believed by the lender to have relatively lax regulation of interest rates (whether generally, or within a certain dollar range).

67.     Third, the two parties agree to form an enterprise in which the bank, such as FinWise, will appear as the nominal "lender" on the loan documentation (such as Plaintiff's Agreement), thereby effectively "renting" their state charter to the finance lender, Opportunity, who will conduct almost the entirety of the actual lending functions such as underwriting, decision making, strategy, marketing, collections, servicing, customer service, and similar which the bank itself conducts little to no traditional lending functions.

68.     The arrangement is a façade employed to make it appear that lenders such as Opportunity are not the finance lender and to avoid interest rate limitations on borrower's transactions. In such

4835-1837-4601, v. 1

arrangements, known as "rent a bank" or – when the partner is an Indian nation – "rent a tribe," the loans are funded through other third-parties controlled and directed by the Consumer Loan lender, and/or prearranged for immediate purchase. The amount of actual involvement of the bank (or tribe) is minimal nominally "approving" loans through an automated or semi-automated process provided or "licensed" from the lender, that involves little to no actual oversight. For example, in *United States v. Tucker et al* it was described how the defendants made use of a "rent a tribe" enterprise in which the defendants:

> [C]aused members of two of the tribes . . . to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of loans that the [Consumer Loan lenders], through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers.

*U.S. v. Tucker et al.*, Indictment, Feb. 9, 2016, 16CRIM091, (S.D.N.Y. 2016).

69.     Thus, even where the finance lender claims that the bank partner "approves" or takes other actions typical to a lending agreement, it is clear that such claims cannot be taken at face value as involving any sort of traditional underwriting or banking activity.

70.     While many Consumer Loan lenders have stated their intention to enter into such arrangements for the purpose of evading state laws,[6] Opportunity is known to have such an arrangement with FinWise. *See e.g.* Eaglesham et al, *"Rent-a-Banks" Defy States' Growing Efforts to Curb High-Cost Lending*, Wall St. Journal (Mar. 11, 2020), https://www.wsj.com/articles/rent-a-banks-defy-states-growing-efforts-to-curb-high-cost-lending-11583435510.

71.     Such arrangements do not allow Defendants to avoid the lending laws set forth herein. *See Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d. Cir. 2015). Such arrangements are a sham. Such conduct is deceptive and unlawful and should be enjoined for the benefit of the general public.[7]

---

[6]     *See, e.g.,* Enova Earnings Call (July 25, 2019), https://www.fool.com/earnings/call-transcripts/2019/07/26/enova-international-enva-q2-2019-earnings-call-tra.aspx ("The bill will not impact our single-pay product, and we will likely convert our near-prime product to a bank-partner program, which will allow us to continue to operate in California at similar rates to what we charge today. Throughout, we don't think that California though is the right answer for consumers who need access to credit. We also do not believe that it will have a material impact on our business. More specifically, the bill would not be effective until next year, so it will have no impact on 2019.").

[7]     As discussed, persons have been held liable for similar deceptive activities attempting to make it appear as if another entity was not the finance lender, challenged under RICO and other laws. *See e.g.*,

72. The finance lender on the loan contracts is misrepresented to be someone other than Opportunity. The deception and misrepresentation is material as the consequence of disclosing the finance lender, and the reduced interest rate that would have to be charged is a fact reasonable consumers/borrowers like Plaintiff would want to know at the time of the transaction and would cause them to act differently (*e.g.*, by rationally demanding a lower interest rate). The critical fact that by substituting FinWise Bank for Opportunity as the nominal lender on the transaction's Promissory Note at the last minute (or adding in a confusing manner "Lender: FinWise Bank C/O Opportunity"), when

---

U.S. Attorneys' Office, *RICO Conspiracy Charged in Payday Lending Case* (June 22, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/rico-conspiracy-charged-in-payday-lending-case):

> According to the information unsealed today, between 1998 and 2012, Rubin owned, controlled, financed, and/or worked for multiple businesses that issued short-term loans, commonly known as "payday loans." Rubin allegedly conspired with other people to evade state usury laws and other restrictions on payday loans by engaging in a series of deceptive business practices that included: (a) paying a federally-insured bank, which was not subject to state laws, to pretend that it was the payday lender; (b) relocating his operations to a state considered "usury friendly;" and (c) paying an Indian tribe to pretend that it was the actual payday lender as part of a scheme to have the tribe claim that "sovereign immunity" prevent application of state usury laws and other regulations.

*See also*, U.S. Attorneys' Office, *Owner Of Payday Lending Enterprise Sentenced To 10 Years In Prison For Orchestrating $220 Million Fraudulent Lending Scheme* (June 12, 2018), https://www.justice.gov/usao-sdny/pr/owner-payday-lending-enterprise-sentenced-10-years-prison-orchestrating-220-million ("Customers across the country, numerous state regulators, and consumer protection groups complained about the Hydra Lenders' deceptive and misleading practices in issuing usurious and fraudulent loans. Beginning in approximately 2006, in an attempt to avoid civil and criminal liability for his conduct, and to enable the Hydra Lenders to extend usurious loans contrary to state laws, Moseley made it appear that the Hydra Lenders were located overseas. Specifically, Moseley nominally incorporated the Hydra Lenders first in Nevis in the Caribbean, and later in New Zealand, and claimed that the Hydra Lenders could not be sued or subject to state enforcement actions because they were beyond the jurisdiction of every state in the United States. In truth, the entirety of Moseley's lending business, including all bank accounts from which loans were originated, all communications with consumers, and all employees, were located at Moseley's corporate office in Kansas City, Missouri."); U.S. Attorneys' Office, *Scott Tucker And Timothy Muir Convicted At Trial For $3.5 Billion Unlawful Internet Payday Lending Enterprise; Defendants Exploited Over 4.5 Million Financially Struggling Americans Through Unlawful Scheme to Evade State Usury Laws*, (Oct. 13, 2017), https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial-35-billion-unlawful-internet-payday ("Acting Manhattan U.S. Attorney Joon H. Kim stated: "As a unanimous jury found today, Scott Tucker and Timothy Muir targeted and exploited millions of struggling, everyday Americans by charging them illegally high interest rates on payday loans, as much as 700 percent. Tucker and Muir sought to get away with their crimes by claiming that this $3.5 billion business was actually owned and operated by Native American tribes. But that was a lie. The jury saw through Tucker and Muir's lies and saw their business for what it was – an illegal and predatory scheme to take callous advantage of vulnerable workers living from paycheck to paycheck.").

FIRST AMENDED COMPLAINT

4835-1837-4601, v. 1

Opportunity is the finance lender conducting all lending and processing functions with borrowers on the opploans.com website or otherwise, causes a significant interest rate change (from 30% to 160%) is not disclosed and explained to borrowers like Plaintiffs, to their financial detriment.

73. Indeed, far from disclosing the fact that due to their arrangement with FinWise the borrower would be charged interest many multiples above the maximum allowed by the law of his home state, California, Defendants instead conspire to represent and do represent, in large and bold typeface, reassurances that the relationship will be formed between the borrower and OppLoans. For example, on the website which Plaintiff visited before taking out his loan, the following representations are made:

    **A.** "**Apply for Online Installment Loans Through OppLoans**";

    **B.** "**More Affordable Payments**";

    **C.** "**Payday loans average an APR of 400%. Compare to maximum 199% APR offered through OppLoans!**";

    **D.** "**Personal Service**";

    **E.** "**We treat <u>our customers</u> like family. Become one of the <u>300k+ customers that trust Opploans for their funding needs</u>**";

    **F.** "**About us: we are a leading financial technology platform focused on helping middle income, credit-challenged consumers build a better financial path. Our mission driven culture means we keep the customer at the center of everything we do. We are passionate about <u>creating accessible lending products </u>that deliver a top-rated customer experience to the millions of Americans who are turned away by traditional providers**";

    **G.** "**Our Mission: <u>To provide</u> financial inclusion to the middle income, credit-challenged consumer through the best available products and an unwavering commitment to <u>our customers</u>**";[8]

74. Thus, far from disclosing their distance to the transaction at issue, OppLoans make a great showing of their "personal" connection to the transactions it solicits, markets, makes, and

---

[8] Representations viewed through links available at https://www.opploans.com/ accessed Aug. 31, 2020, [emphasis added].

FIRST AMENDED COMPLAINT

4835-1837-4601, v. 1

eventually owns and collects. Only after following several hyperlinks and reading several lines down into the small print of footnotes would a reader be able to discover the following:

> Applications submitted on this website may be originated by one of several lenders, including: Opportunity Financial LLC, a licensed lender in certain states; or one of our lending partners. All loans originated by our lending partners will be serviced by OppLoans.[9]

75. Clicking on the hyperlink text of "lending partners" in the above paragraph will, finally, and for the first time, bring up the FinWise logo and a description of the "service" that OppLoans provides to banks.[10] Thus, reading the small print in footnotes, a California borrower such as Plaintiff could learn that they apply through OppLoans, but that OppLoans "lending partner" *"may"* originate the loan by "leveraging" OppLoans' "technology platform," but the loan will always be serviced through OppLoans.

76. Additionally, Defendants make the affirmative misrepresentation that "Our bank partners leverage our technology platform to outsource marketing and servicing while maintaining the critical control of loan origination, underwriting approvals, regulatory and compliance oversight management."[11] In fact, on information and belief, it is OppLoans who determines, at least in part, the terms of origination (including solicitation), underwriting standards, and regulatory compliance

77. Defendants further do not disclose the material fact that the consequence of their scheme to launder loans through late-disclosed (or undisclosed), out-of-state banks such as FinWise – their "lending partner" – is an increase in the interest rate, often to that over five times (or more) that permitted in California. Defendants do not disclose that the reason for partnering with such "lending partners" in California is nothing but a deceptive attempt to manipulate and evade restrictions on interest rates able to be charged under California's Financial Code and unconscionability standard. The presence and role of "lending partners" such as FinWise are presented, if at all, in the most minor and deceptive manner possible, resulting in Defendants taking advantage of unsuspecting, stressed, less sophisticated and vulnerable borrowers like Plaintiff. Reasonable borrowers, like Plaintiff, would want to know prior to completing the loan transaction that there is a significant consequence of OppLoans discretely filtering

---

[9] https://www.opploans.com/register/#step-1 last visited Sep. 1, 2020.
[10] https://www.opploans.com/bank-servicing/ last visited Sep. 1, 2020.
[11] *Id.*

FIRST AMENDED COMPLAINT

4835-1837-4601, v. 1

the loan transaction through an inconspicuous "lending partner" (that they never actually deal with because the servicing is immediately transferred back to OppLoans) for a very brief period of time (*i.e*, a number of hours) – with the secret and undisclosed purpose of evading interest rate limits and multiplying the interest rate changed several times above what otherwise could be charged under the Financial Code and any unconscionability standard. Reasonable consumers, acting rationally, would want to know this information prior to closing the loan transaction, and if told, would act differently *inter alia*, by either avoiding the loan transition altogether, demanding a lower interest rate, questioning the deceptive nature of the "partnership" arrangement, or seeking out an alternative lender that charged lower rates, not those that were unconscionably high.

