1  **BUCKLEY LLP**
   JAMES R. McGUIRE (State Bar No. 189275)
2  jmcguire@buckleyfirm.com
   LAUREN L. ERKER (State Bar No. 291019)
3  lerker@buckleyfirm.com
   201 Mission Street, 12th Floor
4  San Francisco, CA 94105
   Telephone: (415) 619-3500
5  Facsimile: (415) 619-3505

6  MICHAEL A. ROME (State Bar No. 272345)
   mrome@buckleyfirm.com
7  100 Wilshire Boulevard, Suite 1000
   Santa Monica, CA 90401
8  Telephone: (310) 424-3900
   Facsimile: (310) 424-3960

9
   Attorneys for Defendant Opportunity Financial,
10 LLC

11 [Additional counsel listed on signature page]

12

13              **UNITED STATES DISTRICT COURT**

14             **NORTHERN DISTRICT OF CALIFORNIA**

15                    **OAKLAND DIVISION**

16

17 FREDERICK SIMS, an individual, on behalf      Case No. 4:20-cv-04730-PJH
   of the general public,
18                                               **DEFENDANTS OPPORTUNITY**
                  Plaintiff,                     **FINANCIAL, LLC AND FINWISE**
19                                               **BANK'S NOTICE OF MOTION AND**
          v.                                     **MOTION TO DISMISS FIRST AMENDED**
20                                               **COMPLAINT**

21 OPPORTUNITY FINANCIAL, LLC, a                 Date:     January 6, 2021
   Delaware Company, d/b/a OPPLOANS,             Time:     9:00 am
22 FINWISE BANK, a Utah Corporation, and         Crtrm.:   3, 3rd Floor
   DOES 1-100, inclusive,
23
                  Defendants.                    The Hon. Phyllis J. Hamilton
24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS

## MOTION AND NOTICE OF MOTION

**TO PLAINTIFF AND HIS ATTORNEYS OF RECORD, AND THE CLERK OF THE ABOVE-ENTITLED COURT:**

PLEASE TAKE NOTICE that on January 6, 2021 or as soon thereafter as the matter may be heard, in Courtroom 3, 3rd Floor, located at 1301 Clay Street, Oakland, CA 94612, Defendants Opportunity Financial, LLC ("OppLoans") and FinWise Bank ("FinWise") (together, "Defendants") will and hereby do move this Court to dismiss the First Amended Complaint of Plaintiff Frederick Sims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. This Motion is made on the grounds that federal banking statutes and regulations preempt Plaintiff's state-law claims, which fail as a matter of California and Utah law in any event. The Motion is also made on the grounds that Plaintiff's single federal claim fails as a matter of law.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice, all pleadings and papers on file in this action, any arguments of counsel, and such other and further matters as the Court may consider.

DATED: October 7, 2020 BUCKLEY LLP

By: /s James R. McGuire
James R. McGuire
Michael A. Rome
Lauren L. Erker

Attorneys for Defendant Opportunity Financial, LLC, d/b/a OppLoans

DATED: October 7, 2020 HUDSON COOK LLP

By: /s Allen H. Denson
ALLEN H. DENSON (*Pro Hac Vice*)
adenson@hudco.com
MARK E. ROONEY (*Pro Hac Vice*)
mrooney@hudco.com
1909 K Street Northwest, Fourth Floor
Washington, DC 20006
Telephone: (202) 223-6930
Facsimile: (202) 223-6935

**LAW OFFICE OF LAURA SULLIVAN**
LAURA M. SULLIVAN (220529)
laurasullivan@laurasullivanlaw.com
423 South Estate Drive
Orange, CA 92869
Telephone: (714) 744-1522
Facsimile: (714) 744-1524

Attorneys for Defendant FinWise Bank

# STATEMENT OF ISSUES TO BE DECIDED

This motion raises the following issues:

1. Should the Court dismiss the California and Utah state-law claims in the First Amended Complaint because all the claims asserted seek to preclude FinWise from charging interest at the rate it is permitted to assess under Utah law and are therefore preempted under Section 27 of the Federal Deposit Insurance Act, 12 U.S.C. § 1831d?

2. Should the Court dismiss the state-law claims in the First Amended Complaint predicated on violations of California's usury laws because FinWise, a federally insured, Utah-chartered bank, is identified as the lender on Plaintiff's loan agreement and is statutorily exempt from the maximum interest rates in the California Constitution and California Financing Law?

3. Should the Court dismiss Plaintiff's Utah law claims because the loans were originated at a rate expressly permitted by the laws of the State of Utah?

4. Should the Court dismiss Plaintiff's claims for violation of the Electronic Fund Transfer Act ("EFTA") because Plaintiff's own allegations and his loan agreement referenced in the First Amended Complaint unambiguously demonstrate his extension of credit was not conditioned on repayment through recurring electronic funds transfers?

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................1

I.     INTRODUCTION....................................................................................1

II.    SUMMARY OF PLAINTIFF'S ALLEGATIONS ...............................3

III.   ARGUMENT ...........................................................................................5

    A.    Legal Standard...........................................................................5

    B.    Federal Law Preempts Plaintiff's State Law Claims. .............6

          1.    Federal Preemption Principles. .................................6

          2.    The Federal Banking Laws Expressly Permit National Banks, State Banks, and Their Assignees to Charge Interest Rates Permitted in the State in Which They Are Located and Preempt Contrary State Laws. ...........................................................7

               (a)    National Banks' Interest Rate Authority. ...........7

               (b)    The Parallel Interest Rate Authority of State Banks. .......................8

               (c)    The Preemptive Force of Sections 85 and 27 Applies After the Sale or Assignment of Loans. ..........................9

          3.    Section 27 Expressly Preempts Plaintiff's Claims Predicated on Violations of California Law....................................................11

               (a)    Plaintiff's "True Lender" Allegations Do Not Change the Preemption Analysis. ..............14

                    (i)    The Federal Test Supplies the Proper Method to Identify the "True Lender": It Is the Party That Extended Credit.................15

                    (ii)   The Predominant Economic Interest Test Cannot Be Reconciled with the Interest Rate Authority Rule. .............18

                (b)    Plaintiff's New Utah Law Claims Do Not Save His Claims Predicated on California Law Violations from Preemption....................19

          4.    The "True Lender" Test Is Preempted Because It Stands as an Obstacle to Congress's Purposes and Objectives in Enacting Section 27..........................................................21

          5.    Section 27 Also Preempts Plaintiff's New Utah Law Claims.....................................25

    C.    Plaintiff's Claims Fail for Additional Reasons. .....................26

1.  Plaintiff's California Claims Fail Because Utah Law Governs. .................26

2.  Plaintiff's Claims Predicated on California Law Violations Fail Because His Loan Is Not Subject to California's Usury Law.....................27

    (a)    Plaintiff's Loan Is Exempt from California's Usury Law..............27

    (b)    Plaintiff's Allegations That OppLoans Is the True "Finance Lender" Do Not Alter This Conclusion. ...........................30

3.  Plaintiff's Utah Law Unconscionability Claims Fail as a Matter of Law.....................................33

4.  Plaintiff's EFTA Claim Fails as a Matter of Law. .......................37

IV.    CONCLUSION ..............................................................................................39

**Cases**

*America's Cmty. Bankers v. F.D.I.C.*,
    200 F.3d 822 (D.D.C. 2000) .................................................................................... 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................ 6

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ............................................................... 2, 22, 24, 25

*Barnett Bank of Marion Cnty., N.A. v. Nelson*,
    517 U.S. 25 (1996) .............................................................................................. 6

*Basile v. H & R Block, Inc.*,
    897 F. Supp. 194 (E.D. Pa. 1995) ...................................................................... 21

*Beechum v. Navient Sols., Inc.*,
    No. EDCV 15-8239-JGB-KKX, 2016 WL 5340454 (C.D. Cal. Sept. 20, 2016) ............ 31, 32

*Bekins Bar V Ranch v. Huth*,
    664 P.2d 455 (Utah 1983) .................................................................................. 34, 35

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................... 6

*Beneficial Nat'l Bank v. Anderson*,
    539 U.S. 1 (2003) ........................................................................... 8, 22, 23, 26

*Boerner v. Colwell Co.*,
    21 Cal. 3d 37 (1978) .......................................................................................... 28

*California v. Check 'n Go of Cal., Inc.*, No. C 07-02789 JSW, 2007 WL 2406888,
    at *2 (N.D. Cal. Aug. 20, 2007) .................................................................... 9, 11

*Cantamar, L.L.C. v. Champagne*,
    142 P.3d 140 (Utah 2006) ............................................................... 20, 33, 35

*Carter v. West*,
    38 Utah 381 (1911) ............................................................................................ 36

*Cashcall, Inc. v. Morrisey*,
    No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014) ................................... 14

*Cerni v. Axe*,
    No. G031818, 2004 WL 1903317 (Cal. App. 4th Dist. Aug. 26, 2004) ................................. 29

*CFPB v. CashCall, Inc.*,
    No. CV 15-7522-JFW, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) ............... 14, 15, 18, 23

*Chandler v. Washington Mut. Bank, FA.*,
    No. CV 10-00487 ACK-KSC, 2013 WL 12314516 (D. Haw. June 12, 2013) ...................... 18

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ....................................................................................... 10, 12, 13

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504 (1992) .................................................................................................. 6

*Citibank, South Dakota, N.A. v. Palma*,
    646 S.E.2d 635 (N.C. Ct. App. 2007) ..................................................................... 21

*Cobb v. Monarch Fin. Corp.*,
    No. 95 C 1007, 1996 WL 109624 (N.D. Ill. 1996) ................................................... 38

*Cole v. Doe 1*
    *thru 2 Officers of City of Emeryville Police Dept.*, 387 F. Supp. 2d 1084 (N.D.
    Cal. 2005) ............................................................................................................ 29

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ........................................................................................... 7, 22

*Cross v. Downey Sav. & Loan Ass'n*,
    No. CV09-317 CAS (SSX), 2009 WL 481482 (C.D. Cal. Feb. 23, 2009) ...................... 30

*Cross-County Bank v. Klussman*,
    No. C-01-4190 SC, 2004 WL 966289 (N.D. Cal. Apr. 30, 2004) .................................. 9

*Danjanovich v. Robbins*,
    No. 2:04-cv-623 TS, 2005 WL 2457090 (D. Utah Oct. 5, 2005) ................................. 36

*Discover Bank v. Superior Court*,
    36 Cal.4th 148 (2005).................................................................................... 22, 24, 25

*Discover Bank v. Vaden*,
    489 F.3d 594 (4th Cir. 2007), *rev'd on other grounds*, 556 U.S. 49 (2009) ........................ 26

*Easter v. American West Fin.*,
    381 F.3d 948 (9th Cir. 2004)............................................................................. 14, 15

*Engert v. Chadwick*,
    40 Utah 239 (1912) ............................................................................................. 36

*Eul v. Transworld Sys.*,
  No. 15 C 7755, 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017)........................ 23

*Fleet Credit Corp. v. Sion*,
  893 F.2d 441 (1st Cir.1990) ................................................ 18, 19

*Funke v. Sorin Group USA, Inc.*,
  147 F. Supp. 3d 1017 (C.D. Cal. 2015)........................................ 5

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) .......................................................... 22

*Glover v. Fremont Inv. & Loan*,
  No. C-09-03922 JCS, 2009 WL 5114001 (N.D. Cal. Dec. 18, 2009)................ 18

*Green v. Wells Fargo Home Mortg., Inc.*,
  No. 4:07CV01055-WRW, 2009 WL 10711721 (E.D. Ark., Jan. 15, 2009) ............ 21

*Greenwood Trust Co. v. Commw. of Mass.*,
  971 F.2d 818 (1st Cir. 1992) ............................................*passim*

*Harris v. Chase Manhattan Bank*,
  35 Cal. Rptr. 2d 733 (1994) ................................................. 11

*Henry v. F.D.I.C.*,
  695 F. Supp. 2d 1063 (C.D. Cal. 2010)....................................... 13

*Hill v. Chem. Bank*,
  799 F. Supp. 948 (D. Minn. 1992) ........................................... 13

*Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*,
  471 U.S. 707 (1985) ......................................................... 21

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) .......................................................... 15

*Hudson v. Ace Cash Express, Inc.*,
  No. IP 01-1336- C H /S, 2002 WL 1205060 (S.D. Ind. May 30, 2002) ........ 16, 17

*Jones v. Wells Fargo Bank*,
  112 Cal. App. 4th 1527 (2003).............................................. 31, 32

*Kenty v. Bank One, Columbus, N.A.*,
  92 F.3d 384 (6th Cir. 1996) ................................................. 21

*Krispin v. v. May Dep't Stores Co.*,
  218 F.3d 919 (8th Cir. 2000)............................................... 16, 17

*LFG Nat'l Capital, LLC v. Gary, Williams, Finney, Lewis, Watson, & Sperando P.L.*,
    874 F. Supp. 2d 108 (N.D.N.Y. 2012) ................................................................... 29

*Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.*,
    761 F.3d 1027 (9th Cir. 2014) .............................................................................. 25

*Madden v. Midland Funding, LLC*,
    786 F.3d 246 (2d Cir. 2015) ................................................................................. 10

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Service Corp.*,
    439 U.S. 299 (1978) ...................................................................................... *passim*

*Meade v. Marlette Funding, LLC*,
    2018 Colo. Dist. LEXIS 3856 (D. Colo. Aug. 13, 2018) ..................................... 14

*Medimatch, Inc. v. Lucent Techs. Inc.*,
    120 F. Supp. 2d 842 (N.D. Cal. 2000) ................................................................ 27

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
    521 F.3d 1097 (9th Cir. 2008) ................................................................................ 5

*Montgomery v. GCFS, Inc.*,
    237 Cal. App. 4th 724 (2015) .............................................................................. 30

*Moore v. Hill*,
    188 Cal. App. 4th 1267 (2010) ............................................................................ 29

*Naoom v. Secured Assets Income Funds*,
    No. 05-CV-1207 H (CAB), 2006 U.S. Dist. LEXIS 92047 (S.D. Cal. Dec. 20, 2006) ................................................................................................................... 29

*Nunez v. City of San Diego*,
    114 F.3d 935 (9th Cir. 1997) .............................................................................. 29

*Okocha v. HSBC Bank USA, N.A.*,
    No. 08 Civ. 8650(MHP), 2010 WL 5122614 (S.D.N.Y. Dec. 14, 2010) ............. 39