78.     The aforementioned half-truths and affirmative representations above created a duty in Defendants to clearly, fully, and truthfully disclose the nature and effect of their relationship. Plaintiff and other borrowers relied upon these representations to their detriment, and entered into contracts at rates of interest they would not have accepted but for this representation. For example, a reasonable borrower would not take out a loan for several multiples of the interest rate cap of their home state if they were aware of this material information, as they would correctly surmise that they could access a cheaper and more favorable rate from a California lender that was not involved in such a scheme. In addition, by comparing themselves favorably to payday lenders, OppLoans create a distorted picture of low-credit consumer lending in California, and then proceed to step away from the loan contract itself once the consumer had been snared by these representations, diverting that borrower into a convoluted laundering scheme across state lines with minimal, confusing and contradictory disclosures (or no disclosures at all).

79.     On February 5, 2020 California State Assembly Member Limon presented a Written Statement to the U.S. House of Representatives Committee on Financial Services, addressing Consumer Loan lenders' efforts to evade consumer protections and interest rate caps. Her statement included the following:

**High-cost Lenders Declare Intent to Evade California Law via Rent-a-bank Schemes**

After Assembly Bill 539 cleared major legislative hurdles, the executive teams of three publicly traded, high-cost lending companies – Elevate Credit, Enova, and CURO – began their attempts to allay investors' concerns that California's reform efforts would

FIRST AMENDED COMPLAINT

negatively affect their companies' financial results. All three corporations controlled subsidiaries that held licenses from the state of California to make consumer loans, but those licenses required the lenders to follow state laws, including limitations on loan charges. If Assembly Bill 539 became law, these companies would not be able to make loans with interest rates that exceed the new cap. In the summer of 2019, executives at the three companies told investors during quarterly earnings calls that they were exploring the use of bank partnerships to make loans that perpetuated the high-cost and high-default model that the California Legislature specifically acted to stop....

*** 

The companies' plans to partner with banks in attempts to evade state interest rate caps did not come as a surprise. Enova and Elevate have been engaged in rent-a-bank schemes around the country for some time. Enova partners with Republic Bank, a state chartered bank from Kentucky, to originate loans that exceed rate caps in some states. Elevate partners with both Republic Bank *and FinWise Bank, a state chartered bank from Utah, to evade state consumer protection law*s.

Monique Limon, *Written Statement Before the United States House of Representatives Committee on Financial Services Rent-a-Bank Schemes and New Debt Traps: Assessing Efforts to Evade State Consumer Protections and Interest Rate Caps* 7-8 (Feb. 5, 2020), https://financialservices.house.gov/uploadedfiles/hhrg-116-ba00-wstate-limnm-20200205.pdf.

80.     The same conduct of FinWise described by Assembly Member Limon in her February 5, 2020 Written Statement for the House Committee on Financial Services Hearing "to evade California Law via Rent-A Bank Schemes" is also engaged in by FinWise with respect to its' dealings and Consumer Loan transactions with Opportunity. *See* Exh. A. FinWise and Opportunity seek to evade California law in the same way and Plaintiffs' transaction is an example of that. *See* Exh. A. Given that Plaintiff's transaction occurred after the February 5, 2020 Committee on Financial Services Hearing, it is clear that Defendants were aware of the illegality of their conduct and acted intentionally in furtherance of their unlawful scheme anyway, without disclosure of material facts contained in Limon's Statement to borrowers like Plaintiff. Such conduct by Defendant was deceptive and misleading.

81.     The foregoing demonstrates that risk of future injury to the general public continues to exist, making prospective public injunctive relief appropriate and necessary. Plaintiff has obtained installment loans from Defendants in the past and is likely to apply for another installment loan in the future due to financial circumstances and economic conditions. Absent the injunctive relief now sought, Plaintiff, like other members of the general public, may be charged an unconscionably high interest rate resulting in further financial injury and damage.

FIRST AMENDED COMPLAINT

82.     Due to Defendants' deceptive practices, Plaintiff and other members of the general public currently pay, continue to pay and/or are at risk of paying in the future unconscionable interest rates on their loans: (a) which exceed 36% (plus the Federal Funds rate) on loans over $2,500, and (b) which exceed 30% on loans below $2,500. Fin. Code § 22303; 22304.5; Civ. Code § 1670.5. Such practices employed by Defendants are misleading and unlawful and should be immediately enjoined, declared unlawful and any future amounts collected which exceed that rate should be put into a constructive trust for the benefit of the general public (of which Plaintiff is one), as further directed by the court. Pursuant to Fin. Code § 22750 and/or other applicable law, such loans are void, all principal and interest is forfeited and treble damages should be awarded. Alternatively, pursuant to Fin. Code § 22752 all interest and charges on the loans should be forfeited.

83.     Additionally, while Defendants appear to see the Utah Consumer Credit Code as granting them *carte blanche* to engage in whatever usurious lending practice, less vigorous enforcement does not equate to legality or conscionability. In fact, under Utah's longstanding laws pertaining to unconscionability and usury, contracts bearing significantly lower rates of interest than Defendants have been held unconscionable irrespective of the statutory scheme in place at the time, and the present Utah Code contains specific tools to enable courts to refuse to enforce unconscionable and unlawful contracts (Utah Code §§ 70A-2-302, 70C-7-106(1)), award penalties to debtors subject to such contracts (Utah Code § 70C-7-106(4)), impose maximum default "reasonable rates," (Utah Code § 15-1-1), and compensate debtors who have been overcharged interest above a lawful rate through crediting overpayments against principle or, where a reasonable refund request is unreasonably denied, awarding *ten times* that amount as a penalty (Utah Code § 70C-7-201).

84.     In addition, Utah has a longstanding common-law tradition of invalidating unconscionable and usurious loans, including those with comparable or lower rates than Defendants' Consumer Loans. *See, e.g., Carter*, 38 Utah at 381 (60% APR on promissory note lent to an individual with little business experience or literacy unconscionable, and finding a debt fully paid where "the plaintiff received the full amount of money loaned to the defendant and interest at the rate of 15 per cent. per annum."); *Danjanovich v. Robbins*, No. 2:04-CV-623 TS, 2005 WL 2457090, at *5 (D. Utah Oct. 5, 2005) (finding an interest rate of 100% per month in a promissory note between sophisticated

FIRST AMENDED COMPLAINT

corporate actors unconscionable and substituting a reasonable rate of 10% according to Utah Code § 15-1-1.); *Engert*, 40 Utah at 239 (120% APR interest on a private promissory note for $50 "unjust, and unreasonable, and an unconscionable rate" and "against public policy and good morals to hold otherwise and to countenance such transactions"); *Sheedy*, 2016 WL 6902513, at *5 ("Under Utah law, an unconscionable consideration 'is, in law, no consideration'") (citing *Engert*, 40 Utah at 239).

85.     Thus, while Defendants' scheme is certainly devious, it is also misguided – nothing in Utah law or policy can be reasonably read as an invitation to exploit the state's nominal lack of a formal interest rate cap by selling out Utah bank licenses to the highest bidder, or treat the state as a lawless haven for consumer abuse and exploitation. Like California, Utah has a robust consumer protection law and policy.

86.     Additionally, nothing about Defendants' scheme takes OppLoans outside of the definition of a "finance lender" subject to the California Finance Lender's Law, as notwithstanding its attempts to evade California's regulatory scheme, it is still clearly "engaged in the business of making consumer loans" which "may include lending money and taking, in the name of the lender, or in any other name, in whole or in part, as a security for a loan . . . any lien on, [or] assignment of . . . wages, salary, earnings, income, or commission." Cal. Fin. Code § 22009. By lending money and taking in its own name or that of FinWise, and by requiring repayment including through the preauthorization of electronic funds discussed *infra*, OppLoans is a "finance lender" and is thus subject to the financial code's restrictions, including that "[n]o amount in excess of that allowed by this article shall be directly or indirectly charged, contracted for, or received." Cal. Fin. Code § 22306. Reading these provisions liberally in favor of the consumer-protective explicit legislative intent, it is clear that Defendants cannot escape scrutiny through its ploy.

87.     Further, the Finance Lenders Law has a specific "anti-subterfuge" provision:

> No person, except as authorized by this division, shall directly or indirectly charge, contract for, or receive any interest, discount, or consideration greater than the lender would be permitted by law to charge if he or she were not a licensee hereunder, upon the loan, use, or forbearance of money, goods, or things in action, or upon the loan, use, or sale of credit. This section applies to any person, who by any device, subterfuge, or pretense charges, contracts for, or receives greater interest, consideration, or charges than is authorized by this division for any loan, use, or forbearance of money, goods, or things

FIRST AMENDED COMPLAINT

in action or for any loan, use, or sale of credit.[12]

88.     Finally, the Finance Lenders Law – demonstrating the legislative commitment to preventing precisely the harms wrought by Defendants – even contains a specific "anti-evasion" provision, which states:

> Any person who contracts for or negotiates in this state a loan to be made outside the state for the purpose of evading or avoiding the provisions of this division is subject to the provisions of this division.[13]

89.     These sections, read liberally in favor of the consumer-protective legislative intent, demonstrate a commitment in California to protecting the general public from the harms wrought by Defendants' practices at issue herin.

90.     The situation is one in which members of the public, including Plaintiff, partially due to the financial devastation caused by the unethical practices of Consumer Loan lenders such as Defendants, find themselves in ever-increasing need of access to credit. Meanwhile, such lenders, including Defendants, have clearly expressed their intention to flout rules specifically designed to protect members of the public such as Plaintiff.

91.     The foregoing section shows, *inter alia*, that the risk of future harm to Plaintiff and the general public, both on current and future loan transaction installment payments, is immediate and continuing making immediate public injunctive and declaratory relief appropriate.

**F.      Plaintiff's Transactions with Defendants.**

92.     On or about February 14, 2020, Plaintiff obtained a new Consumer Loan (effective February 18, 2020) from Defendants with an excessive, unconscionable, and unlawfully high nominal interest rate of 160.65% APR. In doing so, Plaintiff incurred financial damage, injury, and out-of-pocket loss. The Consumer Loan's term was 9 months, with monthly payments of approximately $275.52 due beginning March 1, 2020 and continuing through November 1, 2020. Total payments due over the loan period is $2,479.74, including repayment of the Amount Financed of $1,500, and a Finance Charge of $979.74. The "Loan #" assigned to Plaintiff by Defendants was ***-******200 and the "Customer #"

---

[12] Cal. Fin. Code § 22326.
[13] Cal. Fin. Code § 22324.