*Parducci v. Overland Sols., Inc.*,
    No. 18-cv-07162-WHO, 2020 WL 4193368 (N.D. Cal. July 21, 2020) ............... 29

*Parks v. MBNA America Bank, N.A.*,
    54 Cal. 4th 376 (2012) ........................................................................................ 24

*Peterson v. Chase Card Funding, LLC*,
    No. 19-CV-00741-LJV-JJM, 2020 WL 5628935 (W.D.N.Y. Sept. 21, 2020) ......... 21, 25

*Piñon v. Bank of Am., NA*,
    741 F.3d 1022 (9th Cir. 2014) .................................................................... 7, 8, 23

*Pruitt v. Wells Fargo Bank, N.A.*,
  CV DKC 15-1308, 2015 WL 9490234 (D. Md. Dec. 30, 2015) ............................................ 21

*Rancho Mt. Props., Inc. v. Gray*,
  No. 11-CV-00358 BEN (BLM), 2012 WL 1192755 (S.D. Cal. Apr. 9, 2012) ....................... 29

*In re Rent-Rite Superkegs West, Ltd.*,
  603 B.R. 41 (Bankr. D. Colo. 2019) .................................................................................. 21

*Resource Mgt. Co. v. Weston Ranch and Livestock Co., Inc.*,
  706 P.2d 1028 (Utah 1985) ............................................................................... 34, 35, 36

*Riley v. Wells Fargo Bank, N.A.*,
  No. 16-cv-157-JMH, 2017 WL 2240570 (E.D. Ky. May 22, 2017) ..................................... 21

*Ryan v. Dan's Food Stores, Inc.*,
  972 P.2d 395 (Utah 1998) .................................................................................. 34, 36, 37

*Satterfield v. Simon & Schuster, Inc.*,
  569 F.3d 946 (9th Cir. 2009) ............................................................................................ 13

*Sawyer v. Bill Me Later, Inc.*,
  23 F. Supp. 3d 1359 (D. Utah 2014) .........................................................................*passim*

*Sawyer v. Bill Me Later, Inc.*,
  CV1004461SJOJCGX, 2010 WL 11492736 (C.D. Cal. Dec. 14, 2010) .............................. 20

*Shannon-Vail Five Inc. v. Bunch*,
  270 F.3d 1207 (9th Cir. 2001) ..................................................................................... 27, 35

*Sheedy v. BSB Properties, LC*,
  No. 2:13-cv-00290-JNP, 2016 WL 6902513 (D. Utah Mar. 1, 2016) ................................ 36

*Smiley v. Citibank (S.D.), N.A.*,
  517 U.S. 735 (1996) ........................................................................................................ 11

*Sosa v. Paulos*,
  924 P.2d 357 (Utah 1996) ......................................................................................... 34, 36

*People ex rel. Spitzer v. Cnty. Bank of Rehoboth Beach, Del.*,
  846 N.Y.S.2d 436 (N.Y. App. Div. 2007) .......................................................................... 14

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ............................................................................................. 6

*Stoorman v. Greenwood Tr. Co.*,
  908 P.2d 133 (Colo. 1995) ............................................................................................... 21

*Strike v. Trans-W. Disc. Corp.*,
  92 Cal. App. 3d 735 (1979) .............................................................................................. 30

*Sumlin v. BNSF Ry. Co.*,
    No. EDCV 17-2364-JFW, 2018 WL 2723458 (C.D. Cal. Apr. 10, 2018) ............................... 7

*Tam v. F.D.I.C.*,
    830 F. Supp. 2d 850 (C.D. Cal. 2011) ................................................................. 13

*Ubaldi v. SLM Corp.*,
    852 F. Supp. 2d 1190 (N.D. Cal. 2012) ......................................................... 14, 15

*Vancoh Realty Co. v. C.I.R.*,
    33 B.T.A. 918 (B.T.A. 1936) ............................................................................. 18

*In re WageWorks, Inc., Sec. Litig.*,
    No. 18-cv-01523-JSW, 2020 U.S. Dist. LEXIS 97180 (N.D. Cal. June 1, 2020) ................... 4

*Warnshuis v. Bausch Health U.S., LLC*,
    No. 1:19-CV-1454 AWI BAM, 2020 WL 3294808 (E.D. Cal. June 18, 2020) ...................... 39

*Washington v. Geo Grp., Inc.*,
    283 F. Supp. 3d 967 (W.D. Wash. 2017) ............................................................. 6

*Wells Fargo Bank N.A. v. Boutris*,
    419 F.3d 949 (9th Cir. 2005) ............................................................................. 6

*West Virginia v. CashCall, Inc.*,
    No. 2008C1964, 2012 WL 11875220 (W.Va. Cir. Ct. Sep. 10, 2012) ............................ 23

*Wireless Warehouse, Inc. v. Boost Mobile, LLC*,
    No. SACV 09-1436-MLG, 2011 WL 92984 (C.D. Cal. Jan. 11, 2011), *aff'd*,
    479 F. App'x 58 (9th Cir. 2012) ....................................................................... 27

*Wishnev v. The Nw. Mut. Life Ins. Co.*,
    8 Cal. 5th 199 (2019) ................................................................................. 27, 28

*WRI Opportunity Loans II, LLC v. Cooper*,
    154 Cal. App. 4th 525 (2007) ...................................................................... 31, 32

*Wright v. Residential Acceptance Network*,
    No. 2:11CV402 DS, 2011 WL 4344179 (D. Utah Sept. 14, 2011) ................................ 18

**Statutes**

12 U.S.C. § 85 ............................................................................................. 8, 9, 26

12 U.S.C. § 86 ............................................................................................. 7, 8, 26

12 U.S.C. § 1831d ......................................................................................... *passim*

12 U.S.C. § 1831d(a) ..................................................................................... *passim*

12 U.S.C. §§ 1831d(a)-(b) .................................................................................................. 26

12 U.S.C. § 1831d(b) .............................................................................................. 3, 25, 26

15 U.S.C. § 1601 *et seq.* ............................................................................................ 16, 17, 18

15 U.S.C. § 1602(g) ........................................................................................................ 17

15 U.S.C. § 1638(a)(1) ..................................................................................................... 17

15 U.S.C. § 1693a(10) ..................................................................................................... 39

15 U.S.C. § 1693k(1) ................................................................................................... 37, 38

Cal. Fin. Code § 1675 ...................................................................................................... 28

Cal. Fin. Code § 22002 ......................................................................................... 28, 29, 32

Cal. Fin. Code § 22009 ............................................................................................... 28, 30

Cal. Fin. Code § 22050(a) ................................................................................................ 28

Cal. Fin. Code. § 22050(a) ............................................................................................... 30

Cal. Fin. Code § 22100(a) ................................................................................................ 28

Cal. Fin. Code § 22303 .................................................................................................... 28

Cal. Fin. Code §22304 ..................................................................................................... 28

DIDMCA ...................................................................................................................... 8, 9

EFTA .................................................................................................................... *passim*

FAA ......................................................................................................................... 22, 24

NBA ..................................................................................................................... *passim*

UCCC ........................................................................................................................... 35

Utah Code Ann. § 15-1-1 ....................................................................................... *passim*

Utah Code Ann. § 70C-2-101 ................................................................... 3, 12, 20, 35

Utah Code Ann. § 70C-7-106(3) ............................................................... 3, 20, 35

**Other Authorities**

12 C.F.R. § 331.4(e) .......................................................................................... 1, 10, 12

12 C.F.R. § 1026.2(a)(17) ................................................................................................ 17

Case No. 4:20-cv-04730-PJH

12 C.F.R. § 1026.18(a) ................................................................................................... 17

12 C.F.R. § Pt. 1026, Supp. I, Part I, Comment 2(a)(17)(i)-2 .................................... 18

Cal. Const. art. XV, § 1 ...................................................................... 27, 28, 30, 32

California Constitution ...................................................................... 28, 30, 31, 32

California Rules of Court Rule 8.1115 ...................................................................... 29

FDIC, Final Rule, Federal Interest Rate Authority, 85 Fed. Reg. 44,146 (July 22,
    2020) ........................................................................................................................... 1

FDIC, Final Rule, Federal Interest Rate Authority, 85 Fed. Reg. 44,146 (July 22,
    2020) (to be codified at 12 C.F.R. pt. 331) ..................................................*passim*

FDIC, No. FDIC-93-27, *12 U.S.C. § 1831d Preempts Contrary State Common Law
    Restrictions on Credit Card Loans* (July 12, 1993),
    https://www.fdic.gov/regulations/laws/rules/4000-8160.html#fdic400093-27 ....... 9

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 5

Interest Rate Authority Notice, 85 Fed. Reg. at 44,152 ............................................. 10

Lender, *Black's Law Dictionary* (11th ed. 2019) ....................................................... 15

OCC, Notice of Proposed Rulemaking, National Banks and Federal Savings
    Associations as Lenders, 85 Fed. Reg. 44,223-01, 44,224 (July 22, 2020) (the
    "True Lender Rule") (to be codified at 12 C.F.R. pt. 7 ........................................... 17

Stephen L. West, *The Utah Consumer Credit Code: Where Did It Come From, Why
    Is It Here, and Where Is It Going*, 1 BYU J. PUB. L. 1 (1986-1987)...................... 34

U.S. Const., Art. VI, cl. 2 ........................................................................................ 6

Utah Dep't of Fin. Insts., https://dfi.utah.gov/general-information/consumer-
    tips/interest-rates/ (last visited Oct. 7, 2020)........................................................... 36

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.  INTRODUCTION

Frederick Sims ("Plaintiff") is a California resident who obtained a loan from FinWise Bank ("FinWise"), a federally insured, state-chartered bank ("state bank") located in Utah.  Federal law permits FinWise to charge interest at the rate allowed by Utah law, without regard to contrary laws of other states, all of which are expressly preempted by Section 27 of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1831d (hereinafter "Section 27").

In the original Complaint, Plaintiff sought to evade preemption by asserting statutory claims predicated on alleged violations of California's usury law against FinWise and the entity to which FinWise allegedly sold his loan, Opportunity Finance, LLC ("OppLoans").  Defendants moved to dismiss on the grounds that Plaintiff's California law claims failed as a matter of law, and that to the extent any survived, Section 27 preempted them because the loans were originated at a rate Utah law allows.  Instead of opposing the motion, Plaintiff amended his Complaint to allege the same California claims *and* new claims under Utah law, asserting there is no preemption because the loans are also unconscionable under Utah law.  As set forth in detail below, this amendment saves none of Plaintiff's claims.  They fail as a matter of law and should be dismissed.

*First*, Plaintiff's claims predicated on California law fail because Section 27 expressly and impliedly preempts them.  Section 27 permits state banks such as FinWise to lend up to the rates permitted by the state in which they are located, and expressly preempts contrary laws in other states.  12 U.S.C. § 1831d(a).  Further, the Federal Deposit Insurance Corporation ("FDIC") issued formal regulations this year clarifying that this preemption applies with full force and effect after the sale or assignment of a loan (the "Interest Rate Authority Rule").  12 C.F.R. § 331.4(e) ("Interest on a loan that is permissible under Section 27 . . . shall not be affected by . . . the sale, assignment, or other transfer of the loan."); *see* FDIC, Final Rule, Federal Interest Rate Authority, 85 Fed. Reg. 44,146 (July 22, 2020) ("Interest Rate Authority Notice") (concluding that an "implicit component" of state-chartered banks' express right to make loans at interest rates permitted in their home states "is the right to assign the loans **under the preemptive authority of section 27.**") (emphasis added).  The interest rate FinWise charged on Plaintiff's loan is permissible in Utah, the state in which FinWise is

located. Utah Code Ann. § 15-1-1 (permitting parties to contract for "any" interest rate). Thus, Section 27 preempts any state-law claims seeking to preclude FinWise or the alleged acquirers of its loans—including OppLoans—from charging that rate. Because Plaintiff's claims premised on purported violations of California law do exactly that, Section 27 expressly preempts them.

Plaintiff's conclusory allegation that OppLoans is the true "finance lender" on his loan does not save his claims from preemption. The state-law true lender analysis that has been adopted by a handful of state and federal courts disregards parties' agreements and instead applies a multi-factor approach to ascertain whether the bank or its assignee/acquirer has the "predominant economic interest" in the loan such that it is the "true" or "*de facto*" lender. Courts that take this approach focus primarily on which party bears the risk of loss in the loan transaction. (*Infra* § III.B.3(a) at 14-15 (summarizing cases).) As set forth in further detail below, this analytical framework is *inconsistent* with federal law, has been *criticized* by federal banking regulators, and has been *rejected* by better-reasoned decisions concluding that the test's focus on whether the bank or subsequent acquirer bears the risk of loss in the loan transaction is inappropriate. This Court should reject it as well.

Indeed, Plaintiff's proposed approach of disregarding the parties' written agreement and inquiring into which entity bore the risk of loss is fundamentally inconsistent with Section 27, which was enacted to prevent states from subjecting state banks to their disparate usury laws. 12 U.S.C. § 1831d(a) (Section 27 was enacted "[i]n order to prevent discrimination against [s]tate-chartered" banks); *Greenwood Trust Co. v. Commw. of Mass.*, 971 F.2d 818, 826-27 (1st Cir. 1992) (explaining that Congress enacted Section 27 to protect state banks from discriminatory state banking laws in other jurisdictions). The "predominant economic interest" test is a thinly veiled end-run around these protections that subjects state banks to the discriminatory laws from which Section 27 was intended to shield them. Accordingly, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting Section 27, and is preempted. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011).

*Second*, Plaintiff's addition of Utah law unconscionability claims does not save his California claims from preemption. Plaintiff claims that because his loan's interest rate allegedly violates Utah's unconscionability doctrine, Defendants are not entitled to interest rate exportation under Section 27.

But Section 27 looks only to whether the rate charged is "allowed by the laws of the state . . . where the bank is located." 12 U.S.C. § 1831d(a). Utah's unconscionability doctrine is not such a law, as it does not regulate the interest rate permitted in Utah. Rather, it is a defense to contract enforcement that applies if a Court determines, upon a review of the totality of the circumstances surrounding a contract, that it would be unjust to enforce it according to its terms. By contrast, Utah's actual laws governing permissible rates of interest allow parties to agree to "any" interest rate. Utah Code Ann. §§ 15-1-1, 70C-2-101; *see id.* § 70C-7-106(3) (explaining that rate permitted by the code "is not in itself unconscionable"). These are the only laws relevant to the Section 27 preemption analysis.