4835-1837-4601, v. 1

was \*\*\*-\*\*\*\*352. *See* Exh. A. Plaintiff obtained the loan for personal, family or household use and continues to make scheduled payments on the loan.

93. In entering into the loan transaction Plaintiff responded to online marketing on Defendant Opportunity's website (opploans.com) offering to extend him credit for personal, family or household use.

94. The marketing did not conspicuously disclose that if funded, the "lender" on the Promissory Note would suddenly be changed to a different entity, or that doing so would have a significant effect on the interest rate charged. Defendants did not disclose that California law limits interest rates on loans under $2,500 to 30% and on loans over $2,500 to 36% (plus the Federal Funds Rate), despite Defendants' superior and/or exclusive knowledge of this fact. The marketing did not disclose that the interest rates available for loans were at unconscionably high rates and that the consumer's recourse was limited by unconscionable arbitration clauses and/or waivers that made enforcement of widespread unlawful practice difficult and less feasible. Defendants did not disclose any facts described in Assembly member Limon's Statement to the House Committee on Financial Services, *supra*. Defendants did not disclose that by adding FinWise's name to the "lender" box on the Promissory note "C/O Opportunity", an entity Plaintiff never dealt, the interest rate would be five time higher than the limit in Fin. Code §22302. Indeed, ironically the OppLoans website as early as August 20, 2018 featured a blog post about the litigation surrounding its then-competitor, the now effectively defunct CashCall, in which *inter alia*, it acknowledges that there are "interest rate caps placed on consumer loans less than $2,500"[14] and cites a San Francisco Chronicle article which opens with the following:

> California law strictly limits interest rates on loans of less than $2,500, and sets no numerical ceiling on interest for higher loans. But the state Supreme Court says rates on loan for $2,500 or more can nevertheless be so oppressive – or "unconscionable" – that they violate the law.

Bob Egelko, *California High Court: 200+ Percent Interest Loans "Unconscionable,"* S.F. Chron. (Aug. 15, 2018), https://www.sfchronicle.com/bayarea/article/Loans-with-200-percent-interest-rates-are-13153780.php. The foregoing were material facts that reasonable consumers, like Plaintiff, would have

---

[14] Ben Moore, *California Payday Loan Provider Shut Down Due to "Unconscionable" APRs*, OppLoans (Aug. 20, 2018), https://www.opploans.com/payday-news/california-payday-lender-shut-down-due-to-unconscionable-aprs/.

4835-1837-4601, v. 1

wanted to know prior to closing the transaction. When Plaintiff viewed the representations on Defendant Opportunity's website, he trusted that he was going to be borrowing from Opportunity, and would therefore be able to benefit from the representations of that company as unlike the usurious and exploitative companies from which it affirmatively distinguished itself. In fact, as shown both by its covert dealings with FinWise and its ultra-high interest rate, in violation of Utah and California law, Opploans never intended to act in a different manner to CashCall, and instead borrowed heavily from its unlawful and unconscionable playbook in representing, contracting for, and collecting charges on its loans to Plaintiff and the general public.

95.    Defendants had a duty to disclose material facts to Plaintiff and other members of the general public given: (1) their exclusive knowledge of material facts not known or reasonably accessible to the Plaintiff; (3) actively concealment of a material fact from the Plaintiff; and/or (3) since they made partial representations that are misleading because some other material fact has not been disclosed.

96.    Such misrepresentations and omissions of fact were material to reasonable consumers/borrowers like Plaintiff. Had such facts been clearly disclosed and explained prior to the time the loan was funded, Plaintiff would have acted differently (e.g. demanding an interest rate within the 30% limit and not agree to an unconscionably high rate over 160%). Such facts could have been disclosed to Plaintiff in a manner Plaintiff, like other borrowers in the general public, would have been exposed. *E.g.*, written disclosure at the time of any loan application was submitted.

97.    In response to Defendants' advertising and statements, and in reliance on the material omissions of fact, Plaintiff filled out Defendants' loan application and forms online on Opportunity's website.

98.    The purpose of the loan proceeds provided Plaintiff was personal, family or household use.

99.    The form contracts that Defendants used to memorialize Plaintiff's transaction, like those used in transactions with other members of the general public, were contracts of adhesion, all drafted on standard forms with terms dictated by Defendants and generated automatically online or otherwise electronically, without any opportunity by the borrower for individual negotiation or modification.

FIRST AMENDED COMPLAINT

100.     The formation of Plaintiff's contracts, like those of the general public, along with any Terms of Use (*see* Opportunity Financial, LLC, https://www.opploans.com/rates-and-terms/ (last visited Aug. 27, 2020)), involved procedural unfairness, unconscionability, and oppression. The process often involves undue oppression arising from an inequality of bargaining power and severe financial stress. The relative bargaining power between borrowers desperately needing credit, on one hand, and Defendants, on the other is unequal. Consumers obtaining consumer installment loans are often people with limited incomes and under financial stress with amounts due and owing to third parties. *See generally* Pew Charitable Trusts, *Auto Title Loans: Market Practices and Borrowers' Experiences* 6 (March 2015), https://www.pewtrusts.org/-/media/assets/2015/03/autotitleloansreport.pdf ("50% of borrowers have trouble meeting expenses at least half of the time. 3 in 10 struggle to make ends meet most months."). Having borrowers sign authorizations for electronic fund transfers for any amounts claimed due, even if unlawful, creates additional unfairness, coercion, and oppression for borrowers.

101.     Any attempt by Defendants through their Loan Agreements to limit their liability or Plaintiff's ability to assert legal claims, including those for public injunctive relief, is unconscionable, unfair and void. Cal. Civ. Code § 3513; Utah Code § 70C-7-106.

102.     The loan application process experienced by Plaintiff and others is one where the borrowers are often under pressure to hurry and sign. https://www.discover.opploans.com ("Easy online application, quick decisions, and funds the next day!" [emphasis in original]; "Fast Funding. Getting you the money you need now."; "Get a decision as soon as today!").

103.     The interest rates, fees, and other terms charged to Plaintiff and the public by Defendants exceed fair value and do not reflect Defendants' cost components of obtaining the money lent and in making and administering the loan.

104.     Further, rather than create a fair and balanced system procedurally, Defendants use arbitration clauses in their form loan contracts of adhesion to distort the process and attempt to create a system in which the more vulnerable and financially challenged party (here, Plaintiff and other members of the general public) is hamstrung in their ability to enforce their rights and terms against the more powerful (Defendants) on an equal playing field. The ability of borrowers like Plaintiff to seek legal relief is significantly hindered. This is done by Defendants in an unfair attempt to insulate themselves

4835-1837-4601, v. 1

against being held responsible in court (or any other forum) for charging excessive interest rates on a widespread and systematic basis. Even with a sixty day opt-out period, borrowers like Plaintiff are handicapped as it is difficult to discern unlawful and abusive conduct and secure legal representation to assist within a short 60 period from the date of the transaction. Further, by attempting to prohibit borrowers like Plaintiff from bringing collective and class actions in court to obtain past damages through the insertion of arbitration clauses and waivers in loan contracts, Defendants further attempt to hamstring Plaintiff and the general public by imposing procedurally unconscionable terms and burdens on them. Individual consumers can rarely hire private counsel and attempt to prosecute an individual case in either court or private arbitration on a true individual basis as the costs of prosecution, and retaining counsel, likely far exceed the amount in controversy and in turn, the potential plaintiff's ability to pay. The standard arbitration clause and waiver against collective arbitration that Defendants insert in their standard form loan contracts of adhesion, is intended to serve as a procedural barrier for Plaintiff and deterrent against the assertion by borrowers of their legal rights. Under both California and Utah law, an arbitration clause may be found unconscionable under generally applicable contract principles, and may contribute to the overall unconscionability of the contract.

**G.      Improper Preauthorization of Electronic Transfers in Violation of 15 U.S.C. § 1693k(1)**

105.     In addition to the insertion of unconscionable procedural hurdles to meaningful relief, Defendants also violated the Electronic Funds Transfer Act, 15 U.S.C. § 1693k(1) ("EFTA") by conditioning the extension of credit to Plaintiff and the general public on the borrower's repayment by means of preauthorized electronic funds transfers. As part of the application process, Defendants required Plaintiff to preauthorize electronic fund transfers. This was unlawful and violative of the EFTA. No exceptions exist for consumer convenience, or for clauses that allow consumers to revoke authorization. *See e.g. de la Torre v. CashCall, Inc.*, 56 F. Supp. 3d 1073, 1089-91 (N.D. Cal.) *on reconsideration,* 56 F. Supp. 3d 1105 (N.D. Cal. 2014), *judgment entered,* No. 08-CV-03174-MEJ, 2014 WL 7277377 (N.D. Cal. Dec. 22, 2014), and *vacated and remanded*, 904 F.3d 866 (9th Cir. 2018), and

*vacated and remanded*, 904 F.3d 866 (9th Cir. 2018)[15]; *F.T.C. v. PayDay Fin. LLC*, 989 F. Supp. 2d 799, 811 (D.S.D. 2013)

106.     Defendants condition the extension of credit to borrowers with a checking or savings account and borrowers who receive paychecks through direct deposit. *See* https://www.opploans.com/faqs/ ("What are the requirements and eligibility to apply for a loan? In order to submit an application that our underwriting can review, applicants must: … Have a checking or savings account [and] Receive paychecks through direct deposit (Due to state regulations, New Mexico residents are exempt from this requirement)").

107.     Upon information and belief, Defendants condition the electronic transfer and/or direct deposit of loan proceeds to borrowers who agree to repay the loan using automated payments.

108.     Upon information and belief, Defendants do not allow borrowers to make regular payments by traditional check payments. Rather, Defendants require borrowers to authorize Defendants to computer generate checks bearing their account numbers. *See* https://www.opploans.com/faq-category/account-loan-repayment/ ("How can I repay my personal loans? It's important to OppLoans to offer easy and convenient ways to pay back your loan. The most popular and preferred method for many customers is through electronic fund transfer (EFT). We also offer a recurring payment option of remotely created checks. For one-time payments, we accept debit cards and EFT.").

109.     Defendants do not allow borrowers to terminate automated payments online or in writing. Rather, borrowers must speak with Defendants by telephone to request terminating automated repayment. *See* https://www.opploans.com/faq-category/account-loan-repayment/ ("How do I update my repayment method? If you would like to change your repayment method, please Contact Us and our Advocates will assist you.").

110.     The insertion of these unlawful preauthorizations as a condition of contract further demonstrates their unconscionable nature generally, and as unlawful consideration renders these contracts unlawful.

---

[15] While this case was vacated and remanded consistent with the California Supreme Court's ruling on the unconscionability standard discussed herein, the District Court's finding as to the EFTA was not part of those later decisions.