*Third,* even if the Court determines Plaintiff's claims are not preempted, his state law claims fail on the merits for several independent reasons. His California law claims are barred by the choice of law provision he invoked, and in any event fail as a matter of law because his loan is statutorily exempt from California's usury laws because it was originated by a state bank. His new Utah law unconscionability claims fare no better, as they are precluded by the exclusive right of action in Section 27 and—in any event—Utah law forbids debtors from claiming a high interest rate in an otherwise lawful contract renders a loan unconscionable. And finally, Plaintiff's new claim for violation of the Electronic Fund Transfer Act ("EFTA") fails because the plain language of his loan agreement unambiguously demonstrates that his extension of credit was not conditioned on an agreement to repay it through recurring electronic funds transfers.

At base, Plaintiff's First Amended Complaint ("FAC") challenges a partnership that complies with federal banking law and is sanctioned by the regulators charged with enforcing that law. For these and other reasons set forth below, and because Plaintiff's causes of action independently fail as a matter of law, the Complaint should be dismissed with prejudice.

## II.    SUMMARY OF PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that in February 2020, he obtained a loan "with an excessive, unconscionable, and unlawfully high" interest rate. (FAC ¶ 92.) Plaintiff attached his Promissory Note and Disclosure Statement ("loan agreement") to the original Complaint. (ECF No. 1-1, Compl. Ex. A.)[1]  The loan

---

[1] Plaintiff appears to have inadvertently failed to attach Exhibit A to the FAC, even though it is

agreement defines "Lender," "we," and "us" to mean "FinWise Bank, an FDIC-insured bank located in Utah." (*Id.*)  It then provides that FinWise will formally "extend credit" to Plaintiff by "initiat[ing] a transfer of funds to the bank account you have identified for this purpose in the process of applying for credit . . . ." (*Id.*)  Further, Plaintiff "promise[d] to pay [FinWise] the principal sum of $1,500 plus interest until the loan is fully paid." (*Id.* ¶ 3.)  Thus, the plain language of the loan agreement attached to the Complaint indicates that FinWise was the lender on Plaintiff's loan, that it would extend credit to Plaintiff by transferring funds to his account, and that Plaintiff would repay FinWise for the loan. The loan agreement also recognized OppLoans's role as the servicer of the loan by directing Plaintiff "to contact our servicer, Opportunity Financial LLC ('Opploans')" to address certain issues. (*Id.* ¶ 4.)

Despite his agreement with FinWise, Plaintiff alleges that OppLoans, not FinWise, is the true "finance lender" of his loan.  (FAC ¶ 21.)  According to Plaintiff, OppLoans and FinWise have "conspired" to "evade" California's maximum interest rates by allowing OppLoans to "rent" FinWise's state charter to make loans at rates permissible for FinWise, but not OppLoans. (*Id.* ¶¶ 21-22, 64-68.)[2]  In purported support of this claim, Plaintiff alleges that OppLoans "immediately" purchases loans made by FinWise and is a service provider to the bank, assisting with underwriting, marketing, servicing, and collections.  (*Id.* ¶¶ 21-22, 24, 67.)  In addition, Plaintiff alleges "on information and belief" that Defendants conditioned his extension of credit on an agreement to repay it through recurring electronic funds transfers.  (*Id.* ¶¶ 107-108).  He makes this allegation even though the loan agreement plainly provides in all-caps that he was "NOT REQUIRED . . . TO AGREE TO MAKE AUTOMATED PAYMENTS TO OBTAIN A LOAN FROM US," (Compl.

---

referred to throughout the FAC.  (*See, e.g.,* FAC ¶¶ 80, 92, 112 (citing to the loan agreement as Exhibit A); *see also id.* ¶ 6 (claiming a copy of the loan agreement is "attached hereto as Exhibit A," when it is not.).)  For purposes of this motion, Defendants cite to the loan agreement as "Compl. Ex. A," which can be located on the docket at ECF No. 1-1.  Given Plaintiff's clear intent to incorporate his loan agreement into the FAC, it is properly considered in this motion and incorporated by reference because Plaintiff "refers extensively to" it and it "forms the basis of [P]laintiff's claims." *In re WageWorks, Inc., Sec. Litig.*, No. 18-cv-01523-JSW, 2020 U.S. Dist. LEXIS 97180, at *12 (N.D. Cal. June 1, 2020) (citing *U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)).

[2] The FAC is replete with inaccurate factual allegations, including those describing the transactional relationship between Defendants.  But even assuming the truth of the facts alleged solely for the purposes of this motion, Plaintiff's claims fail as a matter of law and should be dismissed.

Ex. A. at 2), and expressly permits him to pay by "paper check" (*id.* at ¶ 5).

Based on these allegations, Plaintiff claims that Defendants violated the "unlawful," "unfair," and "fraudulent" prongs of California's unfair competition law ("UCL"), as well as the Utah Consumer Credit Code. He also seeks declaratory relief. The basis for each of these claims is Plaintiff's allegation that his purported true lender, OppLoans, charged him interest that exceeds the maximum rates permitted under California and Utah law, including limitations in the CFL and purported limits imposed by Utah's unconscionability doctrine. (*See, e.g.*, FAC ¶¶ 34-45.) Plaintiff further contends that Defendants misrepresented and omitted information regarding, among other things, the true lender of his loan, the interest-rate limitation applicable to his loan, and the legality of the interest rate charged. (*See, e.g.*, *id.* ¶¶ 72-78.) Finally, Plaintiff alleges that by purportedly conditioning his loan on an agreement to pay by recurring electronic payments, Defendants violated the EFTA. (*Id.* ¶¶ 105-108).

## III.   **ARGUMENT**

The FAC alleges eight claims for relief, all of which fail on the merits. Because the FAC engages in shotgun pleading and the claims overlap in significant part, Defendants provide this roadmap to the Court:

- As set forth in section III.B below, Plaintiff's seven state-law claims under California and Utah law all fail because they are preempted by federal banking laws.

- For the reasons set forth in sections III.C.1-3 below, to the extent the Court finds that any of Plaintiff's state-law claims are not preempted, they fail on the merits for independent reasons.

- As set forth in section III.C.4 below, Plaintiff's eighth claim for relief under EFTA fails because Plaintiff's own allegations demonstrate he cannot state a claim.

### A.   **Legal Standard.**

A complaint must be dismissed under Rule 12(b)(6) if it "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008); *see Funke v. Sorin Group USA, Inc.*, 147 F. Supp. 3d 1017, 1022 (C.D. Cal. 2015) (a complaint is subject to dismissal "where the allegations on their face show that relief is barred as a matter of law") (citation omitted). While allegations of fact must be assumed to be

true, the Court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## B.    Federal Law Preempts Plaintiff's State Law Claims.

Plaintiff's state law claims all fail as a matter of law because federal law preempts them. As set forth in further detail below, federal law expressly and impliedly preempts Plaintiff's efforts to apply California usury laws to a Utah state bank that lends at the rate expressly allowed in its home state. And it also completely preempts Plaintiff's Utah-law claims because Section 27 provides an exclusive federal remedy where, as here, Plaintiff alleges the interest rate on the loan exceeds the rate permitted by the laws of the state in which the bank is located.

### 1.    Federal Preemption Principles.

The Supreme Court of the United States Constitution provides that federal law is "the supreme Law of the Land" notwithstanding any state law to the contrary. U.S. Const., Art. VI, cl. 2. A preemption "question is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State? If so, the Supremacy Clause requires courts to follow federal, not state, law." *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 30 (1996).[3]

"Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, or (3) obstacle/conflict preemption." *Washington v. Geo Grp., Inc.*, 283 F. Supp. 3d 967, 974 (W.D. Wash. 2017) (citing *Nat'l Fed'n of the Blind v. United Airlines, Inc.*, 813 F.3d 718, 724 (9th Cir. 2016)). "Express preemption exists when Congress enacts a statute that contains an

---

[3] Ordinarily, there is a presumption against preemption that requires courts to "assum[e] that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). However, that presumption does not apply here because "the usual presumption against federal preemption of state law is inapplicable to federal banking regulation." *Wells Fargo Bank N.A. v. Boutris*, 419 F.3d 949, 956 (9th Cir. 2005); *see also* Interest Rate Authority Notice, 85 Fed. Reg. at 44,151 (explaining that "the presumption against preemption is inapplicable" to Section 27).

express preemption provision or otherwise explicitly defines the extent to which its enactments preempt state law." *Sumlin v. BNSF Ry. Co.*, No. EDCV 17-2364-JFW (KKx), 2018 WL 2723458, at *2 (C.D. Cal. Apr. 10, 2018) (citing *Arizona v. U.S.*, 567 U.S. 387, 399 (2012)). On the other hand, obstacle preemption is a form of implied conflict preemption that applies when, "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (internal marks omitted).

### 2. The Federal Banking Laws Expressly Permit National Banks, State Banks, and Their Assignees to Charge Interest Rates Permitted in the State in Which They Are Located and Preempt Contrary State Laws.

Over several decades, Congress enacted several laws to limit state-law usury claims against federally chartered banks ("national banks") and state banks. As set forth below, these statutes, their implementing regulations, and case law make clear that federal law (1) authorizes both national and state banks to charge the interest rate permitted in their home state in any state in the country; and (2) preempts state-law usury claims that abridge this right. Because the laws pertaining to state-chartered banks have substantially followed the laws pertaining to federally chartered banks, an understanding of the law governing national banks is important.

### (a) National Banks' Interest Rate Authority.

Title 12 U.S.C. § 85 ("Section 85") of the National Bank Act ("NBA") provides that a national bank "may take, receive, reserve, and charge on any loan . . . interest at the rate allowed by the laws of the State . . . where the bank is located." Title 12 U.S.C. § 86, in turn, creates a private right of action for violations of the federal interest cap set forth in Section 85. These provisions were intended to protect national banks from discriminatory state banking laws and insure "competitive equality" between state and national banks. *Greenwood Trust Co.*, 971 F.3d at 826 n.6; *Marquette Nat'l Bank of Minneapolis v. First of Omaha Service Corp.*, 439 U.S. 299, 314 (1978).

In *Marquette*, the Supreme Court held that Section 85 permitted a national bank to "export" a favorable interest rate from the state in which it was located to customers in another state, without regard to state laws to the contrary. 439 U.S. at 313-14, 317-19; *see also Piñon v. Bank of Am., NA*, 741 F.3d 1022, 1025 (9th Cir. 2014) (under Section 85, "national banks may 'export' the regulatory

regime of the state in which they are located and impose it on customers residing in states with more consumer-friendly regulations"). Accordingly, any state usury law to the contrary is preempted by the NBA. *Marquette,* 439 U.S. at 308, 315-18 (affirming order concluding NBA preempted Minnesota usury law); *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11 (2003) ("Because §§ 85 and 86 provide the exclusive cause of action for such claims, there is, in short, no such thing as a state-law claim of usury against a national bank.").[4]

### (b)     The Parallel Interest Rate Authority of State Banks.

Just as Section 85 permits national banks to export their home interest rate to other states, the statute governing state banks—the Depository Institutions Deregulation and Monetary Control Act ("DIDMCA")—"has a parallel provision" that entitles them to do the same. *Piñon*, 741 F.3d at 1025.

In 1980, following a decade of inflation, soaring interest rates, and a credit crunch, "state lending institutions were constrained in the interest they could charge by state usury laws," while "[n]ational banks did not share this inhibition" in light of the protections of the NBA, leaving state banks "at an almost insuperable competitive disadvantage." *Greenwood Trust Co.*, 971 F.2d at 826. Recognizing the need to "prevent discrimination against State-chartered" banks, Congress enacted Section 27 to grant the same protections to state banks. 12 U.S.C. § 1831d. The legislative history is clear that the purpose of Section 27 was to remedy this inequality and "level the playing field between federally chartered and state-chartered banks." *Greenwood Trust Co.*, 971 F.2d at 826-27 (citing senators' statements confirming the intent of Section 27 was to provide "parity" or "competitive equality" between state and federal banks). To achieve this objective, Congress "incorporated language from section 85" of the NBA into DIDMCA and granted "all federally insured financial institutions—State banks, savings associations, and credit unions—similar interest rate authority to that provided to national banks." Interest Rate Authority Notice, 85 Fed. Reg. at 44,147. "The incorporation [of Section 85's authority] was not mere happenstance. Congress made a conscious choice to incorporate Section 85's standard." *Id.*

---

[4] Notably, in reaching this conclusion, the Supreme Court rejected arguments that interest rate exportation would lead to evasion of state usury laws, finding that was a policy argument "better addressed to the wisdom of Congress" than courts. *Marquette*, 439 U.S. at 319.

Like Section 85 of the NBA, Section 27 of the FDIA preempts any state-law usury caps other than those imposed by the bank's home state as to "any loan . . . made" by a state-chartered bank. 12 U.S.C. § 1831d(a). Because these two provisions are "virtually identical in substance, policy, and internal logic . . . the same express preemption analysis governing Section[] 85 . . . of the [NBA] applies to preemption of state usury laws under Section 27 of the FDIA." *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1363 (D. Utah 2014) (internal marks omitted); *Greenwood Trust Co.*, 971 F.2d at 827 (holding that these provisions "should be interpreted the same way"); *Cross-County Bank v. Klussman*, No. C-01-4190 SC, 2004 WL 966289, at *4 (N.D. Cal. Apr. 30, 2004) ("The historical record clearly requires a court to read the parallel provisions of [DIDMCA] and the [NBA] *in pari materia*."); FDIC, No. FDIC-93-27, *12 U.S.C. § 1831d Preempts Contrary State Common Law Restrictions on Credit Card Loans* (July 12, 1993), https://www.fdic.gov/regulations/laws/rules/4000-8160.html#fdic400093-27 ("We have stated consistently that [Section 27] was intended to give state-chartered FDIC-insured banks the same 'most favored lender' status and right to export interest enjoyed by national banks under 12 U.S.C. 85"). Thus, like Section 85, "Section 27 has been construed to permit a State bank to export to out-of-state borrowers the interest rate permitted by the State in which the State bank is located, and to preempt the contrary laws of such borrowers' States." Interest Rate Authority Notice, 85 Fed. Reg. at 44,147 (citing *Greenwood Trust Co.*, 971 F.2d at 827); *see also California v. Check 'n Go of Cal., Inc.*, No. C 07-02789 JSW, 2007 WL 2406888, at *2 (N.D. Cal. Aug. 20, 2007) (holding Section 27 preempted state usury claims against state-chartered bank).