**H.    Claims for Public Injunctive Relief Cannot be Waived.**

111.    Any attempt to restrict claims for public injunctive relief is substantively unconscionable, contrary to California public policy and unenforceable. *See McGill*, 2 Cal. 5th at 956, 961 ("Agreements to arbitrate claims for public injunctive relief under the CLRA, the UCL, or the false advertising law are not enforceable in California." Cal. Civ. Code § 3513 provides: "Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement.").

112.    Despite this, Defendants' Promissory Note states that "[y]ou also waive your right to seek a public injunction" and "[i]n no event will a claim for public injunctive relief be arbitrated." Exh. A. Such a clause is unconscionable, void, contrary to public policy and Cal. Civ. Code § 3513.

113.    On or around April 2, 2020, Plaintiff submitted via mail and email an opt-out to the Defendants' arbitration clause, as provided for in that clause which reads as follows:

> Write us within 60 calendar days of signing this Note to opt-out of this Clause via email at compliance@opploans.com or by mail to OppLoans, ATTN: Compliance Department, One Prudential Plaza, 130 E Randolph St, Suite 3400, Chicago, IL 60601. List your name, address, loan number and date. This is the only way you can opt out.

Exh. A.

114.    As Plaintiff successfully opted out of the arbitration agreement, no part of that agreement binds him.

115.    "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Cal. Civ. Code § 1668. Clearly, the Promissory Note and, specifically, its Arbitration Clause is just such a contract.

116.    The Promissory Note on Plaintiff's loan is unlawful and should be declared void due to the unconscionable interest rate and high degree of procedural unconscionability. Fin. Code § 22750; Utah Code §§ 15-1-1, 70A-2-302, 70C-7-106, 70C-7-201. Additionally, Defendants should be prohibited from attempting to collect any further principal, interest, or other finance charges and fees on Plaintiff's loan, and a prospective public injunction prohibiting similar conduct should be issued.

# I.     California Law Limits the Charging of Excessive and Unconscionable Interest Rates.

117.    As detailed further herein, California law grants this Court the power to, among other things, void unconscionable contracts like Plaintiff's and other members of the general public and prevent companies like Defendants from continuing to collect on them, whether directly or indirectly through servicing agents and/or other affiliates.

118.    Specifically, the Civil Code grants the court authority to refuse to enforce a contract that has been declared unconscionable at the time it was made as a matter of law:

> (a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
>
> (b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination.

Cal. Civ. Code § 1670.5.

119.    Cal. Civ. Code § 1670.5 applies to the provisions of loan contracts, like Plaintiff's, through Financial Code § 22302, which provides in pertinent part:

> (a) Section 1670.5 of the Civil Code applies to the provisions of a loan contract that is subject to this division.
>
> (b) A loan found to be unconscionable pursuant to Section 1670.5 of the Civil Code shall be deemed to be in violation of this division and subject to the remedies specified in this division.

Cal. Fin. Code § 23302.

120.    Thus, if a loan is found to be unconscionable pursuant to California Civil Code § 1670.5, it is subject to the remedies available under Division 9 of the California Financing Law. This includes, *inter alia*, Financial Code § 22750, preventing enforcement of the contract, and further collection of principal or other charges in connection with the transaction.

121.    Specifically, Financial Code § 22750, found in Chapter 4 of Division 9, provides:

> (a) If any amount other than, or in excess of, the charges permitted by this division is willfully charged, contracted for, or received, ***the contract of loan is void, and no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction***.

4835-1837-4601, v. 1

(b) If any provision of this division is willfully violated in the making or collection of a loan, whether by a licensee or by an unlicensed person subject to this division, the **contract of loan is void, and no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction**.

122. As with any other price term in an agreement governed by California law, an interest rate may be deemed unconscionable. *De La Torre*, 5 Cal. 5th at 976 .

123. A determination of unconscionability has both a procedural and substantive aspect. The procedural aspect is manifested by (1) "oppression," which refers to an inequality of bargaining power resulting in no meaningful choice for the weaker party, or (2) "surprise," which occurs when the supposedly agreed-upon terms are hidden in a prolix document. Substantive unconscionability, on the other hand, refers to an overly harsh allocation of risks or costs which is not justified by the circumstances under which the contract was made.

124. All Consumer Loans directly or indirectly funded by Defendants: (a) between $300 and $2,500, with interest rates exceeding 30% and (b) between $2,500 and $10,000, with interest rates exceeding 36% (plus the Federal Funds rate), are both substantively and procedurally unconscionable and unlawful. Cal. Civ. Code § 1670.5; Financial Code § 22302; Financial Code § 22304.5. This action seeks public injunctive relief on behalf of all persons within the general public currently subject to, or who in the future will be at risk of being subject to, such loans funded by Defendants.

125. Defendants' Consumer Loans, such as Plaintiff's, are procedurally unconscionable due to the absence of meaningful choice on the part of the borrower evidenced by (1) oppression, that is, an inequality of bargaining power resulting in an absence of meaningful choice, or (2) surprise, which occurs when the objectionable term is hidden in the fine print and prolix of the standard form adhesion contract.[16]

_____

[16] Defendants also violated California Financial Code § 22150 through their practice of funding loans like Plaintiffs without regard to the borrower's ability to repay the loan. Section 1452 of Title 10 of the California Code of Regulations was promulgated pursuant to Financial Code § 22150, and provides:

When making or negotiating loans, a finance company shall take into consideration, in determining the size and duration thereof, the financial ability of the borrowers to repay the same, to the end that the borrowers should be reasonably able to repay said loans in the time and manner provided in the loan contracts.

Cal. Code Regs. tit. 10, § 1452.

126.    Consumer Loans, such as Plaintiff's, are substantively unconscionable because they impose a cost on the borrower that is overly harsh and disproportional to the price of credit and related costs. *See, e.g.*, *Carboni v. Arrospide*, 2 Cal. App. 4th 76 (Cal. Ct. App. 1991) (200% interest rate was unconscionable). During the relevant time period, interest rates have been at historic lows. The price of credit that Defendants charged Plaintiff and the general public is several times its true value, without justification. Defendants did not disclose material facts in effort to steer Plaintiff and other members of the general public into high interest rate loans.

**J.    Utah Law Limits the Charging of Excessive and Unconscionable Interest Rates.**

127.    As detailed further herein, Utah law grants this Court the power to, among other things, void unconscionable contracts like Plaintiff's those with other members of the general public, and prevent companies like Defendants from continuing to collect on them, whether directly or indirectly through servicing agents and/or other affiliates.

128.    Pursuant to Utah Code § 70C-7-106(4)(a), a court may find a consumer credit agreement or any part thereof to have been unconscionable. Upon such a finding, the court will refuse to enforce the obligation, and the debtor may recover a penalty of not less than $100 nor more than $5,000 and the cost of the action together with reasonable attorney's fees.

129.    By way of their conduct in inserting highly substantively unconscionable terms, such as the extortionate interest rate, into their consumer credit contract for Plaintiff and the general public's Consumer Loans, and by presenting them uniformly in a procedurally unconscionable manner, Defendants rendered such Consumer Loans unconscionable, unenforceable, and in violation of Utah Code § 70C-7-106.

130.    Courts applying Utah law to determine unconscionability typically consider both procedural and substantive unconscionability. *See, e.g., Carter*, 38 Utah at 381 (60% APR on promissory note lent to an individual with little business experience or literacy unconscionable, and finding a debt fully paid where "the plaintiff received the full amount of money loaned to the defendant and interest at the rate of 15 per cent. per annum."); and *O'Brien*, 2012 WL 1609957, at *4 ("As in California, a two-pronged analysis is used to determine whether a contract is unconscionable – substantive and procedural unconscionability.") (citing *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395,

402 (Utah 1998)).

131.     However, courts applying Utah law will find a loan contract unconscionable based on the rate of interest alone. *See, e.g., Danjanovich*, 2005 WL 2457090, at *5 (finding an interest rate of 100% per month in a promissory note between sophisticated corporate actors unconscionable and substituting a reasonable rate of 10% according to Utah Code § 15-1-1.); *Engert*, 40 Utah at 239, (120% APR interest on a private promissory note for $50 "unjust, and unreasonable, and an unconscionable rate" and "against public policy and good morals to hold otherwise and to countenance such transactions"); *see also Res. Mgmt. Co. v. Weston Ranch & Livestock Co.,* 706 P.2d 1028, 1043 (Utah 1985) (noting pleading of several cases cited by both sides "in which unconscionability was found to exist" and "the existence of substantive unconscionability was either the dominant or exclusive issue" and finding that "[g]ross disparity in terms, absent evidence of procedural unconscionability, can support a finding of unconscionability.").

132.     Additionally, courts consider unconscionable consideration to be sufficient to find a contract void and unenforceable without substitution of a "reasonable rate." *See Sheedy*, 2016 WL 6902513, at *5 ("Under Utah law, an unconscionable consideration 'is, in law, no consideration'") (citing *Engert*, 40 Utah at 239).

133.     When courts do apply the two-pronged unconscionability analysis, the analysis of substantive unconscionability "focuses on the contents of the agreement and examines the relative fairness of the obligations assumes." *O'Brien,* 2012 WL 1609957, at *4 [citations omitted]. Courts will find substantive unconscionability where "there exists an overall imbalance in the obligations and rights imposed by the bargain . . . according to the mores and business practices of the time and place." *The Cantamar, L.L.C. v. Champagne*, 142 P.3d 140, 152 (Utah Ct. App. 2006) (finding a 30% APR rate not substantively unconscionable) (quoting *Sosa v. Paulos*, 924 P.2d 357, 361 (Utah 1996)).

134.     Courts analyzing contracts for procedural unconscionability will focus "on the formation of the agreement" (*Id.*) and:

> Factors bearing on procedural unconscionability include (1) whether each party had a reasonable opportunity to understand the terms and conditions of the agreement, […] (2) whether there was a lack of opportunity for meaningful negotiation, […] (3) whether the agreement was printed on a duplicate or boilerplate form drafted solely by the party in the strongest

4835-1837-4601, v. 1

> bargaining position, id.; (4) whether the terms of the agreement were explained to the weaker party, […] (5) whether the aggrieved party had a meaningful choice or instead felt compelled to accept the terms of the agreement, […] and (6) whether the stronger party employed deceptive practices to obscure key contractual provisions.

*Id.* at 362 (citing *Maxwell v. Fidelity Financial Services, Inc.* 184 Ariz. 82, 89 (1995) (asking whether contracting parties had real and voluntary meeting of minds); *Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 461 (Utah 1983) (finding that "whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power."); and *Res. Mgmt. Co.*, 706 P.2d at 1042).