### (c) The Preemptive Force of Sections 85 and 27 Applies After the Sale or Assignment of Loans.

Section 27 preemption applies to "any loan . . . made" by a state-chartered bank. 12 U.S.C. § 1831d(a). Thus, the preemptive force accompanying loans they make applies after sale or assignment of the loans. The OCC and FDIC recently affirmed this position through formal rulemaking clarifying that the preemptive force of Sections 85 and 27 extend after a loan is sold or assigned.[5] Specifically, in July of 2020, the FDIC issued its Interest Rate Authority Rule, which

---

[5] This rule is sometimes referred to as the "*Madden*-fix" rule, because it was issued in part to

Case No. 4:20-cv-04730-PJH

provides that "[w]hether interest [charged] on a loan is permissible under [S]ection 27 . . . is **determined as of the date the loan was made**," and that **"[i]nterest on a loan that is permissible under [S]ection 27 . . . shall not be not affected by . . . the sale, assignment, or other transfer of the loan, in whole or in part**." 12 C.F.R. § 331.4(e) (emphasis added).

In the notice accompanying the publication of the Interest Rate Authority Rule, the FDIC explained that it issued this rule to "address a statutory gap" in the FDIA, which "expressly gives banks the right to make loans at the rates permitted by their home States, but does not explicitly list all the components of that right." Interest Rate Authority Notice, 85 Fed. Reg. at 44,146 (internal marks omitted). The FDIC filled this statutory gap by concluding that "[o]ne such implicit component" of the right of state-chartered banks to make loans permitted by their home states "is the right to assign loans under the preemptive authority of section 27." *Id.* In reaching this conclusion, the FDIC explained that "[b]anks' power to make loans has been traditionally viewed as carrying with it the power to assign loans," and therefore "a State bank's Federal statutory authority under section 27 to make loans at particular rates includes the power to assign the loans at those rates." *Id.* Rejecting the alternative view, the FDIC explained that "[d]enying State banks the ability to transfer enforceable rights in the loans they make under the preemptive authority of section 27 would undermine the purpose of section 27 and deprive State Banks of an important and indispensable component of their Federal statutory power to make loans at the rates permitted by their home State."[6] *Id.* at 44,149.

As set forth in further detail below, this interpretation of Section 27 is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Thus,

---

address legal uncertainty created by *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), an aberrational decision concluding that the NBA's preemption provisions at Section 85 did not apply to a bank-made loan that was assigned to a non-bank. *Madden* was widely criticized when decided, including by the OCC, and is now directly contrary to binding FDIC regulation.

[6] In the notice accompanying the Interest Rate Authority Rule, the FDIC made clear that the rule did "not address the question of when a State bank is the true lender with respect to a loan," did not address which party should be tasked with making such a determination, and was not intended to foreclose true lender claims. Interest Rate Authority Notice, 85 Fed. Reg. at 44,152. Defendants do not argue otherwise. Rather, as set forth herein, the proper way to identify the true lender is simply to look to the lending agreement and which entity funded the loan, and the alternative tests that focus on the totality of the circumstances or the "predominant economic interest" are preempted by Section 27 and inconsistent with the Interest Rate Authority Rule. The FDIC has indicated it intends to address the issue through separate rulemaking, as the OCC already has. To the extent such rulemaking is issued while this brief is pending, Defendants will promptly update the Court.

after the Interest Rate Authority Rule, it is beyond dispute that the assignees or acquirers of loans acquire them with the preemptive authority of Section 27, and have the right to enforce the interest rate originally charged by the national or state bank.

### 3. Section 27 Expressly Preempts Plaintiff's Claims Predicated on Violations of California Law.

As discussed, it is well-settled that Section 27 of the FDIA permits state banks to charge interest on loans up to the rate allowed in the state in which they are located, and expressly preempts laws to the contrary. Thus, federal law preempts state-law statutory and common law claims premised on the invalidity of the interest rate properly charged under Section 27. *See, e.g., California v. Check'n Go of Cal., Inc.*, No. C 07-02789 JSW, 2007 WL 2406888, at *2 (N.D. Cal. Aug. 20, 2007) (finding Section 27 preempted state usury claims against state-chartered bank); *Greenwood Trust Co.*, 971 F.2d at 827-31 (same); *Sawyer,* 23 F. Supp. 3d at 1369 (holding Section 27 preempted California state-law usury claims); *Harris v. Chase Manhattan Bank*, 35 Cal. Rptr. 2d 733, 740 (1994) (holding Section 27 preempted California statutory and common law claims premised on interest charged by state-chartered bank); *see also Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 738, 746 (1996) (affirming decision holding Section 85 of the NBA preempted California "statutory and common-law claims" premised on allegation that out-of-state bank was charging customers "unconscionable" interest in violation of California law.)

The allegations of the FAC demonstrate that Plaintiff's UCL claims predicated on California law violations are barred as a matter of law. Plaintiff is a California resident. (FAC ¶ 2.) He alleges several UCL claims premised on violations of California law, all of which are premised on his allegation that the interest charged on the loan he obtained from FinWise exceeded the rate allowed by California law. (*See generally* FAC.) These claims all have the same fatal flaw: the very agreement attached to the Complaint and Plaintiff's own allegations make clear that FinWise was the lender on his loan. (*See* Compl. Ex. A. (defining "Lender" as "FinWise Bank, an FDIC-insured Bank located in Utah" and stating that FinWise is extending credit to Plaintiff, who is required to pay back principal and interest to FinWise); *see also* FAC ¶¶ 21-22 (alleging that FinWise immediately sells the loan to OppLoans after funding as part of a "pre-arranged deal," implicitly recognizing FinWise held a loan to

sell).) As an FDIC-insured, state-chartered bank located in Utah, FinWise has the right under Section 27 to loan "at the rate allowed by the laws of th[at] State." 12 U.S.C. § 1831d(a); Defs.' Req. for Judicial Notice ("RJN") Exs. A, B. Utah allows for parties to contract for "any" interest rate in connection with a loan. Utah Code Ann. § 15-1-1. Thus, even if California law would not permit a lender subject to its usury restrictions to charge the interest rate Plaintiff agreed to, that rate is permissible under Utah state law, and thus permissible under Section 27.

Plaintiff's allegation that OppLoans and FinWise have a "pre-arranged deal" by which Plaintiff's loan was "purchased or otherwise obtain[ed] by OppLoans" does not change the analysis. While there may have previously been ambiguity as to whether preemption extended to a state-chartered bank's assignees, the FDIC conclusively resolved that issue with the Interest Rate Authority Rule, under which the permissibility of interest under Section 27 is determined at the time the loan is made, and the permissible interest "shall not be affected by . . . the sale, assignment, or other transfer of the loan, in whole or in part." 12 C.F.R. § 331.4(e); (*see supra* § III.B.2(c) at 9-11). Under Utah law, FinWise was free to lend at the rate agreed upon with Plaintiff. Utah Code Ann. § 15-1-1; *see also* Utah Code Ann. § 70C-2-101 (providing that unless a finance charge is expressly "restricted" by the Utah Consumer Credit Code, "the parties to a consumer credit agreement may contract for payment by the debtor of any finance charge and other charges and fees."). Thus, Plaintiff's California claims against FinWise (the lender) or OppLoans (the alleged purchaser) are all preempted.[7]

The Interest Rate Authority Rule, which was properly promulgated by the FDIC through notice-and-comment rulemaking interpreting Section 27, is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The rule properly addresses two gaps identified in the FDIA: (1) "at what point in time the validity and enforceability of section 27 of the interest-rate term of a bank's loan should be determined;" and (2) whether the "components of" the "right to make loans at the rates permitted by their home States" allows banks "to assign the loans made under the preemptive authority of section 27." Interest Rate Authority Notice,

---

[7] As set forth in detail below in section III.B.3(b), Plaintiff's attempt to rescue his claims from preemption in the FAC by alleging the loan is unconscionable under Utah law does not change the preemption analysis, because Section 27 looks only to the laws of the bank's home state regulating the rate of interest that may be charged, and not general contract defenses such as unconscionability.

85 Fed. Reg. at 44,148-49. Accordingly, under *Chevron*, because Section 27 "is silent or ambiguous with respect to the issue at hand, [the Court] must defer to the [FDIC's] . . . construction of [Section 27]" so long as it is not "arbitrary, capricious, or manifestly contrary to the statute." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) (quoting *Chevron*, 467 U.S. at 842-44).

Under this standard, courts defer to FDIC interpretations of the FDIA issued, as here, pursuant to formal notice-and-comment rulemaking. *See, e.g., Henry v. F.D.I.C.*, 695 F. Supp. 2d 1063, 1075 (C.D. Cal. 2010) (deferring to FDIC's interpretation of the FDIA under *Chevron*); *Tam v. F.D.I.C.*, 830 F. Supp. 2d 850, 862 (C.D. Cal. 2011) (same); *America's Cmty. Bankers v. F.D.I.C.*, 200 F.3d 822, 834 (D.D.C. 2000) (same); *Hill v. Chem. Bank*, 799 F. Supp. 948, 953 (D. Minn. 1992) (same).

Here, Plaintiff cannot demonstrate that the FDIC's interpretation of Section 27 of the FDIA was "arbitrary, capricious, or manifestly contrary to the statute." To the contrary, the FDIC's interpretation of Section 27 and its rationale for the Interest Rate Authority Rule is unassailable. As the FDIC explained when it issued this rule, it has been recognized for hundreds of years that "State banks['] power to make loans . . . at particular rates necessarily includes the power to assign the loans at those rates." Interest Rate Authority Notice, 85 Fed. Reg. at 44,149 (citing *Planters' Bank v. Sharp*, 47 U.S. 301, 323 (1848) (holding that a statute that explicitly gave banks the power to make loans implicitly gave them the power to assign them)). Accordingly, the FDIC's interpretation of Section 27 is "consistent with state banking powers and common law doctrines such as the 'valid when made' . . . rule[]," which "provides that usury must exist at the inception of the loan for a loan to be deemed usurious; as a corollary, if the loan was not usurious at inception, the loan cannot become usurious at a later time, such as upon assignment, and the assignee may lawfully charge interest at the rate contained in the transferred loan." *Id.* (collecting authority).

This interpretation, which is grounded in long-settled principles of banking law, is a permissible construction of Section 27 entitled to *Chevron* deference. Section 27 and the Interest Rate Authority Rule dispose of Plaintiff's claims predicated on violations of California law, all of which seek to hold FinWise and its alleged assignee liable for charging an interest rate permissible in the lender's home state. They should be dismissed.

### (a) Plaintiff's "True Lender" Allegations Do Not Change the Preemption Analysis.

Plaintiff alleges (inconsistently) that OppLoans, not FinWise, is the true "finance lender" of his loan. (FAC ¶ 21.) Plaintiff claims FinWise originated his loan and then sold it to OppLoans, and that FinWise is listed as the lender on his loan agreement. (*Id.* ¶¶ 22, 24, 67, 72.) Further, the face of the loan agreement shows that FinWise is the lender. (Compl. Ex. A.) Plaintiff nonetheless contends that OppLoans and FinWise seek to "evade" maximum interest rates by allowing OppLoans to "rent" FinWise's state charter to make loans at rates permissible for FinWise, but not OppLoans. (*Id.* ¶¶ 22, 67-68.) In Plaintiff's view, OppLoans is the actual lender because, he alleges, it "immediately" purchases loans made by FinWise and allegedly is a service provider to the bank, assisting with underwriting, marketing, servicing, and collections. (*Id.* ¶¶ 22, 24, 67.) By these allegations, Plaintiff appears to request that this Court ignore his loan agreement (and allegations regarding the sale of his loan) that makes clear FinWise is the lender, and instead follow courts that have adopted a complex, multi-factor, state-law analysis to ascertain the identity of the "true" or "*de facto*" lender.[8]

In the cases that have engaged in this analysis, courts purport to identify the "true lender" by analyzing the totality of the circumstances, including the substance of the relationship between the bank and non-bank lender, to determine which bank has the "predominant economic interest" in loans originated under the particular arrangement. *See, e.g., CFPB v. CashCall, Inc.*, No. CV 15-7522-JFW (RAOx), 2016 WL 4820635, at *5-6 (C.D. Cal. Aug. 31, 2016) (applying the law of 16 states); *Cashcall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014) (applying West Virginia law); *People ex rel. Spitzer v. Cnty. Bank of Rehoboth Beach, Del.*, 846 N.Y.S.2d 436, 439 (N.Y. App. Div. 2007) (applying New York law); *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1196 (N.D. Cal. 2012) (applying California law); *Meade v. Marlette Funding, LLC*, 2018 Colo. Dist. LEXIS 3856 (D. Colo. Aug. 13, 2018) (applying Colorado law).[9] Under this approach, which the

---

[8] In the Complaint, Plaintiff repeatedly referred to OppLoans as the "true lender." In the FAC, Plaintiff changed the wording to refer to OppLoans as the actual "finance lender." This wording change does not alter Plaintiff's request that the Court disregard the loan agreement and determine that a non-party to it was actually the true lender all along.

[9] In *Easter v. American West Fin.*, 381 F.3d 948, 957 (9th Cir. 2004), the Ninth Circuit applied

FAC implicitly asks this Court to adopt, "the key and most determinative factor" is whether the original lender "placed its own money at risk . . . or whether the entire monetary burden and risk of the loan program was borne by [the non-bank assignee]." *CashCall,* 2016 WL 4820635, at *6.

This multi-factor, totality-of-the-circumstances approach to identifying the "true" lender on a given transaction is highly controversial and has been criticized by courts and federal regulators. As set forth below, this Court should decline to apply it for several reasons. *First*, the "predominant economic interest" test some courts use to identify the lender for preemption purposes is contrary to federal law, has been severely criticized by the OCC, and has been rejected by the better-reasoned decisions to address it. *Second*, the "predominant economic interest" test's focus on which entity bears the risk of loss is no longer viable after the publication of the Interest Rate Authority Rule. *Third,* because the "predominant economic interest" test enables the discrimination against state banks Section 27 was enacted to prevent, and undermines the regime of legal certainty Congress established when it passed Section 27 into law, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting Section 27, and is therefore preempted. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

> **(i)**      **The Federal Test Supplies the Proper Method to Identify the "True Lender": It Is the Party That Extended Credit.**

A "lender" is "[a] person or entity from which something (esp. money) is borrowed." Lender, *Black's Law Dictionary* (11th ed. 2019). Consistent with the plain meaning of the term, many federal courts evaluating preemption under the NBA and FDIA have properly held that the lender on a loan is the entity that (i) contracts with the borrower for the loan and/or (ii) supplies the loan funds (the "federal test"). Plaintiff seeks to convert OppLoans from a loan purchaser and service provider to a lender, but his request requires the Court to disregard the federal test and instead adopt a multi-factor test to allegedly better determine which entity made his loan. Such tests have been fashioned from state-law analyses created to address entirely different questions and have "no basis" in the FDIA and

---

the State of Washington's established "de facto" lender doctrine for purposes of determining whether a transaction was usurious. However, that case did not address or involve preemption or Sections 27 or 85. As such, cases like *Ubaldi* that came after *Easter* have recognized it is not binding authority on the question. *Ubaldi*, 852 F. Supp. 2d at 1196.