135.    Plaintiff's note, carrying an APR of 160%, is sufficiently one-sided and shocking as to render it unconscionable under Utah law based on the interest rate alone. However, as discussed *supra*, the contracts contain myriad elements of high degrees of procedural and substantive unconscionability, such that courts applying Utah unconscionability law would find the contract to be unconscionable under either test.

136.    As Defendants' Consumer Loan contracts are unconscionable under Utah law common and statutory law, Claimant is entitled to penalties under Utah Code § 70C-7-106(4)(a) and reasonable costs and attorneys' fees under § 70C-7-106(4)(b).

137.    In addition, under Utah law the effect of an unconscionable interest rate is sufficient to remove that contract from the general rule that "[t]he parties to a lawful written, verbal, or implied contract may agree upon any rate of interest for the contract" contained within the same statute. Utah Code § 15-1-1(1) ; *see also Danjanovich*, 2005 WL 2457090, at *5; *Sheedy*, 2016 WL 6902513, at *5. Where an unconscionable or otherwise unlawful rate is found, Utah's usury law permits courts to substitute the default "reasonable rate" of 10% APR. Utah Code § 15-1-1(2).

138.    As discussed, Defendants' Consumer Loans are uniformly unconscionable and violative of Utah unconscionability statutory and common law, and this Court should reform those Consumer Loans to the reasonable rate of 10% APR pursuant to Utah Code § 15-1-1.

FIRST AMENDED COMPLAINT
4835-1837-4601, v. 1

139. The Promissory Note between Plaintiff and Defendants had an unconscionable interest rate and APR, and is unlawful and should be declared void. No person, including Defendants, should be permitted to collect or receive any further principal, charges, or recompense in connection with the transaction.

140. Plaintiff's transaction was common and typical of Defendants' lending activities with the general public. Upon information and belief, Defendants funded thousands of Consumer Loans in California on terms similar to Plaintiff's, drafted on common forms, all with unconscionable interest rates. No person, including Defendants, should be permitted to collect or receive any principal, charges, or recompense in connection with the transactions at issue.

Interest rates (a) between $300 and $2,500, with interest rates exceeding 30% and (b) between $2,500 and $10,000, with interest rates exceeding 36% (plus the Federal Funds rate), are unconscionable. Cal. Civ. Code § 1670.5; Financial Code § 22302; § 22304.5; Utah Code Utah Code §§ 15-1-1, 70A-2-302, 70C-7-106, 70C-7-201. The California Constitution provides for a 10% usury rate and Cal. Civ. Code § 1916-2 provides for a 12% maximum interest rate. Other provisions of the Financial Code cap interest rates at no more than 36% (plus the Federal Funds rate). Financial Code § 22302; §22304.5. These rates indicate a state policy of finding ultra-high interest loans such as the Consumer Loans promulgated by Defendants unconscionable, unfair and unlawful. The Utah Code, while not setting a maximum rate, will reform unconscionable and otherwise unlawful contracts to a default "reasonable rate" of 10% APR.

141. Defendants' conduct charging usurious, excessive, and unconscionable interest rates on their Consumer Loans was willful and intentional. Defendants' conduct charging usurious, excessive, and unconscionable interest rates on Consumer Loans was not done as a result of any bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid such error, or otherwise inadvertent. This is shown by statements on Defendants' websites, *inter alia*, showing that they regularly and routinely charge usurious, excessive, and unconscionable interest rates above 36% (plus the Federal Funds rate) on all of their Consumer Loans. The minimum rate on opploans.com is 99%. *See* Opportunity Financial, LLC, https://www.opploans.com/personal-loans/ (last visited Aug. 27, 2020).

FIRST AMENDED COMPLAINT

142.    Members of the general public, including Plaintiff, were injured financially and suffered out-of-pocket loss of money by Defendants' usurious, excessive, and unconscionable, charging and will continue to be injured in the future unless Defendants' conduct is enjoined and the Consumer Loan contracts declared unconscionable and void. Prospective public injunctive and declaratory relief is necessary to stop ongoing, immediate, and future harm to the general public. Through the allegations below Plaintiff seeks the same injunctive and declaratory relief as is sought for the general public.

## V. ALLEGATIONS REGARDING THE GENERAL PUBLIC

143.    Plaintiff brings this action on his own behalf and on behalf of the general public pursuant to Business and Professions Code § 17200 *et seq.*

144.    It is not necessary to seek class certification in order to obtain injunctive relief on behalf of the general public. *McGill*, 2 Cal. 5th at 960 .

145.    "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.

146.    Nonetheless, Plaintiff and members of the general public satisfy the requirements of Cal. Code Civ. P. § 382 *et seq.* and any other applicable rule of civil procedure and reserve the right to amend this complaint to assert class allegations in the future, if discovery, further investigation and/or law reveals such action is warranted to best pursue these claims. The claims presented are capable of being resolved in an administratively feasible manner in a single proceeding.

147.    Numerous persons within the general public obtained Consumer Loans from Defendants during the preceding 4-year period: (a) between $300 and $2,500, with interest rates exceeding 30% and (b) between $2,500 and $10,000, with interest rates exceeding 36% (plus the Federal Funds rate).

148.    Individual joinder of members of the general public is impracticable and unfeasible. Upon information and belief, the number of individuals to whom Defendants issued Consumer Loans (a) between $300 and $2,500, with interest rates exceeding 30% and (b) between $2,500 and $10,000,

with interest rates exceeding 36% (plus the Federal Funds rate), in the state of California, and from which Defendants currently collect principal, interest and/or other amounts claimed due on, exceeds 1,000.

149.    Questions of law and fact at issue in this action will generate common answers apt to drive the resolution of this litigation, including, but not limited to, the following:

    a.    Whether the interest rates charged on the Consumer Loans were usurious, excessive, unfair and/or unconscionable under California Law;

    b.    Whether the interest rates charged on the Consumer Loans were usurious, excessive, unfair and/or unconscionable under Utah Law;

    c.    Whether the interest rates charged on the Consumer Loans were in excess of the cap set by Cal. Fin. Code §22303 and § 22304.5;

    d.    Whether public injunctive relief is appropriate;

    e.    Whether declaratory relief is appropriate;

    f.    Whether Defendants' conduct as alleged herein violated the California Finance Code;

    g.    Whether Defendants' conduct as alleged herein violated the unfair, unlawful and/or fraudulent prongs of the California Unfair Competition Law (UCL); and

    h.    Whether Defendants' conduct as alleged herein violated the California False Advertising Law;

150.    No violations alleged in this complaint are contingent on any individualized interaction of any kind between members of the general public and the Defendants.

151.    Plaintiff has a claim that is typical and representative of other persons in the general public who obtained or are at risk of obtaining Consumer Loans, written on similar standard form contracts, from Defendants. All claims are based on the exact same legal theories. Plaintiff was and is a victim of the policies, practices, and customs of Defendants complained of in this action in ways that have deprived him of the rights guaranteed by California Bus. & Prof. Code 17200 *et. seq.*, and other

4835-1837-4601, v. 1

applicable law. As a pattern and practice and matter of policy, in violation of the laws, Defendants committed unfair and unconscionable practices based on the claims alleged in the preceding paragraphs.

152.    Like all persons in the general public who have or will obtain Consumer Loans from Defendants, Plaintiff entered into loan agreements (promissory note) with Defendants that charged a grossly exorbitant and unconscionable interest rate (over 160%) constituting usury in violation of public policy and California and Utah law. Cal. Fin. Code. § 22303; Utah Code §§ 15-1-1 *et seq.*, 70A-2-302, 70C-70106. Plaintiff's transaction with Defendants was not unique, but instead was reflective of Defendants' common business practices and systems. Defendants' websites and electronic platforms systematically and automatically processes loans like Plaintiffs, all with unconscionable rates well exceeding 30%, often multiple times over.

153.    Plaintiff will fairly and adequately protect the interests of other persons in the general public who obtained Consumer Loans from Defendants. Plaintiff has no interests that are adverse to, or in conflict with, other persons in the general public who obtained Consumer Loans from Defendants. Plaintiff's request for injunctive relief will benefit the general public. Plaintiff has retained counsel, designated below, who are experienced in representative and complex litigation and who have sufficient resources and skill to prosecute this action vigorously on behalf of other persons in the general public who obtained Consumer Loans from Defendants.

154.    There is a well-defined community of interest in the questions of law and fact affecting the general public and Plaintiff. Common questions of law and fact exist as to all members of the general public and predominate over any questions which may affect only individuals. The common question of whether the interest rates charged on Plaintiff's and others' Consumer Loans were usurious, excessive, and unconscionable, and if so, is the loan contract void making injunctive relief barring further collections appropriate, is common and predominates in each individual's claim. Resolution of that question in Plaintiff's transaction, applying common evidence, witnesses and law, will similarly resolve it for other members of the general public.

155.    A prospective public injunction benefiting all of Defendants' California borrowers of Consumer Loans with excessive interest rates is superior to the litigation of a multitude of cases by members of the general public. This action is superior to other methods for the fair and efficient

adjudication of the controversy. Resolution of common questions on behalf of the general public is superior to multiple individual actions or piecemeal litigation, avoids inconsistent decisions, presents fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each person in the general public who obtained a Consumer Loans from Defendants.

156.    Absent a public injunction, the problems explained herein will continue and individual borrowers would find the cost of resolving their similar claims prohibitively high and would have no effective remedy. This concern is significant given the economic vulnerability and backgrounds of people who obtained the high interest Consumer Loans from Defendants.

157.    In addition, Defendants have acted or refused to act on grounds that apply generally to the general public, thereby making injunctive, equitable, declaratory, or a combination of such relief appropriate with respect to public. Defendants continue to charge and/or collect usurious interest rates in violation of California law that prohibits unconscionable interest rates and terms.

158.    The provisions of California law upon which Plaintiff bases these claims contain provisions that are broadly remedial in nature. These laws and standards serve an important public interest in establishing minimum due process and public protection from adhesion contracts in California. In *McGill* , the California Supreme Court ruled that any contract that waives the statutory remedy of public injunctive relief on behalf of the general public under the Unfair Competition Law is contrary to California public policy and thus unenforceable under California Law.

159.    The nature of this action and the format of laws available to Plaintiff and members of the general public identified herein make this format a particularly efficient and appropriate procedure to redress the wrongs alleged herein. If each member of the general public were required to file an individual lawsuit, the corporate Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Plaintiff with their vastly superior financial and legal resources.