NBA. *Hudson v. Ace Cash Express, Inc.*, No. IP 01-1336- C H /S, 2002 WL 1205060, at *6 (S.D. Ind. May 30, 2002). They also have come under fire by the OCC, which recently proposed a rule adopting the federal test for determining the "true lender" under federal law. The OCC's approach is consistent with federal lending law, such as the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and there is no basis for the Court to depart from its application to the federal preemption issues raised here.

To start, the better-reasoned decisions addressing this issue have rejected limiting federal preemption through amorphous "true lender" tests. For example, in *Hudson*, the plaintiff sued a non-bank for usury under Indiana law. 2002 WL 1205060, at *1. A national bank funded the plaintiff's loan and was identified as the lender on the loan agreement, but then sold a 95 percent interest to the non-bank. *Id.* at *2-3. The non-bank was also solely responsible for collecting loan payments and charging fees. *Id.* at *3. The plaintiff argued that NBA preemption did not apply because the non-bank should be treated as the "actual lender" given the bank's "insignificant" role in the lending program and the defendants' purported intent to circumvent Indiana's interest-rate limitations. *Id.* at *4. The court rejected this argument, finding no basis in the NBA for "drawing jurisdictional boundaries in such an uncertain and unpredictable way." *Id.* at *6. Rather, the fact that the bank had "made the loan to [the plaintiff]" was "dispositive." *Id.* at *7.

Similarly, in *Krispin*, the Eighth Circuit "look[ed] to the originating entity (the bank), and not the ongoing assignee (the [non-bank]), in determining whether" NBA preemption applies. *Krispin v. v. May Dep't Stores Co.*, 218 F.3d 919, 924 (8th Cir. 2000). It held that the plaintiff's claims against the alleged assignee were subject to NBA preemption even though the bank that originated the loans sold its full interest in them to its assignee on a daily basis. *Krispin*, 218 F.3d at 924; *see also Hudson*, 2002 WL 1205060, at *5 (explaining that in *Krispin*, the national bank "held no financial stake in the loans" but the claims against the assignee were preempted nonetheless).

Likewise, the court in *Sawyer* rejected the plaintiff's argument that a state bank was not "the true lender or the real party in interest" on his loan where the non-bank service provider facilitated the loan process for the bank, which was the party to the loan contract, funded the loan, and held the loan for two days before selling it to the non-bank. *Sawyer*, 23 F. Supp. 3d at 1360-61, 1367-69. Even

crediting the plaintiff's allegation that the challenged loan program was "intentionally structured" to circumvent state usury law, the court found the bank's origination of the plaintiff's loan to require preemption of his usury claims under Section 27. *Id.* at 1363; *see id.* at 1367-69.

Consistent with these decisions, the OCC recently proposed adopting the federal test used in these decisions to determine when a national bank is the "true lender" in a partnership between a bank and a third party. OCC, Notice of Proposed Rulemaking, National Banks and Federal Savings Associations as Lenders, 85 Fed. Reg. 44,223-01, 44,224 (July 22, 2020) (the "True Lender Rule") (to be codified at 12 C.F.R. pt. 7). The OCC's proposed test is like that used in *Hudson*, *Krispin*, and *Sawyer* and identifies the lender as the entity (1) named as the lender in the loan agreement or (2) that funds the loan. *Id.* at 44,224. In its notice of proposed rulemaking, the OCC heavily criticized the decisions applying "fact-intensive balancing tests" that consider numerous factors to determine the predominant economic interest. *Id.* It explained that, in courts' application of such tests, "no factor is dispositive, nor are the factors assessed based on any predictable, bright-line standard." *Id.* "[T]he lack of a uniform and predictable standard . . . increase[s] the subjectivity in determining who is the true lender," which means that stakeholders cannot "reliably determine which entity makes a loan." *Id.* This results in uncertainty regarding key legal issues, such as the applicable regulatory framework and interest-rate limitation. *See id.* In the OCC's view, the federal test addresses these fundamental defects in the multi-factor tests and provides "clarity and certainty" regarding the "statutory, regulatory, and supervisory framework applicable to [a] loan." *Id.* at 44,225.

As the OCC's proposed rule makes clear, courts' experimentation with multi-factor true lender tests in the federal preemption context has resulted in legal uncertainty. To avoid this untenable result, the Court should apply the federal test here. This would be consistent with how the lender is determined under federal lending laws, including TILA, the federal statute governing disclosures from lenders to borrowers in connection with extending credit. TILA requires that, at the time of origination, the "creditor" or lender of a loan be disclosed to the borrower, and the creditor to be identified is the party to whom the loan is "initially payable on the face of the evidence of indebtedness." *See* 15 U.S.C. §§ 1602(g), 1638(a)(1); 12 C.F.R. §§ 1026.18(a), 1026.2(a)(17). The lender does not change even if the lender's intention from inception is to "simultaneous[ly]" assign a

loan to a third party.  12 C.F.R. § Pt. 1026, Supp. I, Part I, Comment 2(a)(17)(i)-2; *see Wright v. Residential Acceptance Network*, No. 2:11CV402 DS, 2011 WL 4344179, at *1 (D. Utah Sept. 14, 2011) (noting that, even if the loan is assigned simultaneously with its creation, "the party to whom the obligation is initially payable 'is the only creditor in the transaction'" for TILA purposes); *Glover v. Fremont Inv. & Loan,* No. C-09-03922 JCS, 2009 WL 5114001, at *3 (N.D. Cal. Dec. 18, 2009) (confirming assignee need not be identified as the creditor under TILA).

In short, the approach to determining the lender under federal law does not turn on a party's ultimate economic interest in a loan or any purported intent to avoid state usury law.  This Court should follow the federal test, reject the contrary multi-factor approach, and conclude that FinWise— the party with whom Plaintiff entered into a loan agreement—is his lender.

### (ii)    The Predominant Economic Interest Test Cannot Be Reconciled with the Interest Rate Authority Rule.

The "predominant economic interest" test fails for another reason not considered by any of the courts that have adopted it: the FDIC's Interest Rate Authority Rule rendered it obsolete.  Under the multi-factor "predominant economic interest" test, the "key and most determinative factor" is which party bears the risk of loss on the loan. *CashCall,* 2016 WL 4820635 at *6.  But after the Interest Rate Authority Rule, this factor no longer makes any sense.  Consequently, the "predominant economic interest" test—which relies heavily on this factor—is no longer viable and must be discarded.  *See, e.g., Fleet Credit Corp. v. Sion*, 893 F.2d 441, 445–47 (1st Cir.1990) (previously used multi-factor test to identify predicate criminal acts "no longer a reliable guide" after contrary Supreme Court decision).

The basic economics of loan assignments show why this is the case.  When parties acquire loans, they acquire the right to payment on the note in exchange for the amount they pay for the loan, but also bear the risk of loss in the event of default or nonpayment. *Chandler v. Washington Mut. Bank, FA*, No. CV 10-00487 ACK-KSC, 2013 WL 12314516, at *2, *5 (D. Haw. June 12, 2013) (explaining that a bank that acquires a loan "is assuming the risk that a borrower might default") (citation omitted); *see also Vancoh Realty Co. v. C.I.R.*, 33 B.T.A. 918, 923–24 (B.T.A. 1936) (explaining that loans are sold based on the present value of the obligation to pay in the future, including "the adequacy of the security" in the event of nonpayment).  Thus, if a borrower defaults,

the assignee or acquirer that holds the right to payment on the note will ordinarily suffer the loss, not the original lender/assignor.

Thus, in most circumstances in which a loan is sold or assigned, the assignee or acquirer of a loan will necessarily bear the primary risk of loss. Since identification of the party bearing the risk of loss is the "key and most determinative factor" under the "predominant economic interest" test, that means—in practice—that the test will often (if not always) result in a conclusion that the assignee (1) bears the primary risk of loss, (2) is therefore the "true" or "*de facto*" lender, and (3) consequently **is not** entitled to the protections of Section 27. Such an outcome cannot be squared with the Interest Rate Authority Rule, which makes clear that an assignee or acquirer of a loan is entitled to rely on the "preemptive authority of Section 27" to continue charging the original interest rate after sale or assignment. Interest Rate Authority Notice, 85 Fed. Reg. at 44,146. Because the "predominant economic interest" test focuses on a factor that cannot be reconciled with the Interest Rate Authority Rule, it is "no longer a reliable guide" to identifying the true lender and should be abandoned. *Fleet Credit Corp.*, 893 F.2d at 446.

> **(b)    Plaintiff's New Utah Law Claims Do Not Save His Claims Predicated on California Law Violations from Preemption.**

In response to the preemption arguments discussed above, Plaintiff amended his Complaint to add new claims for relief under Utah law. (FAC ¶¶ 42-45, 214-227). Plaintiff's apparent theory is that because the loan's interest rate purportedly violates Utah's unconscionability doctrine, Defendants are not entitled to interest rate exportation under Section 27. (*Id.* ¶¶ 83-85). Plaintiff is wrong. As set forth below at sections III.B.5 (pp. 25-26) and III.C.3 (pp. 33-37), Plaintiff's Utah claims all fail as a matter of law. But even if they survived, his claims predicated on violations of California law still would be preempted, because Utah's unconscionability doctrine is not a law that sets interest rates and thus has no bearing on Section 27 preemption.

Section 27 permits state banks to take and charge interest "at the **rate allowed by** the laws of the State…where the Bank is located." 12 U.S.C. § 1831d(a) (emphasis added). Utah's unconscionability doctrine is not such a law. It does not regulate the rate of interest allowed at all. Rather, it is a defense to contract enforcement that may be invoked by a party resisting enforcement

upon a showing of both procedural and substantive unconscionability, which requires courts to look to the totality of the contract, including numerous factors wholly unrelated to the interest rate, to determine whether it should "reliev[e] one side or the other from the effects of a bad bargain." *See Cantamar, L.L.C. v. Champagne*, 142 P.3d 140, 151, 153 (Utah 2006) (internal quotations omitted) (holding interest rate did not render loan unconscionable even if it was "high by some standards" given the risk the lender assumed and the absence of any evidence the plaintiff actually "suffered from lack of choice, felt compelled to execute the Note, or that [the lender] obscured key provisions of the agreement."). Given the holistic nature of the unconscionability analysis, which takes into account several considerations that have nothing to do with interest rates, it plainly is not a "law of the State" of Utah setting forth "the rate [of interest] allowed." 12 U.S.C. § 1831d(a).

By contrast, Utah's actual laws governing permissible rates of interest are clear: they permit parties to agree to "any" interest rate. Utah Code Ann. sections 15-1-1, 70C-2-101. These are the only laws in Utah regulating interest rates, and are thus the only laws that may be referenced for purposes of determining Section 27 preemption. This conclusion is further enforced by the fact that the Utah Consumer Credit Code provides that a rate permitted by the code "is not in itself unconscionable." Utah Code Ann. § 70C-7-106(3). Seeing as the code separately provides that a lender and borrower may contract for "any" finance charge as long as it is not expressly prohibited, *id.* § 70C-2-101, it is clear that the only laws in Utah governing the allowable rate of interest are Utah Code Ann. sections 15-1-1 and 70C-2-101, each of which confirm there is no interest rate cap in Utah. *See Sawyer v. Bill Me Later, Inc.*, CV1004461SJOJCGX, 2010 WL 11492736, at *4–6 (C.D. Cal. Dec. 14, 2010) (recognizing that Utah Code Ann. section 15-1-1 reflects Utah's public policy "interest in respecting contractual freedom" and contrasting the absence of any interest rate cap under Utah law with California's usury laws).

Plaintiff's contrary approach would upend the entire concept of interest rate exportation. As set forth above, Sections 85 and 27 were enacted to create uniform and certain lending rules allowing banks to export the regulatory regime of their home states regarding permissible interest rates without regard to the laws of other states. Permitting parties to negate the preemptive force of these statutes by invoking general contract defenses like unconscionability—or duress, mistake, and impossibility

for that matter—would eliminate the certainty Congress sought to provide by directing courts to look to the laws of the banks' home states that actually set forth the allowable interest rate. Plaintiff may still assert such defenses to enforcement, but he cannot use them to revive preempted claims under the laws of other states.

Since the Supreme Court's decision in *Marquette*, scores of cases have held that similar laws in other jurisdictions, such as South Dakota, Delaware, and Wisconsin, allow national and state chartered banks to lend at any interest rate and export that rate to other states, without regard to their lower interest rates. *See, e.g., In re Rent-Rite Superkegs West, Ltd.*, 603 B.R. 41, 65 (Bankr. D. Colo. 2019); *Kenty v. Bank One, Columbus*, N.A., 92 F.3d 384, 394 (6th Cir. 1996)*; Stoorman v. Greenwood Tr. Co.*, 908 P.2d 133, 136 (Colo. 1995); *Basile v. H & R Block, Inc.*, 897 F. Supp. 194, 198-99 (E.D. Pa. 1995); *Peterson v. Chase Card Funding, LLC,* No. 19-CV-00741-LJV-JJM, 2020 WL 5628935, at *1–2 (W.D.N.Y. Sept. 21, 2020)*; Citibank, South Dakota, N.A. v. Palma*, 646 S.E.2d 635, 640 (N.C. Ct. App. 2007); *Pruitt v. Wells Fargo Bank, N.A.*, CV DKC 15-1308, 2015 WL 9490234, at *5 (D. Md. Dec. 30, 2015); *Riley v. Wells Fargo Bank, N.A.*, No. 16-cv-157-JMH, 2017 WL 2240570, at *5 (E.D. Ky. May 22, 2017); *Green v. Wells Fargo Home Mortg., Inc.*, No. 4:07CV01055-WRW, 2009 WL 10711721, at *3 (E.D. Ark., Jan. 15, 2009). That is despite the fact that each of these states has an unconscionability defense to contract enforcement. This Court should decline Plaintiff's invitation to create a new exception to the interest rate exportation rule that would effectively swallow it whole.