160.    The prosecution of separate actions seeking injunctive relief by all affected individuals in the general public with loan terms similar to Plaintiff's, even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual borrowers against the Defendants, which would establish potentially incompatible standards of conduct for the Defendants,

and/or (b) adjudications with respect to individual borrowers which would, as a practical matter, be dispositive of the interests of the other borrowers not parties to the adjudications, or which would substantially impair or impede the ability to protect the interests of the general public. Further, the claims of individual borrowers are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

## **FIRST CAUSE OF ACTION**

### **Public Injunction and Declaratory Relief**

### **For Violation of California's Unfair Competition Law: Unlawful Conduct**

### **Cal. Bus. & Prof. Code §§ 17200 *et seq***

161. Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

162. Plaintiff brings this claim individually and on behalf of the general public against Defendants. The same relief sought for Plaintiff is sought for members of the general public.

163. California Business & Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Defendants violated (and continue to violate) California's Unfair Competition Law, California Business & Professions Code § 17200 *et seq.*, by engaging in the above-described unlawful, unfair, unconscionable, fraudulent, deceptive, untrue, and misleading acts and practices.

**A.** **Defendants' business practices detailed herein are unlawful in that they violate California Financing Law.**

164. The Financial Code provides that any loan found to be unconscionable pursuant to Section 1670.5 of the Civil Code shall be deemed in violation of Cal. Fin. Code § 22302.

165. In addition, for loans under $2,500, the Financial Code restricts interest rates as follows:

> (a) Two and one-half percent per month on that part of the unpaid principal balance of any loan up to, including, but not in excess of two hundred twenty-five dollars ($225).
> (b) Two percent per month on that portion of the unpaid principal balance in excess of two hundred twenty-five dollars ($225) up to, including, but not in excess of nine hundred dollars ($900).

4835-1837-4601, v. 1

      (c) One and one-half percent per month on that part of the unpaid principal balance in excess of nine hundred dollars ($900) up to, including, but not in excess of one thousand six hundred fifty dollars ($1,650).

      (d) One percent per month on any remainder of such unpaid balance in excess of one thousand six hundred fifty dollars ($1,650).

Cal. Fin. Code § 22303.

166.    For loans between $2,500 and 10,000 interest is restricted to 36% (plus the federal Funds Rate), or approximately 38%.

167.    Pursuant to Fin. Code § 22303, no licensee such as Defendant Opportunity "may contract for and receive charges at a rate" in excess of those list in the preceding paragraphs. The same limitations apply to finance lenders making loans of $2,500 to $10,000 pursuant to Fin. Code § 22304.5. Upon information and belief, Defendant Opportunity both contracts *and* receives charges for interest rates in excess of the statutory cap.

168.    Fin. Code § 22326 provides:

      No person, except as authorized by this division, *shall directly or indirectly charge, contract for, or receive any interest*, discount, or consideration greater than the lender would be permitted by law to charge if he or she were not a licensee hereunder, upon the loan, use, or forbearance of money, goods, or things in action, or upon the loan, use, or sale of credit. This section applies to any person, who by any device, subterfuge, or pretense charges, contracts for, or receives greater interest, consideration, or charges than is authorized by this division for any loan, use, or forbearance of money, goods, or things in action or for any loan, use, or sale of credit.

169.    Based on the foregoing, Defendants violated Fin. Code § 22326.

170.    Clearly, Defendants' loans, including the 160.65% rate charged Plaintiff are grossly in excess of these statutorily defined caps and therefore "unlawful" for purposes of the UCL.

171.    Pursuant to Cal. Fin. Code § 22750 the loans are void and unenforceable.

172.    By the terms of the standard form contract Defendants drafted and presented to Plaintiff (and their other borrowers), a court of law must make the determination regarding whether the finance charges it imposed (160+%) are excessive.

173.    Here, Defendants' conduct contracting for, charging, and receiving excessive interest rates on Consumer Loans made to Plaintiff and the general public was unconscionable and thus in violation of California Financing Law for reasons detailed herein. First, Defendants failed to disclose that their Consumer Loan products were usurious, had unconscionably high interest rates and/or in

violation of California laws prohibiting usurious and unconscionable loans, and the rate caps of Fin. Code § 22302-22304.5. Second, Defendants' Consumer Loan products were one-sided, take-it-or-leave it adhesion contracts, which intentionally restrict remedies for their financially-stressed customers to private arbitration to insulate Defendants from litigation allowing any of their claims to be heard in a court of law or consolidated for class treatment, even if it is the most efficient way to proceed. In marketing these contracts, Defendants pressure Plaintiff and the general public to act quickly, knowing it's potential customer base was financially vulnerable. Third, Defendants failed to disclose material facts regarding the Consumer Loans, including the usurious and unconscionable interest rate, prior to completion of the loan application. Fourth, Defendants failed to disclose the identity of a finance lender on the transaction (Defendant Opportunity) and that they conspired together to form a deceptive rent-a-bank arrangement to try to dodge California's interest rate limits. Fifth, the promissory note contract contained procedurally unconscionable terms and waivers. Sixth, the excessive interest rates charged are disproportionate to any legitimate and reasonable costs. As detailed herein, the totality of the circumstances in Defendants' marketing, execution, and enforcement of the Consumer Loan products at issue, indicates the absence of a meaningful choice for Plaintiff and members of the general public in securing these Consumer Loans, and creates overly harsh and unduly oppressive results that are nearly impossible to obtain relief from. Defendants' conduct is willful in that their business model is expressly designed to achieve this outcome.

174.    Likewise, Defendants violated Cal. Civ. Code §1670.5 in that they charged an unconscionable rate of interest on their Consumer Loans. The Financial Code provides that any loan found to be unconscionable pursuant to § 1670.5 of the Civil Code shall be deemed in violation of Cal. Fin. Code § 22302.

**B.    Defendants' business practices detailed herein are unlawful in that they violate California's False Advertising Law.**

175.    California's False Advertising Law (the "FAL"), makes it unlawful "to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner

or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading[.]" Cal. Bus. & Prof. Code § 17500.

176.     As detailed further, Defendants made and disseminated advertising, including statements on their websites, with the intent directly or indirectly to dispose of the property or perform the services or induce the public to enter into an obligation relating to the Consumer Loan products described in this Complaint, which did in fact induce such obligations, and which were materially misleading to Plaintiff and the general public.

177.     In particular, Defendants misrepresented the nature of the lending arrangement with the effect of inducing reasonable borrowers into loans at rates of interest many multiples of the highest cap allowable in California, and continue to misrepresent to existing and future borrowers that these loans are lawful and collectible.

178.     The unlawful business practices set forth have caused Plaintiff to suffer an injury in fact, and continue to threaten to injure Plaintiff and the general public, by causing a loss of money paid to Defendants which includes usurious, unconscionable and unlawful interest.

179.     In addition, Defendants violated the FAL in that they failed to acknowledge to consumers, such as Plaintiff, that the interest rates charged were unconscionable, unlawful, and thus uncollectable according to, *inter alia* the California Financial Code. Cal. Fin. Code §1670.5, Utah Code § 70A-2-302, Utah Code § 60C-7-106, and Utah Code § 15-1-1 *et seq.*. The California Financial Code provides that any loan found to be unconscionable pursuant to Section 1670.5 of the Civil Code shall be deemed in violation of Cal. Fin. Code § 22302.

## C.     Defendants' business practices detailed herein are unlawful in that they violate the Electronic Funds Transfer Act.

180.     In addition, by conditioning the extension of credit on the provision of preauthorization for electronic withdrawals, as evidenced by Plaintiff's loan agreement, Defendants violated the EFTA.

181.     That act holds that "No person may . . . (1) condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers . . .". 15 U.S.C. § 1693k(1). However, Defendants' standard-form contract of adhesion includes as standard and necessary the terms:

      A.   "You further authorize us to initiate separate electronic payments from the Bank Account for any other amounts due under this Note, including any applicable Late Fee or Returned Payment Fee.";

      B.   "When we use information from your check to make an electronic funds transfer, funds may be withdrawn from your account as soon as the same day we receive your payment";

      C.   "You authorize our agents to make a one-time withdrawal from the Bank Account to collect this Returned Payment Fee.";

182.     This conduct violates the EFTA and constitutes an unlawful business practice for the purpose of the UCL.

183.     Among other relief, corrective statements and advertising should be issued on behalf of the public, and Defendants should be required to cease their practice of requiring preauthorization of electronic funds transfers as a condition of credit.

184.     These violations have unjustly enriched Defendants at the expense of Plaintiff and the general public. As a result, Plaintiff and the general public are entitled to public injunctive and declaratory relief requiring Defendants to immediately cease the unfair, unlawful, and fraudulent business practices alleged herein. Specifically, Plaintiff and members of the general public are entitled to, at a minimum, public injunctive relief preventing Defendants from continuing such conduct in the future and issuing corrective statements; declaratory relief in the form of an order declaring void any existing Consumer Loans from Defendants to members of the public (or similarly defined class) with unconscionable interest rates exceeding 36% (plus the Federal Funds rate); prohibiting further collection of any principal, interest or other amounts under those Consumer Loans after the day this action is commenced; prohibiting any debt collection efforts; prohibiting any required electronic fund transfers via the ACH network; and reasonable attorneys' fees and costs pursuant to Cal. Code Civ. P. § 1021.5, *inter alia*. Any new sums collected by Defendants as interest exceeding 30% (on loans between $300

and $2,500) and 36% (plus the Federal Funds rate)(on loans between $2,500 and $10,000) should be placed in a constructive trust for the benefit of Plaintiff and the general public.

## SECOND CAUSE OF ACTION

### Public Injunction and Declaratory Relief

### For Violation of California's Unfair Competition Law: Unfair Conduct

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

185.    Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

186.    Plaintiff brings this claim individually and on behalf of the general public against Defendants. The same relief sought for Plaintiff is sought for members of the general public.

187.    California Business & Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Defendants violated (and continue to violate) California's Unfair Competition Law, California Business & Professions Code § 17200 *et seq.*, by engaging in the above-described unlawful, unfair, unconscionable, fraudulent, deceptive, untrue, and misleading acts and practices.

188.    An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided. *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal.App.4th 824, 839 (2006), *as modified* (Nov. 8, 2006).

189.    By the terms of the standard form contracts Defendants drafted and presented to Plaintiff (and their other borrowers), a court of law must make the determination regarding whether the finance charges it imposed are excessive and unconscionable and subject to a public injunction.

190.    Defendants' business practices charging excessive interest rates (above 30% on loans between $500 and $2,500; above 36% (plus the Federal Funds rate) on loans between $2,500 and $10,000) on Consumer Loans made to Plaintiff and the general public, as detailed herein are unfair. Consumers like Plaintiff are substantially injured by Defendants' conduct. In entering into unconscionable loan contracts, Plaintiff and members of the general public, already in financially precarious positions, have paid copious amounts of money to Defendants. Plaintiff and the general

FIRST AMENDED COMPLAINT

public have little recourse after entering these contracts due to the unconscionable provisions contained therein. Upon information and belief, Defendants' intent in creating, marketing, and enforcing these contracts is to maximize financial gain at the expense of Plaintiff and the general public, which could result in repeat loans perpetuating their customers' indebtedness and securing constant revenue streams of usurious interest payments. Any potential benefit to competition from Defendants' business practices is eclipsed by the harm suffered by Plaintiff and members of the general public.