### 4. The "True Lender" Test Is Preempted Because It Stands as an Obstacle to Congress's Purposes and Objectives in Enacting Section 27.

For the reasons discussed in section III.B.3, Section 27's preemption clause forecloses Plaintiff's California law claims. But even if the Court concludes otherwise, the claims still fail because they are premised on a court-made doctrine that poses a direct obstacle to Congress's purposes and objectives in enacting Section 27. *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712-13 (1985) (explaining that conflict preemption occurs when either (1) "compliance with both federal and state regulations is a physical impossibility," or (2) "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress").

Whether state law poses an obstacle to accomplishing the purposes of federal law is "a matter of judgment," "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. If, after examining the "entire scheme" of the federal law, the court determines that its purpose and operation are frustrated by state law, then the state law is preempted. *Id.* These principles apply to and preempt common law claims and court-made doctrines that interfere with federal objectives as well. *Concepcion*, 563 U.S. at 352 (holding that California's *Discover Bank* rule, a court-made doctrine limiting the enforceability of class arbitration waivers, was preempted because it stood as an obstacle to the purposes and objectives of the Federal Arbitration Act); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (holding that federal vehicle regulations obstacle-preempted state-law tort claims premised on contradictory duties).

As set forth above, Congress enacted Section 27 in the wake of a clear record of competitive imbalance between federal and state-chartered banks. (*Supra* § III.B.2(b) at 8-9.) Whereas Sections 85 and 86 provided national banks with a "uniform [set of rules] limiting the liability of national banks" and giving them "protection from possible unfriendly state legislation," *Beneficial*, 539 U.S. at 10-11 (citation omitted), state banks had no such protection and were subject to the whims of varying state usury frameworks. (*Id.*) To "level the playing field" and provide state banks with the same uniform set of rules governing the interest they may charge, Congress enacted Section 27, which extended to state-chartered banks the power to charge interest on any loan they funded up to the rate permissible in the state in which they were located. *Greenwood Trust Co.*, 971 F.2d at 827-29; (*see also supra* § III.B.2(b) at 8-9 (citing authority recognizing Congressional intent to create parity between state and national banks).) Erasing any doubt as to congressional intent, Section 27 clearly states that it was enacted "to prevent discrimination" against state-chartered banks, and expressly preempts all contrary state laws. 12 U.S.C. § 1831d(a).

Under this new framework, rather than being subject to 50 different regulatory regimes, state-chartered banks could structure their lending business around one set of "uniform rules," *Beneficial*, 539 U.S. at 10-11, with certainty that their interest rate could be exported to any other state "notwithstanding any State constitution or statute" to the contrary. 12 U.S.C. § 1831d(a). In practice,

this sea change meant that just like federal banks, state banks could "'export' the regulatory regime of the state in which they are located and impose it" in other states. *Piñon,* 741 F.3d at 1025 (Section 27 has same effect as Section 85).

The true lender theory advanced by Plaintiff interferes with this regime of regulatory certainty and enables precisely the type of state-law discrimination against out-of-state, state-chartered banks Congress sought to eliminate when it enacted Section 27. It eschews the traditional method of determining who the lender is—looking at the contract to see who funded the loan—in favor of a nebulous, multi-factor analysis that varies from state to state and court to court, vitiating the protection of "uniform rules" both state and federally chartered banks are entitled to enjoy. For example, in *CashCall*, the district court derived a "predominant economic interest" from state-law principles, and in so doing analyzed which party bore the risk of loss, which party provided the money used to fund the loans, whether the assignee purchased *all* loans originated pursuant to the lending program, whether the assignee paid more for each loan than the amount actually financed, the existence of a guaranteed minimum payment to the named originating entity, and which party bore the regulatory risk, among other factors. 2016 WL 4820635, at *5-6 (purporting to "apply the law of the 16 [] states" to support this test). By contrast, in other cases conducting true lender analyses, courts considered factors not discussed in *CashCall*, such as (i) which party was responsible for loan accounting and tracking; (ii) whether the assignee provided a personal guarantee of its obligations to the named originating entity; and (iii) which party was responsible for supplying loan applications. *See, e.g., West Virginia v. CashCall, Inc.*, No. 2008C1964, 2012 WL 11875220, at *8-9 (W.Va. Cir. Ct. Sep. 10, 2012); *Eul v. Transworld Sys.,* No. 15 C 7755, 2017 WL 1178537, at *6 (N.D. Ill. Mar. 30, 2017). Further, even where courts consider overlapping factors, there is no guarantee courts give the factors the same weight.

Thus, the "true lender" test subjects loans made by state (and federally) chartered banks to potential challenges under the usury laws of fifty states depending on various factors derived from state-law principles. Such a test revives the discrimination against out-of-state banks Congress sought to end through Section 27, and thwarts Congress's purpose of creating uniform and certain lending rules. *Beneficial,* 539 U.S. at 10-11 (Sections 85 and 86 were enacted to provide for a "[u]niform [set

of rules] limiting the liability of national banks"); *Greenwood Trust Co.*, 971 F.2d at 827 (because Section 27 was enacted to give state-chartered banks the same protection federally chartered banks enjoy under Sections 85 and 86, these provisions "should be interpreted the same way"); *Sawyer*, 23 F. Supp. 3d at 1363 (when analyzing preemption under Section 27, courts "look[] for guidance to precedent in which the Supreme Court addressed the application of the state usury laws . . . of the state where a bank is located to consumers residing in a foreign state with greater consumer protections under Section 85 of the [NBA]"). Banks cannot exercise their authority to make loans if that authority is subject to states second-guessing and challenging the loans based on complex factual inquiries that vary state by state and court by court.

*Parks v. MBNA America Bank, N.A.*, 54 Cal. 4th 376 (2012), supports a finding of obstacle preemption. In that case, the California Supreme Court held that the NBA obstacle-preempted a California law prohibiting banks from offering preprinted checks to customers unless they make certain disclosures. *Id.* at 380, 387. The *Parks* court struck down the law because allowing all 50 states to enact "a diverse or duplicative patchwork of local disclosure requirements" would "significantly impair[]" national banks' authority under the NBA, especially given the fact that there was 'no indication' that Congress intended to subject" national banks to such "local restriction[s]." *Id.* at 387-89. For the same reasons, permitting courts in 50 different states to revive previously preempted usury claims against state banks by enacting "a diverse or duplicative patchwork" of multi-factor true lender tests would "significantly impair[]" state banks' authority to export their home-state's interest rates under Section 27. *Id.*

*Concepcion* also supports this conclusion. There, the U.S. Supreme Court found that California's *Discover Bank* rule was obstacle-preempted because it was contrary to Congress's purposes and objectives in enacting the Federal Arbitration Act ("FAA"). The *Discover Bank* rule was a court-made doctrine that declared class-wide arbitration waivers unenforceable where it was "alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money." *Discover Bank v. Superior Court*, 36 Cal.4th 148, 162–63 (2005). The Supreme Court found that this rule was an "obstacle to the accomplishment and execution of the full purposes and objectives" of the FAA,

because it undermined the FAA's "principal purpose," which is to "ensur[e] that private arbitration agreements are enforced according to their terms." *Concepcion*, 563 U.S. at 344. The majority explained that "the point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined procedures tailored to the type of dispute," which the *Discover Bank* rule interfered with by allowing parties to demand it *ex post*, notwithstanding their contractual waiver. *Id.*

Like the *Discover Bank* rule invalidated in *Concepcion*, the "true lender" test is a court-made doctrine that interferes with the purpose behind Section 27. The point of ending state-level discrimination against state banks was to provide them with the same certainty enjoyed by federally chartered banks that loans properly originated in their home states would not be second-guessed by regulators and borrowers in other states and subject to the usury and common law claims of 50 different states. The "true lender" test, as it currently exists, destroys that certainty by subjecting every single loan to a complex, multi-factor, after-the-fact, subjective analysis pursuant to state-law principles. Such a test, which is only a recent invention by parties seeking to make use of long-since preempted laws, effectively strips Section 27 of its preemptive force and returns state-chartered banks to the pre-1980 status quo. It "stands as an obstacle to the accomplishment and execution of the full purposes and objectives," and is preempted. *Concepcion*, 563 U.S. at 352; *see also Peterson*, 2020 WL 5628935, at *6-7 (holding the plaintiff's usury claims against a non-bank that acquired an interest in loans from a national bank "are expressly preempted by the NBA" but that "even if they were not, they would be implicitly preempted").

### 5. Section 27 Also Preempts Plaintiff's New Utah Law Claims.

In the FAC, Plaintiff alleges three claims under Utah law. (FAC ¶¶ 214-227.) Two are titled "unconscionable contract/usury," while the third is titled "refund of excess charge." Regardless of their labels, all three are premised on Plaintiff's allegation that Defendants lent to him at a rate that exceeds the interest rate Utah law permits. These claims are preempted and fail because Section 27 provides the exclusive remedy for a borrower alleging that a state bank charged interest in excess of its limits. 12 U.S.C. § 1831d(b); *Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.*, 761 F.3d 1027, 1036 (9th Cir. 2014) (complete preemption applies when "the complaints challenge[] the 'rate of interest' . . . charged, regardless of the state law monikers affixed to the . . . claims").

In *Beneficial*, the United States Supreme Court held that the private right of action set forth in Section 86 of the NBA provided the "exclusive cause of action" for claims that national banks charged interest in excess of the rate permitted by Section 85. 539 U.S. at 10-11 ("Because §§ 85 and 86 provide the exclusive cause of action for such claims, there is, in short, no such thing as a state-law claim of usury against a national bank."). As set forth above, courts recognize that because Section 27 was drafted to mirror the NBA, its provisions "should be interpreted the same way." *Greenwood Trust Co.*, 971 F.2d at 826-27. Like Sections 85 and 86 of the NBA, Section 27 specifies the amount of "interest" a state bank may charge and provides a remedy for violations. 12 U.S.C. §§ 1831d(a)-(b). Because these provisions "should be interpreted the same way" as Sections 85 and 86 of the NBA, Section 1831d(b)'s private right of action likewise must be interpreted as the "exclusive cause of action" for claims, such as Plaintiff's here, that a state bank charged interest in an amount exceeding the rate permissible in the state in which it is located. *Beneficial*, 539 U.S. at 10-11; *see also Discover Bank v. Vaden*, 489 F.3d 594, 606 (4th Cir. 2007), *rev'd on other grounds* (holding that "Congress intended complete preemption of state-court usury claims under [Section 27].").

Put differently, because "[t]here is…no such thing as a state-law claim of usury against a [state-chartered] bank," *Beneficial*, 539 U.S. at 10-11, Plaintiff's Utah claims all fail. Any claim based on an excessive rate of interest, such as Plaintiff's here, must be brought under Section 27.

**C.      Plaintiff's Claims Fail for Additional Reasons.**

As set forth above, Plaintiff's state-law claims fail because they are preempted and Plaintiff failed to utilize the exclusive means of challenging excessive interest rates under federal banking law. But even if the Court concludes otherwise, those claims still fail for the reasons set forth below.

**1.      Plaintiff's California Claims Fail Because Utah Law Governs.**

In Plaintiff's Complaint, he brought only California law claims. In response to Defendants' motion to dismiss, he asserts new Utah law claims alleging violation of Utah law. In light of this election, choice-of-law principles bar Plaintiff's California law claims.

The FAC does not allege any wrongful conduct that occurred in California. Rather, it alleges that a Utah bank (FinWise) and a Chicago-based servicer (OppLoans) conspired to make a usurious loan. But the fact that the Plaintiff is a California resident is not enough to invoke the UCL here,

given that his loan agreement contains a choice-of-law clause providing that it is governed by Utah law (Compl. Ex. A at ¶ 18), and Plaintiff has actually brought Utah law claims.  *Medimatch, Inc. v. Lucent Techs. Inc.*, 120 F. Supp. 2d 842, 859 (N.D. Cal. 2000) ("Plaintiffs…filed a claim for violation of a New Jersey statute, and have contractually agreed to the application of New Jersey law.  There is no conceivable scenario in which this Court could apply California law to the instant claim."); *see also Wireless Warehouse, Inc. v. Boost Mobile, LLC*, No. SACV 09-1436-MLG, 2011 WL 92984, at *4-5 (C.D. Cal. Jan. 11, 2011) (dismissing UCL claims in light of Virginia choice of law clause), *aff'd*, 479 F. App'x 58 (9th Cir. 2012).

Where, as here, a court is confronted with two different regulatory regimes governing usury, it must conduct a choice-of-law analysis to determine which law governs the contract.  *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001) (holding that loan to California resident by Nevada lender was governed by Nevada law under California choice-of-law principles).  Plaintiff cannot proceed under both California and Utah usury laws; at a minimum, he must pick a regime.  By electing to pursue Utah claims, he did so.  Accordingly, his UCL claims predicated on California law violations all fail as a matter of law.

> ### 2. Plaintiff's Claims Predicated on California Law Violations Fail Because His Loan Is Not Subject to California's Usury Law.
>
> #### (a) Plaintiff's Loan Is Exempt from California's Usury Law.

Even if the Court allows Plaintiff to invoke California law, his claims all fail because his loan is statutorily exempt from California's usury law.  California's usury law, though "far from a model of clarity," regulates the charging of interest in the state.  *Wishnev v. The Nw. Mut. Life Ins. Co.*, 8 Cal. 5th 199, 206 (2019).  Section 1 of Article XV of the California Constitution prohibits the charging of interest on a loan at a rate in excess of 10 percent.  Cal. Const. art. XV, § 1; *Wishnev*, 8 Cal. 5th at 209.  It also enumerates several classes of lenders exempt from that prohibition and makes clear that none of its interest-rate restrictions apply "to any successor in interest to any" loan made by an exempted lender.  Cal. Const., Art. XV, § 1.  At the same time, it authorizes the California Legislature to create additional classes of lenders exempt from the maximum rate and to set alternative maximum interest rates applicable to the exempted lenders.  *Id.*; *Wishnev*, 8 Cal. 5th at 209.