191. In addition, Defendants' conduct of charging unconscionable and unlawful rates of interest under, *inter alia*, Cal. Civ. § 1670.5, Cal. Fin. Code. §22302-22304.5, Utah Code § 70A-2-302, Utah Code § 60C-7-106, and Utah Code § 15-1-1 *et seq.*, constitutes unfair conduct as Defendants, as described *supra*, wrought significant harm against Plaintiff and the general public through their charging of excessive and unlawful rates of interest. This injury could not be reasonably avoided by the consumer (as, on information and belief, *all* of Defendants' loans carry such unlawful and unconscionable rates of interest and all of their agreements, including Plaintiff's Agreement, are non-negotiable documents), and clearly the lack of compliance with California lending laws offers no countervailing benefit to consumers. Likewise, the evasion of such laws, and others, through Defendants' deceptive use of "rent a bank" enterprises constitute unfair competition as this intentional conduct penalizes competitors who seek to abide by California's regulatory, contract, and statutory schemes that govern Consumer Loans. Further, Defendants' misrepresentation of the finance lender on Promissory Notes is unfair as Defendants unfairly and abusively use that façade as a trick against consumers/borrowers to multiply the interest rate they are charged.

192. The unfair business practices set forth herein have caused Plaintiff to suffer an injury in fact, and continue to threaten to injure Plaintiff and the general public by causing a loss of money paid to Defendants which includes usurious, excessive and unconscionable interest rates.

193. Among other relief, corrective statements and advertising should be issued on behalf of the public.

194. These violations have unjustly enriched Defendants at the expense of Plaintiff and the general public. As a result, Plaintiff and the general public are entitled to injunctive and declaratory relief requiring Defendants to immediately cease the unfair, unlawful, and fraudulent business practices

alleged herein. Specifically, Plaintiff and members of the general public are entitled to, at a minimum, public injunctive relief preventing Defendants from continuing such conduct in the future; declaratory relief in the form of an order declaring void any existing Consumer Loans from Defendants to members of the public (or similarly defined class) with unconscionable and excessive interest rates; prohibiting further collection of any principal, interest or other amounts under those Consumer Loans after the day this action is commenced; prohibiting any debt collection efforts; prohibiting any required electronic fund transfers via the ACH network; and reasonable attorneys' fees and costs pursuant to Cal. Code Civ. P. § 1021.5, *inter alia*. Any new sums collected by Defendants as interest exceeding 30% (on loans between $300 and $2,500) and 36% (plus the Federal Funds rate) (on loans between $2,500 and $10,000) should be placed in a constructive trust for the benefit of Plaintiff and the general public.

## THIRD CAUSE OF ACTION

### Public Injunction and Declaratory Relief

### For Violation of California's Unfair Competition Law: Fraudulent Conduct

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

195. Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

196. Plaintiff brings this claim individually and on behalf of the general public against Defendants.

197. California Business & Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Defendants violated (and continue to violate) California's Unfair Competition Law, California Business & Professions Code § 17200 *et seq.*, by engaging in the above-described unlawful, unfair, unconscionable, fraudulent, deceptive, untrue, and misleading acts and practices.

198. By the terms of the standard form contract Defendants drafted and presented to Plaintiff (and their other borrowers), a court of law must make the determination regarding whether the finance charges it imposed are excessive and unconscionable.

199. "[T]he term 'fraudulent' as used in the section does not refer to the common law tort of fraud but only requires a showing members of the public are likely to be deceived. No proof of direct

harm from a defendant's unfair business practice need be shown, such that [a]llegations of actual deception, reasonable reliance, and damage are unnecessary." *Day v. AT&T Corp.*, 63 Cal.App.4th 325, 332 (1998) (internal citations and quotation omitted).

200. Defendants' business practices charging interest rates above 36% (plus the Federal Funds rate) on Consumer Loans made to Plaintiff and the general public, as detailed herein are fraudulent. By way of material omissions, Defendants' advertising related to the Consumer Loans made was materially false and misleading, and caused Plaintiff and members of the general public to enter into transactions that but for such advertising, they would not have entered.

201. Defendants partner with out-of-state "rent a banks" including FinWise bank to fraudulently portray FinWise bank as the actual lender of the Consumer Loans funded by Defendants. This fraudulent scheme has as its goal the misleading of the general public, including Plaintiff, by wrongfully informing them that their loan is not subject to California consumer protection laws, including § 22302-22304.5 of the Financial Code. As discussed *supra*, these relationships are a sham with the dual purpose of evading regulatory oversight, and deceiving the general public as to the legality and collectability of the Consumer Loans Defendants fund. Both objectives constitute fraudulent conduct sufficient for the UCL.

202. Additionally, Defendants fail to disclose that their Consumer Loans were void and not collectable. *See*, *CashCall, Inc.*, 2016 WL 4820635, at *9 ("easily" concluding that misrepresenting a loan was enforceable under similar circumstances was material to reasonable consumers).

203. Likewise, Defendants conduct was fraudulent in that they failed to acknowledge to consumers, such as Plaintiff, that the interest rates charged were unconscionable, unlawful, and thus uncollectable according to, *inter alia* the California Financial Code. The Financial Code provides that any loan found to be unconscionable pursuant to Section 1670.5 of the Civil Code shall be deemed in violation of Cal. Fin. Code § 22302. Additionally, by representing the lender as FinWise Bank rather than Defendants, Defendant sought to fraudulently avoid regulatory oversight, legal compliance, and litigation from consumers like Plaintiff and the general public.

204. In making and disseminating these misleading statements, Defendants knew, or by the exercise of reasonable care should have known, that the statements and/or material omissions were

deceptive and misleading to reasonable consumers. These concealments and partial disclosures gave rise to an affirmative duty disclose. Defendants had superior knowledge of these facts and any disclosures made were half-truths or statements, requiring full disclosure to make their statements complete. Defendants' failure to disclose such information constitutes fraudulent conduct in violation of the UCL. In addition, neither Plaintiff nor any reasonable member of the general public would enter into a loan at an interest rate in excess not only of any unconscionability standard but strict statutory caps.

205.    The fraudulent business practices set forth have caused Plaintiff to suffer an injury in fact, and continue to threaten to injure Plaintiff and the general public, by causing a loss of money paid to Defendants which includes usurious and unconscionable interest.

206.    Among other relief, corrective statements and advertising should be issued on behalf of the public.

207.    These violations have unjustly enriched Defendants at the expense of Plaintiff and the general public. As a result, Plaintiff and the general public are entitled to injunctive and declaratory relief requiring Defendants to immediately cease the unfair, unlawful, and fraudulent business practices alleged herein. Specifically, Plaintiff and members of the general public are entitled to, at a minimum, public injunctive relief preventing Defendants from continuing such conduct in the future; declaratory relief in the form of an order declaring void any existing Consumer Loans from Defendants to members of the general public with unconscionable and excessive interest rates; prohibiting further collection of any principal, interest or other amounts under those Consumer Loans after the day this action is commenced; prohibiting any debt collection efforts; prohibiting any required electronic fund transfers via the ACH network; and reasonable attorneys' fees and costs pursuant to Cal. Code Civ. P. § 1021.5, *inter alia*. Any new sums collected by Defendants as interest exceeding 30% (on loans between $300 and $2,500) and 36% (plus the Federal Funds rate)(on loans between $2,500 and $10,000) should be placed in a constructive trust for the benefit of Plaintiff and the general public.

4835-1837-4601, v. 1

## **FOURTH CAUSE OF ACTION**

### **Public Injunction and Declaratory Relief**

### **Declaratory Relief**

208.    Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

209.    The terms of the standard form contract Defendants drafted and presented to Plaintiff and their other borrowers require Plaintiff (and other members of the general public) to pay excessive and unconscionable interest rates.

210.    Defendants' practices charging and collecting from the general public unconscionable interest rates and finance charges should be declared unlawful.

211.    Among other relief, corrective statements and advertising should be issued on behalf of the public.

212.    Plaintiff and the general public are entitled to injunctive and declaratory relief requiring Defendants to immediately cease the unfair, unlawful, and fraudulent business practices alleged herein. Specifically, Plaintiff and members of the general public are entitled to, at a minimum, public injunctive relief preventing Defendants from continuing such conduct in the future; declaratory relief in the form of an order declaring void any existing Consumer Loans from Defendants to members of the general public with unconscionable interest rates interest exceeding 30% (on loans between $300 and $2,500) and 36% (plus the Federal Funds rate)(on loans between $2,500 and $10,000); prohibiting further collection of any principal, interest or other amounts under those Consumer Loans after the day this action is commenced; prohibiting any debt collection efforts; prohibiting any required electronic fund transfers via the ACH network; and reasonable attorneys' fees and costs pursuant to Cal. Code Civ. P. § 1021.5, *inter alia*. Any new sums collected by Defendants as interest exceeding 30% (on loans between $300 and $2,500) and 36% (plus the Federal Funds rate) (on loans between $2,500 and $10,000) should be placed in a constructive trust for the benefit of Plaintiff and the general public.

213.    To the extent Defendants continue to collect new interest payments or finance charges exceeding 30% (on loans between $300 and $2,500) and 36% (plus the Federal Funds rate) (on loans between $2,500 and $10,000) annually after the commencement of this action and notice of their

ongoing violations, creation of a constructive trust to hold such sums collected, with disbursement and allocation as thereafter directed by this forum.

## **FIFTH CAUSE OF ACTION**

### **Utah - Unconscionable Contract/Usury**

### **Statutory Penalties**

214.    Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

215.    The terms of the standard form contract Defendants drafted and presented to Plaintiff and their other borrowers require Plaintiff (and other members of the general public) to pay excessive, usurious and unconscionable interest rates.

216.    Pursuant to Utah Code § 70C-7-106(4)(a), if this Court as a matter of law finds a consumer credit agreement or any part thereof to have been unconscionable, then the debtor may recover a penalty of not less than $100 nor more than $5,000 and the cost of the action together with reasonable attorney's fees.

217.    By way of their conduct in inserting highly substantively unconscionable terms, such as the extortionate interest rate, into their consumer credit contract for Plaintiff and the general public's Consumer Loans, and by presenting them uniformly in a procedurally unconscionable manner, Defendants rendered such Consumer Loans unconscionable, unenforceable, and in violation of Utah Code § 70C-7-106.