Case No. 4:20-cv-04730-PJH

Pursuant to its constitutional authority, California Legislature expressly exempted loans originated by state-chartered banks, like FinWise, from the constitutional usury provision. Cal. Fin. Code § 1675 ("Any foreign (other state) state bank is exempted from the restrictions of Section 1 of Article XV of the California Constitution relating to rates of interest upon the loan or forbearance of any money . . . .").[10]  It also enacted the CFL to create an additional exemption for, among others, "finance lenders." Cal. Fin. Code § 22002. A "finance lender" includes "any person who is engaged in the business of making consumer loans or making commercial loans," and must be licensed under the CFL. *Id.* § 22009; *see id.* § 22100(a). Further, as permitted by Article XV, Section 1, the Legislature prescribed maximum interest rates with which CFL licensees must comply. *See, e.g.*, *id.* §§ 22303-22304.5 (setting forth maximum interest rates on consumer loans). State banks, however, are explicitly exempted from the CFL's provisions. *Id.* § 22050(a) (the CFL "does not apply to any person doing business under any law of any state or of the United States relating to banks").

Here, Plaintiff's loan is exempt from California's interest rate limitation on two independent levels. First, as set forth above, the California Constitution expressly exempts loans originated by state-chartered banks from its usury restriction and extends that exemption to successors-in-interest, which OppLoans is alleged to be here. The CFL does not alter these exemptions or limit them. Rather, by its terms, the CFL merely exempts an **additional** class of lenders from the California Constitution's interest rate limitations—"finance lenders"—pursuant to its constitutional authority to do so. Cal Fin Code § 22002 (explaining that the CFL "creates a class of exempt persons pursuant to Section 1 of Article XV of the California Constitution."); *Wishnev*, 8 Cal. 5th at 210 (explaining that in 1979, the California Constitution was amended to "allow the Legislature to designate additional classes of exempt lenders."). For this class of lenders, which previously were subject to the California Constitution's 10% interest rate cap, the CFL allows them to lend at a higher rate so long as they comply with its provisions. However, it does not purport to—and does not—have any impact with respect to entities that already were exempt, and thus were not affected by a statute that by its own

---

[10] *See also Boerner v. Colwell Co.*, 21 Cal. 3d 37, 44 n.6 (1978) (explaining the Constitution "exempt[s] from its [usury] restrictions certain types of institutional lenders, including…state-chartered banks").

terms merely created an additional class of exempt lenders. *See Naoom v. Secured Assets Income Funds,* No. 05-CV-1207 H (CAB), 2006 U.S. Dist. LEXIS 92047, at *26 (S.D. Cal. Dec. 20, 2006) (explaining that the CFL "creates a class of persons exempt from California's usury laws."); *Cerni v. Axe*, No. G031818, 2004 WL 1903317, at *2 (Cal. App. 4th Dist. Aug. 26, 2004) ("We understand [Financial Code] section 22002 to mean that lenders who are subject to the [CFL] are free from the constitutional usury prohibition");[11] *Moore v. Hill*, 188 Cal. App. 4th 1267, 1280 (2010) (recognizing the CFL exempted a defendant from California's constitutional usury prohibition); *Rancho Mt. Props., Inc. v. Gray,* No. 11-CV-00358 BEN (BLM), 2012 WL 1192755, at *5 (S.D. Cal. Apr. 9, 2012) (finding that because a lender was a part of the "class of exempt persons" created by the CFL, it was exempt from the California Constitution's usury restrictions); *LFG Nat'l Capital, LLC v. Gary, Williams, Finney, Lewis, Watson, & Sperando P.L.*, 874 F. Supp. 2d 108, 125 (N.D.N.Y. 2012) (recognizing the CFL "exempts…lenders from the constitutional restrictions on interest.").

Here, Plaintiff's loan is not subject to the maximum interest rates of California's usury law because it was extended by an exempt state bank, FinWise. (*See* RJN Exs. A, B.) This is clear from the face of Plaintiff's loan agreement, which provides that FinWise is the entity extending him credit and the entity he must repay. (Compl. Ex. A & ¶ 3 (stating that FinWise will "extend credit . . . when [it] initiates a transfer of funds to the bank account you have identified for this purpose" and Plaintiff "promise[d] to pay [FinWise] the principal sum of $1,500 plus interest until the loan is fully paid").) The FAC, which alleges that the loan agreement identifies FinWise as the lender and that FinWise sold Plaintiff's loan to OppLoans, confirms that FinWise originated the loan. (FAC ¶¶ 22, 24, 67, 72.) Thus, his UCL claims premised on California law violations—each of which is predicated on the incorrect assumptions that California's usury laws apply to his loan and that OppLoans was his

---

[11] While *Cerni* is unpublished and may not be cited in California state courts under Rule 8.1115 of the California Rules of Court, such rules "are not binding on this federal court," *Parducci v. Overland Sols., Inc.*, No. 18-cv-07162-WHO, 2020 WL 4193368, at *5 (N.D. Cal. July 21, 2020) which may rely on *Cerni* as persuasive authority. *Nunez v. City of San Diego*, 114 F.3d 935, 943 n.4 (9th Cir. 1997) (explaining that while federal courts "are not bound by" unpublished state court opinions, they "are not precluded from considering" them); *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F. Supp. 2d 1084, 1103, n.7 (N.D. Cal. 2005) (relying on unpublished California appellate case and rejecting argument that California rules precluded doing so).

1  lender—fail.

2      Moreover, any subsequent owner of Plaintiff's loan—which OppLoans is alleged to be here

3  (*id.* ¶ 24)—is also expressly exempt because "[t]he Constitution does not require successors in interest

4  to be independently exempt from usury restrictions." *Montgomery v. GCFS, Inc.*, 237 Cal. App. 4th

5  724, 732 (2015); Cal. Const. art. XV, § 1 ("none of the above [interest-rate] restrictions shall apply to .

6  . . any successor in interest to any loan or forbearance exempted under this article"); *Strike v. Trans-*

7  *W. Disc. Corp.*, 92 Cal. App. 3d 735, 745 (1979) ("[A] contract, not usurious in its inception, does not

8  become usurious by subsequent events.").  To conclude otherwise would "prohibit—make

9  uneconomic—the assignment or sale by banks of their commercial property to a secondary market.

10 This would be disastrous in terms of bank operations and not conformable to the public policy

11 exempting banks in the first instance." *Strike*, 92 Cal. App. 3d at 745.

12     Second, even if the Court concludes the CFL's interest rate cap applies to lenders already

13 exempted by the California Constitution—which it does not—Plaintiff's loan still would be exempt.

14 That is because the CFL itself also expressly exempts state-chartered banks from all of its

15 requirements, including its interest rate requirements. *Id.* § 22050(a) (the CFL "does not apply to any

16 person doing business under any law of any state or of the United States relating to banks"); *see Cross*

17 *v. Downey Sav. & Loan Ass'n*, No. CV09-317 CAS (SSX), 2009 WL 481482, at *5 (C.D. Cal. Feb.

18 23, 2009) (dismissing claim predicated on alleged violation of the CFL on the ground that the statute

19 does not apply to banks or savings and loan associations).  And California law is clear that a loan

20 made by an exempt entity "does not become usurious by subsequent events," *Strike*, 92 Cal. App. 3d

21 at 745, such as the alleged sale of Plaintiff's loan from FinWise to OppLoans.  *Montgomery*, 237 Cal.

22 App. 4th at 732 (explaining that "[u]sury restrictions do not restrict the assignment of loans" and

23 therefore the sale or assignment of a loan made by lender exempted under the CFL to a non-exempt

24 lender would not alter the terms of the loan).

25          **(b)     Plaintiff's Allegations That OppLoans Is the True "Finance**
            **Lender" Do Not Alter This Conclusion.**
26

27     To avoid the clear-cut conclusion that his loan is exempt from California's usury law, Plaintiff

28 alleges that "Opportunity serves as the 'finance lender' under Fin. Code § 22009 on transactions like

Plaintiff's and FinWise is a mere conduit to launder transactions to make it appear that it is acting as a lender." (FAC ¶ 21.) This allegation provides no reason to disregard the exempt status of Plaintiff's loan as evidenced by his loan agreement. *First*, as noted above, Plaintiff's loan is statutorily exempt from the CFL because it was made by an entity already exempt under the California Constitution, so his allegations about OppLoans being a "finance lender" are wholly irrelevant. *Second*, in any event, California courts look *only* to the *face* of the transaction at issue to determine whether an exemption to the usury prohibition applies. *Beechum v. Navient Sols., Inc.*, No. EDCV 15-8239-JGB-KKX, 2016 WL 5340454, at *7 (C.D. Cal. Sept. 20, 2016); *WRI Opportunity Loans II, LLC v. Cooper*, 154 Cal. App. 4th 525, 535-36 (2007) ("*WRI*"); *Jones v. Wells Fargo Bank*, 112 Cal. App. 4th 1527, 1537-39 (2003).

In *Beechum*, the court rejected the alternative approach implied by Plaintiff's "true lender" allegations, which is to inquire into the substance of his loan transaction and OppLoans's and FinWise's purported intent. There, the plaintiffs claimed that the non-bank, service-provider defendants were the "true lenders" of the plaintiffs' loans because they entered into a forward purchase agreement with the bank to purchase its loans within 90 days, and originated, underwrote, marketed, determined the terms of, and bore the risk of loss as to the loans. *Beechum*, 2016 WL 5340454, at *1-2. As here, the *Beechum* plaintiffs alleged that their loans were issued by a bank, but nonetheless asserted usury claims based on the non-bank defendants' receipt of interest above the constitutional maximum interest rate. *Id.* at *2-3.

The plaintiffs argued that the court should "look[] to substance over form to assess whether a loan, that on its face appears non-usurious, is in fact usurious," as well as the lender's intent, in order to determine whether their loans were exempted from California's interest-rate limitations. *Id.* at *6. The court rejected this proposition, concluding that California decisions considered these factors only "when assessing whether a transaction satisfies the elements of usury or falls under a common law exemption to the usury prohibition—*not* when assessing whether the transaction or a party to the transaction fall under a constitutional or statutory exemption from the usury prohibition." *Id.* Since the plaintiffs alleged that their loans were issued by a bank, the court concluded that the loans were exempted from the usury prohibition and dismissed all their claims. *Id.* at *6 n.7, 8.

The *Beechum* court relied on two California appellate decisions approving exactly this analysis. *Id.* at *7; *see Jones*, 112 Cal. App. 4th at 1535, 1537-39 (the plaintiff's allegation that the defendants intended to violate the usury law by creating a "sham" loan did not exclude loan from statutory exemption because the defendants' intent was irrelevant given that the loan "fit within a legally authorized exception to the general usury law," which "remove[s] the need for evasion); *WRI*, 154 Cal. App. 4th at 536 ("when a loan meets the requirements for a statutory exemption to the usury law, courts will not look beyond those requirements to determine whether the underlying transaction exposes the lender's profits to significant risk or betrays an intent to evade the usury law"). It noted that it could not locate any authority that the applicability of a statutory or constitutional exemption to a usury provision turns on the "substance" of the transaction. *Beechum*, 2016 WL 5340454, at *6. And, since *Beechum*, there have been no California or federal decisions disagreeing with the *Beechum*, *Jones*, and *WRI* approach to applying such exemptions. Thus, *Beechum* forecloses Plaintiff's attempt to apply "true lender" theories to an analysis of applicable usury exemptions under the California Constitution.

Further, there can be no dispute that *Beechum* also governs the applicability of the exemption for banks to the CFL's maximum interest rates because the CFL itself is an exemption to the Constitution's usury restriction. *See* Cal. Fin. Code. § 22002 ("[T]his division creates a class of exempt persons pursuant to Section 1 of Article XV of the California Constitution.").

As set forth above, because the California Constitution exempts Plaintiff's loans from the state's usury restrictions, the CFL does not apply and *Beechum* is dispositive here. But even if the CFL applies, this Court should apply *Beechum* anyway, as its reasoning applies with full force and effect to the CFL's exemptions. Indeed, given that the CFL is an integrated component of California's usury law, it would be incongruous to treat the applicability of the state-bank exemption to the constitutional usury prohibition and the bank exemption to the CFL differently. First, both are statutory exemptions to the same regulatory scheme, and "the function of [such exemptions] generally is to curtail this kind of inquiry into the underlying transaction." *WRI*, 154 Cal. App. 4th at 540. Second, treating the applicability of the exemptions differently could lead to the absurd result that the same state bank-made loan is found to be exempt from the constitutional maximum interest rates, but

not the CFL's maximum interest rates, even though state banks are exempted from both interest-rate limitations. Such an outcome particularly makes no sense when the CFL was enacted to create additional exemptions to the constitutional usury prohibition, not to eliminate existing exemptions.

Plaintiff alleges that FinWise, a state-chartered bank, made his loan—and this allegation is confirmed on the face of his loan agreement. (FAC ¶¶ 22, 67, 72; Compl. Ex. A.) Therefore, Plaintiff's loan is statutorily exempt from the interest-rate limitations in the Constitution and CFL.[12] As a result, each of his UCL claims predicated on the interest rate charged, allegations of violations of California's usury laws, or misrepresentation of the identity of the purported true lender fail as a matter of law.

### 3. Plaintiff's Utah Law Unconscionability Claims Fail as a Matter of Law.

The FAC alleges that Plaintiff's loan agreement should be voided "due to the unconscionable interest rate and high degree of procedural unconscionability." (FAC ¶ 116.) According to Plaintiff, the amount of the interest rate alone is sufficient for the Court to find his loan agreement unconscionable. (*Id.* ¶ 135.) Nonetheless, he also states, in conclusory fashion, that his loan agreement was a "contract[] of adhesion" "drafted on standard forms with terms dictated by Defendants and generated automatically online or otherwise electronically, without any opportunity by the borrower for individual negotiation or modification." (*Id.* ¶ 99.) Based on these allegations, Plaintiff asserts three "claims" of unconscionability under Utah law. Notably, while these claims are alleged separately and with overlapping and confusing labels (*id.* ¶¶ 217, 222, 226-27), each is based on the same allegation that his loan agreement is unconscionable under Utah law. These claims fail because Plaintiff cannot state a claim for unconscionability under Utah law.

"A party claiming unconscionability bears a heavy burden." *Cantamar*, 142 P.3d at 151-152 (quoting *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998)). That is because "[w]ith a few exceptions, it is still axiomatic in contract law [in Utah] that 'persons dealing at arm's length are entitled to contract on their own terms without the intervention of the courts for purpose of relieving

_____

[12] Plaintiff's allegation that OppLoans has a license to act as a "finance lender" in California is irrelevant because the loan agreement makes clear that FinWise is the lender on Plaintiff's loan, and Plaintiff's loan is the only loan relevant to this motion.

one side or the other from the effects of a bad bargain.'" *Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 459 (Utah 1983) ("Although courts will not be parties to enforcing flagrantly unjust agreements, it is not for the courts to assume the paternalistic role of declaring that one who has freely bound himself need not perform because the bargain is not favorable.").