218.    Courts applying Utah law to determine unconscionability typically consider both procedural and substantive unconscionability.[17] However, such courts will find a loan contract unconscionable based on the rate of interest alone.[18] Additionally, courts consider unconscionable

---

[17] *See, e.g., Carter v. West*, 38 Utah 381, 381 (1911) (60% APR on promissory note lent to an individual with little business experience or literacy unconscionable, and finding a debt fully paid where "the plaintiff received the full amount of money loaned to the defendant and interest at the rate of 15 per cent. per annum."); *O'Brien*, 2012 WL 1609957, at *4 ("As in California, a two-pronged analysis is used to determine whether a contract is unconscionable – substantive and procedural unconscionability.") (citing *Ryan* 972 P.2d at 402).

[18] *See, e.g., Danjanovich v. Robbins*, No. 2:04-CV-623 TS, 2005 WL 2457090, at *5 (D. Utah Oct. 5, 2005) (finding an interest rate of 100% per month in a promissory note between sophisticated corporate actors unconscionable and substituting a reasonable rate of 10% according to Utah Code § 15-1-1.);

4835-1837-4601, v. 1

consideration to be sufficient to find a contract void and unenforceable without substitution of a "reasonable rate."[19]

219.    Plaintiff's note, carrying an APR of 160%, is sufficiently one-sided and shocking as to render it unconscionable under Utah law based on the interest rate alone. However, as discussed *supra*, the contracts contain myriad elements of high degrees of procedural and substantive unconscionability, such that courts applying Utah unconscionability law would find the contract to be unconscionable under either test.

220.    As Defendants' Consumer Loan contracts are unconscionable under Utah law common and stator law, Claimant is entitled to penalties under Utah Code § 70C-7-106(4)(a) and reasonable costs and attorneys' fees under § 70C-7-106(4)(b).

### SIXTH CAUSE OF ACTION

### Utah - Unconscionable Contract/Usury

### Substitution of Reasonable Rate

221.    Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

222.    In addition to the statutory penalties available for borrowers under an unconscionable Consumer Loan, Utah's usury law permits courts to substitute the default "reasonable rate" of 10% APR. Utah Code § 15-1-1(2).

223.    In addition, under Utah law the effect of an unconscionable interest rate is sufficient to remove that contract from the general rule that "[t]he parties to a lawful written, verbal, or implied contract may agree upon any rate of interest for the contract" contained within the same statute. Utah Code § 15-1-1(1) ; *see also Danjanovich*, 2005 WL 2457090, at *5; *Sheedy*, 2016 WL 6902513, at *5.

224.    Under Utah law, where an interest rate is unconscionable, courts are permitted to substitute the default maximum rate of 10% APR. As discussed, Defendants' Consumer Loans are

---

*Engert v. Chadwick*, 40 Utah 239, 239 (1912) (120% APR interest on a private promissory note for $50 "unjust, and unreasonable, and an unconscionable rate" and "against public policy and good morals to hold otherwise and to countenance such transactions");

[19] *See Sheedy v. BSB Properties, LC*, No. 2:13-CV-00290-JNP, 2016 WL 6902513, at *5 (D. Utah Mar. 1, 2016) ("Under Utah law, an unconscionable consideration 'is, in law, no consideration'") (citing *Engert*, 40 Utah at 239).

4835-1837-4601, v. 1

uniformly unconscionable and violative of Utah unconscionability statutory and common law, and this Court should reform those Consumer Loans to the reasonable rate of 10% APR pursuant to Utah Code § 15-1-1.

## SEVENTH CAUSE OF ACTION

### Violation of Utah Code § 70C-7-201

### Refund of Excess Charge

225.    Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

226.    Due to the excessive, usurious, and unconscionable rates of interest on his Consumer Loan, Plaintiff is not, and has never been, obligated to pay the excessive finance charge on his Consumer Loan.

227.    Plaintiff made payments on his loan at a rate in excess of any permitted by Utah unconscionability law and therefore the Utah Consumer Credit Code. Pursuant to Utah Code § 70C-7-201, such excess paid should be ordered by this Court as credited towards the remaining balance of Plaintiff's Consumer Loan, reformed by way of Utah usury law to the reasonable rate of 10% APR.

## EIGHTH CAUSE OF ACTION

### Violation of 15 U.S.C. § 1693k(1)

### Statutory Damages

228.    Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

229.    In addition, by conditioning the extension of credit on the provision of preauthorization for electronic withdrawals, as evidenced by Plaintiff's loan agreement, Defendants violated the EFTA.

230.    That act holds that "No person may . . . (1) condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers . . .". 15 U.S.C. § 1693k(1). However, Defendants' standard-form contract of adhesion includes as standard and necessary the terms:

D.    "You further authorize us to initiate separate electronic payments from the Bank Account for any other amounts due under this Note, including any applicable Late Fee or Returned

1  Payment Fee.";

2  E. "When we use information from your check to make an electronic funds transfer, funds

3  may be withdrawn from your account as soon as the same day we receive your payment";

4  F. "You authorize our agents to make a one-time withdrawal from the Bank Account to

5  collect this Returned Payment Fee.";

6  231.  Upon information and belief, Defendants condition the electronic transfer and/or direct

7  deposit of loan proceeds to borrowers who agree to repay the loan using automated payments.

8  232.  Upon information and belief, Defendants do not allow borrowers to make regular

9  payments by traditional check payments. Rather, Defendants require borrowers to authorize Defendants

10 to computer generate checks bearing their account numbers. *See* https://www.opploans.com/faq-

11 category/account-loan-repayment/ ("How can I repay my personal loans? It's important to OppLoans to

12 offer easy and convenient ways to pay back your loan. The most popular and preferred method for many

13 customers is through electronic fund transfer (EFT). We also offer a recurring payment option of

14 remotely created checks. For one-time payments, we accept debit cards and EFT.").

15 233.  Defendants do not allow borrowers to terminate automated payments online or in writing.

16 Rather, borrowers must speak with Defendants by telephone to request terminating automated

17 repayment. *See* https://www.opploans.com/faq-category/account-loan-repayment/ ("How do I update

18 my repayment method? If you would like to change your repayment method, please Contact Us and our

19 Advocates will assist you.").

20 234.  This conduct violates the EFTA. Pursuant to 15 U.S.C. 1693m(a), "any person who fails

21 to comply with any provision of this subchapter with respect to any consumer, except for an error

22 resolved in accordance with section 1693f of this title, is liable to such consumer in an amount equal to

23 the sum of--- (1) any actual damage sustained by such consumer as a result of such failure; or (2)(A) in

24 the case of an individual action, an amount not less than $100 nor greater than $1,000." *Id.* In addition,

25 that section provides factors for determining the amount of award which include "(1) in any individual

26 action under subsection (a)(2)(A), the frequency and persistence of noncompliance, the nature of such

27 noncompliance, and the extent to which noncompliance was intentional." *Id.*

28 235.  In this case, on information and belief all loans extended by Defendants contain such a

clause as a necessary component of their adhesive contracts. In addition, the fact that these contracts are part of a sophisticated scheme to prey upon vulnerable borrowers is highly indicative of the scienter of the parties responsible. As such, Plaintiff respectfully requests the maximum recovery for these violations, in accordance with the factors listed *supra*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the California general public, request relief as follows on all counts:

A. A public injunction sufficient to prevent Defendants from entering into any loans including Consumer Loans with usurious, excessive, and unconscionable interest rates (exceeding 30% (on loans between $300 and $2,500) and 36% (plus the Federal Funds rate)(on loans between $2,500 and $10,000)) in or from California;

B. A public injunction sufficient to prevent Defendants from collecting any further principal, interest, fees or other amounts on existing loans including Consumer Loans with usurious, excessive, and/or unconscionable interest rates (exceeding 30% (on loans between $300 and $2,500) and 36% (plus the Federal Funds rate)(on loans between $2,500 and $10,000)), in or from California, including payments required by electronic fund transfer;

C. A public injunction sufficient to prevent Defendants from continuing to falsely advertise their Consumer Loan products in or from California;

D. Declaratory relief that the finance charges and interest rates Defendants imposed on Plaintiff and the general public pursuant to their standard form contracts are excessive, unfair, unconscionable and unlawful;

E. Declaratory relief that the finance charges and interest rate charged by Defendants to Plaintiff for the Consumer Loan was in excess of the legal maximum;

F. A preliminary injunction and a permanent injunction, restraining and enjoining Defendants from making, disseminating, or causing to be made or disseminated, before the public in California via the Internet, television, radio, or other publication, or any advertising device, or in any other manner or means offers to provide loans including Consumer Loans with usurious and

FIRST AMENDED COMPLAINT

4835-1837-4601, v. 1

unconscionable interest rates (exceeding 30% (on loans between $300 and $2,500) and 36% (plus the Federal Funds rate)(on loans between $2,500 and $10,000)).

G. Public injunctive relief and declaratory relief that Plaintiff's and all other members of the general public's Consumer Loans with interest rates of exceeding 30% (on loans between $300 and $2,500) and 36% (plus the Federal Funds rate)(on loans between $2,500 and $10,000) are void, preventing Defendants from collecting further interest or payments towards the principle of each such loan;

H. An injunction requiring Defendants to notify all applicable credit reporting agencies of the void Consumer Loans and correcting any negative credit references made in relation to the Consumer Loans;

I. An injunction requiring Defendants to notify all person who they funded loans including Consumer Loans with interest rates exceeding 30% (on loans between $300 and $2,500) and 36% (plus the Federal Funds rate) (on loans between $2,500 and $10,000) and notify them of the excessive interest rate charges and their rights and abilities to seek relief;

J. To the extent Defendants continue to collect new interest payments or finance charges exceeding 30% (on loans between $300 and $2,500) and 36% (plus the Federal Funds rate)(on loans between $2,500 and $10,000) annually after the commencement of this action and notice of their ongoing violations, creation of a constructive trust to hold such sums collected, with disbursement and allocation as thereafter directed by this court;

K. All restitution that may be available at law or equity including that related to all excessive and unconscionable interest charged and collected;

L. All statutory damages that may be available;

M. All punitive damages that may be available, including those under Utah Code §60C-7-106;

N. Reasonable attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5, Utah Code § 60C-7-106, and/or any other applicable law, rule or term; and

O. Such other and further relief as the Court deems just and proper and to which Plaintiff and members of the general public may be entitled.

FIRST AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

ZIMMERMAN REED, LLP

Dated: September 1, 2020          By:      /s/ Caleb Marker
                                          Caleb Marker
                                          Flinn T. Milligan
                                          Arielle Canepa
                                          2381 Rosecrans Ave., Suite 328
                                          Manhattan Beach, CA 90245
                                          (877) 500-8780 Telephone
                                          (877) 500-8781 Facsimile
                                          Email: caleb.marker@zimmreed.com
                                                  flinn.milligan@zimmreed.com
                                                  arielle.canepa@zimmreed.com

                                          *Attorneys for Plaintiff*

FIRST AMENDED COMPLAINT

4835-1837-4601, v. 1