"The basic test" for unconscionability in Utah is "whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." *Resource Mgt. Co. v. Weston Ranch and Livestock Co., Inc.*, 706 P.2d 1028, 1041 (Utah 1985) (quoting U.C.C. § 2–302, Comment 1). "The principle is one of the prevention of oppression and unfair surprise…**and not of disturbance of allocation of risks because of superior bargaining power**." *Id.* (emphasis added). Consistent with this framework, Utah courts analyze two factors to determine whether a contract is unconscionable: "procedural unconscionability, which focuses on the formation of the agreement, and substantive unconscionability, which focuses on the agreement's contents." *Sosa v. Paulos*, 924 P.2d 357, 360 (Utah 1996). While "substantive unconscionability alone may support a finding of unconscionability . . . procedural unconscionability without any substantive imbalance will rarely render a contract unconscionable." *Ryan*, 972 P.2d at 402 (citing *Sosa*, 924 P.2d at 361). For substantive unconscionability, "[e]ven if a contract term is unreasonable or more advantageous to one party, the contract, without more, is not unconscionable." *Id.* ("the terms must be 'so one-sided as to oppress . . . an innocent party'"); *Resource Mgt. Co.*, 706 P.2d at 1044 (substantive unconscionability exists where "the contract [is] so unfair or oppressive in its mutual obligations as to shock the conscience.").

In the consumer loan context, this law is informed by Utah's policy decision to expressly permit parties to contract for any interest rate. For several decades, Utah—like California—had an interest rate cap. Stephen L. West, *The Utah Consumer Credit Code: Where Did It Come From, Why Is It Here, and Where Is It Going*, 1 BYU J. PUB. L. 1, 2 (1986-1987). In 1985, the Utah Legislature abolished that cap and changed the law to permit consenting adults to freely contract for any interest rate. *Id.* at 3 ("In response to the beneficial effects of competition, Utah legislators [] allowed for greater freedom of contract in consumer credit transactions. The substantive provisions of the [] code

are now based on the premise that parties to any consumer credit transaction are free to contract for any finance charge which they agree upon; finance charge ceilings have been completely removed."). Utah law now permits "parties to a. . . contract [to] agree upon **any** rate of interest for the contract, including a contract for a . . . loan." Utah Code Ann. § 15-1-1 (emphasis added). The Utah Consumer Credit Code ("UCCC"), which specifically applies to consumer credit transactions, Utah Code Ann. § 70C-2-101, similarly states that "[e]xcept where restricted or otherwise covered by provisions of this title, the parties to a consumer credit agreement may contract for payment by the debtor of **any finance charge and other charges and fees**." *Id.* § 70C-2-101 (emphasis added). There are no applicable restrictions and the UCCC expressly provides that "a charge or practice expressly permitted by this title is not in itself unconscionable," *id.* § 70C-7-106(3), reflecting a legislative effort to prevent efforts to use unconscionability as an end-run around this express policy decision. The Utah legislature's repeal of the state's interest-rate cap evidences a clear policy decision to provide parties with freedom to contract at any interest rate. *See Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1213 (9th Cir. 2001) (noting that the Nevada legislature's similar repeal of its usury law in 1981 demonstrated a preference "to favor individual contract decisions and the free flow of capital").

Because sections 15-1-1 and 70C-2-101 allow parties to contract at **any** interest rate, there is nothing substantively unconscionable about the parties' agreed-to interest rate here. Holding otherwise would mean concluding that the parties' agreement to a fully disclosed interest rate—which Utah statutes expressly permit—would "shock the conscience and confound the judgment of any man of common sense." *Resource Mgt. Co.*, 706 P.2d at 1041. Such a conclusion is untenable, as it would directly undermine the Utah Legislature's clear policy choice, and would require disregarding decades of Utah cases rejecting substantive unconscionability claims based on purportedly high interest rates alone. *See Bekins*, 664 P.2d at 462-63 (holding that even if lender's rates were "high by some standards," they were not unconscionable because they were proportionate to the high degree of risk the lender assumed in extending the loans); *Cantamar, L.L.C.*, 142 P.3d at 151-152 (recognizing that parties may agree to any interest rate under Utah law and concluding that challenged interest rate was not unconscionable). Defendants are aware of no Utah case since the enactment of sections 15-1-1 and 70C-2-101 finding an interest rate substantively unconscionable based solely on the allegation that

it is too high, **and Plaintiff cites none**.[13]  Accordingly, Plaintiff has failed to allege any substantive unconscionability, which alone defeats these claims.

The Utah cases Plaintiff cites in the FAC do not warrant a different conclusion.  Two of them are over 100 years old and predate Utah's removal of its interest rate cap by several decades.  *Carter v. West*, 38 Utah 381 (1911); *Engert v. Chadwick*, 40 Utah 239 (1912).  The others have nothing to do with unconscionability of interest rates on consumer loans.  *Resource Mgt. Co.* 706 P.2d at 1049 (finding trial court's determination that contract was unconscionable to be "erroneous as a matter of law"); *Danjanovich v. Robbins*, No. 2:04-cv-623 TS, 2005 WL 2457090, at *1 (D. Utah Oct. 5, 2005) (refusing to enforce fraudulently promised rate of return); *Sheedy v. BSB Properties, LC*, No. 2:13-cv-00290-JNP, 2016 WL 6902513, at *5 (D. Utah Mar. 1, 2016) (finding an indemnity contract exposing someone to unlimited personal liability "may be unconscionable").  None of these cases are remotely on point, and Plaintiff's citation to them only highlights the weakness of these unconscionability claims.

Without viable allegations of substantive unconscionability, Plaintiff's claims cannot proceed.  In any event, his allegations of procedural unconscionability are also insufficient because they are nothing more than conclusory allegations parroted from *Ryan* and *Sosa*, utilizing words and phrases like "adhesion," "standard forms," and "generated automatically."  (FAC ¶ 99.)  Contrary to what Plaintiff alleges, the Utah Supreme Court has explained "[t]hat the terms of a contract are embodied in a written form developed by one of the parties does not automatically render it either a contract of adhesion." *Resource Mgt. Co.*, 706 P.2d at 1048.  "Far more important is whether key terms are *hidden* in a maze of fine print and minimized by deceptive sales practices." *Id.* (emphasis in original) (internal marks omitted).

---

[13] The Utah Department of Financial Institutions ("DFI") website also implicitly recognizes that Plaintiff's interest rate is not unconscionable.  Specifically, in discussing unconscionability in Utah, the DFI recognizes that "[r]ates are determined by the market; in other words, competition and demand determine the interest rate."  The DFI goes on to demonstrate rates which are "available in Utah" for 24-month loans, including an example of a 120% APR.  *See* Utah Dep't of Fin. Insts., https://dfi.utah.gov/general-information/consumer-tips/interest-rates/ (last visited Oct. 7, 2020).  If FinWise's rates were *per se* unconscionable as Plaintiff suggests, it would make no sense for the DFI to list approvingly a similar APR as an "available rate" in Utah.

Here, the first page of Plaintiff's loan agreement includes a bolded, all-capital leader **"HIGH COST CREDIT DISCLOSURE"** that informed plaintiff that **"this is an expensive form of credit,"** and that because **"alternative forms of credit may be less expensive and more suitable for [his] needs,"** Plaintiff **"should compare the cost of other options with this loan before executing this note."** (Compl. Ex. A at 1). The loan agreement then goes on to identify the interest rate in several places, including in a bold box on the very first page of the agreement under the large, all-capital header of "ANNUAL PERCENTAGE RATE." (*Id.*). Indeed, Plaintiff acknowledges that he voluntarily entered into the loan transaction with FinWise at the challenged interest rate, does not contend that he could not have obtained credit elsewhere (or that he even tried), and does not contend that he tried to negotiate the terms of the agreement and was rebuffed. (FAC ¶¶ 92-93.) To the contrary, his own allegation that he exercised his right to opt out of the arbitration clause undercuts his claims of procedural unconscionability. (FAC ¶ 113.) To establish such unconscionability, Plaintiff must do more than simply allege that he entered into a form contract. *See Ryan*, 972 P.2d at 404 (facts that acknowledgement form and accompanying handbook were drafted solely by employer and employee did not have an opportunity to negotiate the terms he agreed to "alone d[id] not render the acknowledgment unconscionable"). He fails to do so here.

In sum, Utah law forecloses Plaintiff's efforts to premise claims of substantive unconscionability on his interest rate alone, and his procedural unconscionability claims are also insufficient. For these reasons, Plaintiff fails to allege facts sufficient to state a claim for unconscionability under Utah law.

### 4. Plaintiff's EFTA Claim Fails as a Matter of Law.

In the FAC, Plaintiff asserts a new claim for violation of the EFTA. This claim fails as a matter of law because the plain language of Plaintiff's loan agreement and the allegations in the FAC demonstrate FinWise did not condition the extension of credit on an agreement to repay it through recurring electronic funds transfers.

The EFTA provides in relevant part that "[n]o person may **condition** the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." 15 U.S.C. § 1693k(1) (emphasis added). An electronic fund transfer ("EFT") is "any transfer of funds,

other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." *Id.* § 1693a(7). Thus, consistent with the plain language of the statute, liability under section 1693k(1) attaches when a lender requires a borrower to preauthorize automatic debits to repay a loan as a precondition to extending credit to that borrower. *See, e.g.*, *Cobb v. Monarch Fin. Corp.*, No. 95 C 1007, 1996 WL 109624, at *1 (N.D. Ill. 1996) (holding that lender did not violate section 1693k(1) because preauthorized funds transfers were not a prerequisite to receiving credit).

Here, Plaintiff's EFTA claim must be dismissed because Plaintiff's own allegations and exhibits disprove his allegation—made "upon information and belief" only—that "Defendants condition the…deposit of loan proceeds to borrowers who agree to repay the loan using automatic payments" and "do not allow borrowers to make…payments by traditional check." (FAC ¶¶ 231-32.) The loan agreement states in large bold, capital letters that Plaintiff was "NOT REQUIRED . . . TO AGREE TO MAKE AUTOMATED PAYMENTS TO OBTAIN A LOAN FROM US." (Compl. Ex. A at 2.) It also permits Plaintiff to repay his loan by "paper check" instead of through recurring automatic payments (*id.* ¶ 5), and indicates plainly that "if you elected to make automatic payments…you acknowledge that you are voluntarily choosing to pay by automatic payment," and "may change your desired payment method at any time" (*id.* at pg. 2). Thus, contrary to what Plaintiff asserts "on information and belief," the plain language of the contract unambiguously allowed Plaintiff to choose payment methods other than automatic payments.

Notably, Plaintiff nowhere alleges ever attempting to repay by other means. Instead, the FAC misleads the Court by cherry picking inapposite provisions, stripping them of context, and suggesting they evidence a violation of EFTA. (FAC ¶¶ 181, 230.) But a review of the loan agreement proves Plaintiff is incorrect. The provisions quoted in the FAC are inapposite because they address fees for one-off events such as overdrafts, **_not_** repayment of the extension of credit. (Compl. Ex. A at pg. 2 (containing language quoted at FAC ¶ 230).) Such provisions do not implicate EFTA because it only prohibits conditioning loans on "**_repayment_** by means of preauthorized fund transfers." 15 U.S.C. § 1693k(1) (emphasis added). Paying an overdraft fee is not repaying a loan. Further, "preauthorized

fund transfer[s]" under EFTA are defined debits "authorized in advance **to recur at substantially regular intervals**." 15 U.S.C. § 1693a(10) (emphasis added). EFTA does not prohibit preauthorized electronic payment of **fees** because fees are not incurred or paid at regular intervals. *Okocha v. HSBC Bank USA, N.A.*, No. 08 Civ. 8650(MHP), 2010 WL 5122614, at *2 (S.D.N.Y. Dec. 14, 2010) (automatic debits of overdraft fees did not violate EFTA because fees are not drawn at regular intervals and thus do not meet definition of "preauthorized electronic fund transfers"). Moreover, the other disclosure language Plaintiff cites in the FAC—which comes from a website FAQ answer (FAC ¶ 108)—actually disproves Plaintiff's claim because it offers customers different repayment options, including one-time debit card payments.

Finally, faced with this stark language and no facts upon which to premise this claim, Plaintiff alleges on "information and belief" that Defendants condition their loans on automatic repayment. (FAC ¶ 231.) The Court should disregard this allegation because "information and belief" pleading is proper only "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Warnshuis v. Bausch Health U.S., LLC*, No. 1:19-CV-1454 AWI BAM, 2020 WL 3294808, at *3 (E.D. Cal. June 18, 2020) (quoting *Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017)). Such pleading is especially inappropriate where, as here, the allegedly improper act—conditioning a loan upon agreement to recurring electronic payments—is a communication that must be *made to* Plaintiff.

The plain language of Plaintiff's contract and his own allegations make clear there was no conditioning of repayment on an agreement to repay through recurring EFTs. Accordingly, Plaintiff's EFTA claim fails as a matter of law.

## IV.    <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff's claims should all be dismissed with prejudice.

DATED: October 7, 2020

BUCKLEY LLP

By: _____/s James R. McGuire_____
James R. McGuire
Michael A. Rome
Lauren L. Erker

Attorneys for Defendant Opportunity Financial,
LLC, d/b/a OppLoans

DATED: October 7, 2020

HUDSON COOK LLP

By: _____/s Allen H. Denson_____
ALLEN H. DENSON (*Pro Hac Vice*)
adenson@hudco.com
MARK E. ROONEY (*Pro Hac Vice*)
mrooney@hudco.com
1909 K Street Northwest, Fourth Floor
Washington, DC 20006
Telephone: (202) 223-6930
Facsimile: (202) 223-6935

**LAW OFFICE OF LAURA SULLIVAN**
LAURA M. SULLIVAN (220529)
laurasullivan@laurasullivanlaw.com
423 South Estate Drive
Orange, CA 92869
Telephone: (714) 744-1522
Facsimile: (714) 744-1524

Attorneys for Defendant FinWise Bank

# CERTIFICATION

Pursuant to Local Rule 5-1(i)(3), I hereby attest that concurrence of the filing of the accompanying **DEFENDANTS OPPORTUNITY FINANCIAL, LLC AND FINWISE BANK'S NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT** has been obtained.

/s James R. McGuire