ZIMMERMAN REED LLP
Caleb Marker (SBN 269721)
  E-mail: caleb.marker@zimmreed.com
Flinn T. Milligan (SBN 323042)
  Email: flinn.milligan@zimmreed.com
Arielle Canepa (SBN 329546)
  Email: arielle.canepa@zimmreed.com
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

*(Additional Counsel Listed Below)*

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREDERICK SIMS, an individual, on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>OPPORTUNITY FINANCIAL, LLC, a Delaware Company, d/b/a OPPLOANS, FINWISE BANK, a Utah Corporation, and DOES 1-100, inclusive,<br><br>Defendants. | CASE NO.: 4:20-cv-04730-PJH<br><br>*Assigned to the Honorable Phyllis J. Hamilton*<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS OPPORTUNITY FINANCIAL, LLC AND FINWISE BANK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date: January 6, 2021<br>Time: 9:00 AM<br>Courtroom: 3, 3rd Floor<br><br>Date Action Filed: May 11, 2020<br>Date Removed: July 15, 2020<br>FAC Filed: September 1, 2020<br><br>Trial Date: TBD |

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................... 1

II.   STATEMENT OF FACTS ....................................................................................... 3

III.  ARGUMENT ........................................................................................................... 5

      A.    Legal Standard ............................................................................................ 5

      B.    Defendants' Motion Is a Partial Motion to Dismiss Only........................... 5

            1.    Defendants Fail to Challenge Plaintiff's UCL Claim Regarding Surprising Mr. Sims with an Unknown Lender .................................................................... 7

      C.    Federal Banking Law Does Not Preempt Plaintiff's State Law Claims ......... 7

            1.    A Thorough Analysis of the "True Lender" Is Required ..................... 9

            2.    The So-Called "Federal Test" Does Not Apply ................................ 10

                  i.    Relevant Caselaw Does Not Support Application of the So-Called "Federal Test" ................................................................................ 12

                  ii.   The OCC and FDIC Rules Regarding Section 27 and 85 Are Entitled to Little Deference ............................................................................. 14

            3.    Far From Creating Certainty, Defendants' Approach Produces Unfair Surprise ............................................................................................... 15

      D.    Oppolans Is Clearly the "True Lender" for Plaintiff's Loans ...................... 16

            1.    The Text of the Loan Agreement Actually Provides Evidence that Oppolans Is the Lender ........................................................................................ 16

            2.    Factually Oppolans Exercises All Control Over, and Bears All Risk from, the Loans ................................................................................................... 18

      E.    Oppolans Is a "Finance Lender" and Must Obey the CFL ........................... 19

            3.    Oppolans Violates the CFL Through its Unlawful Lending *And* its Attempted Evasion ............................................................................................... 20

            4.    Oppolans Loans Violate the Applicable Interest Rate Cap................ 21

            5.    Oppolans Loans Are Unconscionable Under the CFL....................... 21

            6.    Oppolans Violates the Anti-Evasion and Anti-Subterfuge Provisions of the CFL ................................................................................................... 22

            7.    As Defendants' Loan Agreements Violate the CFL, They Are Void .......... 23

      F.    Plaintiff's Remaining California Law Claims Are Valid and Largely Unchallenged ... 24

      G.    Even if FinWise Was the "True Lender" the Loans Were Not "Valid When Made"..... 25

| | 1. | Section 27 and the Interest Rate Authority Incorporate the "Laws of the State" .................................................................................................. 26 |
| | 2. | Defendants' Expansive Reimagination of Section 27 Is Unsupported .............. 27 |
| | 3. | The UCCC Is a Cohesive Body of Credit Regulation....................................... 28 |
| | 4. | The UCCC Incorporates Common Law and Has No "Safe Harbor" for Interest Rates ............................................................................................................... 29 |
| | 5. | The UCCC Provides Remedies for Unconscionability and Excessive Interest of a Loan ............................................................................................................... 31 |
| | 6. | Courts May Find that Loan Agreements Are Unconscionable as a Whole or in Part ................................................................................................................. 31 |
| | 7. | A Remedy for Excessive Charges Makes No Sense if Charges Cannot be Excessive ......................................................................................................... 32 |
| | 8. | Utah Courts Undertake Serious Analysis of Unconscionability Claims............ 32 |
| H. | | California Law Governs ............................................................................................... 36 |
| I. | | Plaintiff Has Stated a Claim for Violation of the EFTA ................................................ 38 |
| IV. | CONCLUSION | ....................................................................................................................... 39 |

Case No.  4:20-cv-04730-PJH

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FAC

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Arista Records, LLC v. Doe 3,*
  604 F.3d 110 (2d Cir. 2010)....................................................................................5

*Armendariz v. Found. Health Psychcare Servs., Inc.,*
  24 Cal. 4th 83 (2000) ...........................................................................................22

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011)..............................................................................................22

*Bank of Am. v. City & Cty. of San Francisco,*
  309 F.3d 551 (9th Cir. 2002)..................................................................................6

*Barnes v. Helfenbein,*
  548 P.2d 1014 (Okla. 1976)..................................................................................34

*Basile v. H & R Block, Inc.,*
  897 F. Supp. 194 (E.D. Pa. 1995).........................................................................28

*Bekins Bar V Ranch v. Huth,*
  664 P.2d 455 (Utah 1983) ..............................................................31, 33, 34, 35, 36

*Bell Atl.  Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................................................5

*Black v. Fin. Freedom Senior Funding Corp.,*
  92 Cal. App. 4th 917 (2001)...................................................................................6

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.,*
  622 F.3d 996 (9th Cir. 2010).................................................................................36

*California ex rel Xavier Becerra et al. v. Office of the Comptroller of the Currency,*
  20-CV-5200 (N.D. Cal. Jul. 29, 2020)...................................................................8

*California ex rel Xavier Becerra et al.  v. Fed. Deposit Ins. Corp.,*
  20-CV-5860 (N.D. Cal. Aug. 20, 2020)..................................................................8

*Carter v. West,*
  38 Utah 381 (1911) ...............................................................................................33

*CashCall, Inc. v. Morrissey,*
  No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014).............................10, 14

*Citibank, S. Dakota, N.A. v. Palma,*
  184 N.C. App. 504 (2007).....................................................................................27

*Citizens' National Bank v. Donnell*,
  195 U.S. 369 (1904) ........................................................................... 26

*Concha v. London*,
  62 F.3d 1493 (9th Cir. 1995) ................................................................ 5

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*,
  No. CV157522JFWRAOX, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) ........... 10

*Daggs v. Phoenix National Bank*,
  177 U.S. 549 (1900) ........................................................................... 26

*Danjanovich v. Robbins*,
  No. 2:04-CV-623 TS, 2005 WL 2457090 (D. Utah Oct. 5, 2005) .............. 32, 33

*De La Torre v. CashCall, Inc.*,
  5 Cal. 5th 966 (2018) .................................................................... 3, 20

*De Wolf v. Johnson*,
  23 U.S. 367 (1825) ...................................................................... 14, 15

*Doe v. United States*,
  419 F.3d 1058 (9th Cir. 2005) ................................................................ 5

*Easter v. American West Fin.*,
  381 F.3d 948 (9th Cir. 2004) ................................................................. 9

*Engert v. Chadwick*,
  40 Utah 239 (1912) ............................................................................ 33

*Eul v. Transworld Sys.*, No. 15 C 7755,
  No. 15 C 7755, 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017) ........ 5, 10, 16, 17, 18

*First Nat. Bank of Logan, Utah v. Walker Bank & Tr. Co.*,
  385 U.S. 252 (1966) ........................................................................... 26

*First National Bank of Mena v. Nowlin*,
  509 F.2d 872 (8th Cir. 1975) ...................................................... 11, 26, 27

*First Nat'l Bank v. Kentucky*,
  76 U.S. 353 (1869) .............................................................................. 6

*Goleta National Bank v. Lingerfelt*,
  211 F. Supp. 2d 711 (E.D. N.C. 2002) ..................................................... 10

*Goleta National Bank v. O'Donnell*,
  239 F. Supp. 2d 745 (S.D. Ohio 2002) .................................................... 10

*Green v. Wells Fargo Home Mortg., Inc.*,
  No. 4:07CV01055-WRW, 2009 WL 10711721 (E.D. Ark. Jan. 15, 2009) ........... 28

*Hudson v. Ace Cash Express, Inc.*,
  No. IP 01-1336-C H/S, 2002 WL 1205060 (S.D. Ind. May 30, 2002) ................................... 11, 12

*In re Cmty. Bank of N. Virginia*,
  418 F.3d 277 (3d Cir. 2005) ................................................................................................. 10

*In re Fin. Serv. Enter.*,
  2016 WL 7840137 ................................................................................................................ 19

*In re Rent-Rite Superkegs W., Ltd.*,
  603 B.R. 41 (Bankr. D. Colo. 2019) ...................................................................................... 28

*In re Rose*,
  266 B.R. 192 (Bankr. N.D. Cal. 2001) .................................................................................. 19

*Kenty v. Bank One, Columbus, N.A.*,
  92 F.3d 384 (6th Cir. 1996) ................................................................................................... 28

*Krispin v. May Dep't Stores Co.*,
  218 F. 3d 919 (8th Cir. 2000) .......................................................................................... 12, 13

*Kubiak v. City of Chicago*,
  810 F.3d 476 (7th Cir. 2016) ................................................................................................. 16

*Lusnak v. Bank of Am., N.A.*,
  883 F.3d 1185 (9th Cir.) .................................................................................................. 14, 15

*Medimatch, Inc. v. Lucent Techs. Inc.*,
  120 F. Supp. 2d 842 (N.D. Cal. 2000) ................................................................................... 37

*Moore v. City of Costa Mesa*,
  886 F.2d 260 (9th Cir. 1989) ................................................................................................... 5

*N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*,
  163 F.3d 449 (7th Cir. 1988) ............................................................................................ 38, 39

*Nat'l State Bank v. Long*,
  630 F.2d 981 (3d Cir. 1980) ..................................................................................................... 6

*Nedlloyd Lines B.V. v. Superior Court*,
  3 Cal. 4th 459 (1992) ...................................................................................................... 36, 37

*O'Melveny & Myers v. FDIC*,
  512 U.S. 79 (1993) ................................................................................................................ 11

*Peterson v. Chase Card Funding, LLC*,
  No. 19-CV-00741-LJV-JJM, 2020 WL 5628935 (W.D.N.Y. Sept. 21, 2020) .......................... 28

*Pruitt v. Wells Fargo Bank, N.A.*,
  No. CV DKC 15-1308, 2015 WL 9490234 (D. Md. Dec. 30, 2015) ........................................ 28

*Riley v. Wells Fargo Bank*, N.A.,
   No. 16-CV-157-JMH, 2017 WL 2240570 (E.D. Ky. May 22, 2017) ................................ 28

*Roper v. Consurve, Inc.*,
   777 F. Supp. 508 (S.D. Miss. 1990) ................................................................................ 26

*Ruiz v. Affinity Logistics Corp.*,
   667 F.3d 1318 (9th Cir. 2012) ........................................................................................ 37

*Scott v. Lloyd*,
   34 U.S. 418 (1835) .......................................................................................................... 14

*Sheedy v. BSB Properties, LC*,
   No. 2:13-CV-00290-JNP, 2016 WL 6902513 (D. Utah Mar. 1, 2016) .......................... 33

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ........................................................................................................ 14

*Soo Park v. Thompson*,
   851 F.3d 910 (9th Cir. 2017) ............................................................................... 5, 9, 38

*Stoorman v. Greenwood Tr. Co.*,
   908 P.2d 133 (Colo. 1995) .............................................................................................. 28

*The Cantamar, L.L.C.  v. Champagne*,
   142 P.3d 140 (2006) .................................................................................................. 35, 36

*TRW Inc.  v. Andrews*,
   534 U.S. 19 (2001) .......................................................................................................... 32

*Ubaldi v. SLM Corp.*,
   852 F. Supp. 2d 1190 (N.D. Cal. 2012) ..................................... 5, 7, 9, 10, 13, 16, 17, 18

*Union National Bank v. Louisville, N., A. & C. Ry. Co.*,
   163 U.S. 325 (1896) ........................................................................................................ 11

*United Am. Life Ins. Co. v. Willey*,
   21 Utah 2d 279 (1968) ............................................................................................... 29, 31

*Washington Mut.  Bank, FA v. Superior Court*,
   24 Cal. 4th 906 (2001) ........................................................................................ 36, 37, 38

*Watters v. Wachovia Bank, N.A.*,
   550 U.S. 1 (2007) .............................................................................................................. 6

*Williams v. Gerber Prod. Co.*,
   552 F.3d 934 (9th Cir. 2008) .......................................................................................... 17

*Williams v. Walker-Thomas Furniture Co.*,
   350 F.2d 449- (D.C. Cir. 1965) ...................................................................................... 34

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FAC

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ........................................................................................... 6

## Statutes

12 U.S.C. § 85 .......................................................................................................... 14

12 U.S.C. § 1831d ................................................................................................ 7, 25

12 U.S.C. § 1831d(a) ........................................................................................... 26, 29

12 U.S.C. § 1735f-7a(a)(2) ...................................................................................... 9

15 U.S.C. § 1693k .................................................................................................. 39

15 U.S.C. § 1693k(1) ............................................................................................... 4

15 U.S.C. § 1601 .................................................................................................... 11

Bus. & Prof. Code § 17500 ................................................................................ 6, 37

Bus. & Prof. Code § 17200 ................................................................................ 6, 37

Cal. Const. art.  XV § 1 .......................................................................................... 20

Cal. Fin. Code § 22000 ................................................................................ 4, 19, 37

Cal. Fin. Code § 22001(a) ................................................................................. 19, 23

Cal. Fin. Code § 22002 .......................................................................................... 20

Cal. Fin. Code § 22009 .......................................................................................... 19

Cal. Fin. Code § 22302 ........................................................................... 20, 21, 22, 24

Cal. Fin. Code § 22303 ................................................................................. 19, 21, 24

Cal. Fin. Code § 22306 .......................................................................................... 21

Cal. Fin. Code § 22324 ............................................................................ 15, 19, 23, 24

Cal. Fin. Code § 22326 .......................................................................................... 22

Cal. Fin. Code § 22750 .......................................................................................... 23

Cal. Civil Code § 1608 ........................................................................................... 23

Cal. Civil Code § 1670.5 .............................................................................. 21, 23, 24

S.D. Codified Laws § 54-3-1.1 ............................................................................... 27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Utah Code § 15-1-1 ......................................................................................... 28

Utah Code § 70A-2-302 .................................................................................. 36

Utah Code § 70C-1-102 ................................................................................... 28

Utah Code § 70C-1-103 ....................................................................... 29, 30, 31

Utah Code § 70C-1-106 ................................................................................... 29

Utah Code § 70C-2-101 ....................................................... 27, 28, 30, 32

Utah Code § 70C-2-105 ................................................................................... 32

Utah Code § 70C-7-201 ....................................................................... 29, 31, 32

Utah Code § 70C-7-106 ....................................................... 29, 30, 31, 32, 33, 36

## Rules

Fed. R. Civ. P. 10(c) ....................................................................................... 38

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 6

## Regulations

12 C.F.R. § 7.40001(e) ...................................................................................... 8

12 C.F.R. § 160.110(d) ...................................................................................... 8

12 C.F.R. § 331 .................................................................................................. 8

## Other Authorities

*FDIC, Final Rule, Federal Interest Rate Authority,*
    85 Fed. Reg. 44146 (July  22, 2020) ..................................................... 8, 12, 36

OCC, *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*
    85 Fed. Reg. at 33430-36 (June 2, 2020) *(to be codified at 12 C.F.R.  §§ 7.40001(e) and*
    *160.110(d))* ......................................................................................... 8

*OCC, Final Rule, National Banks and Federal Savings Associations as Lenders,*
    85 Fed. Reg. 68742 (October 30, 2020) ........................................................... 14

*Letter re: National Banks and Federal Savings Associations as Lenders,*
    85 Fed. Reg. 68742-47 (September 3, 2020) ................................................... 14

*Fair Access to Credit Act,*
    AB 539 ....................................................................................................... 3

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FAC

*Rate Regulation at the Crossroads of Usury and Unconscionability: The Case for Regulating Abusive Commercial and Consumer Interest Rates Under the Unconscionability* Standard,
31 Hous. L. Rev. 721 (1994) ........................................................................................... 9, 27, 28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FAC

## I.  **INTRODUCTION**

Defendants' Motion to Dismiss (the "Motion") tells a compelling story.  The story is one of a regulatory arms race between high-interest rate lenders offering loans at rates well over 150% such as Opportunity Financial, LLC ("Opploans") and state legislatures, regulators, and courts.  The earnestness with which Defendants argue the gravamen of their case – that they are untouchable – underscores the gravity of this Court's decision.  On the one side, there is the historic right and power of states to regulate high interest lending – a power that has existed in this country since the Revolutionary War, has been a consistent moral guidepost since biblical times, and has existed as the earliest form of consumer regulations since Babylon.  Supporting this historic mandate is a venerable history of comprehensive regulation and common law abhorrence of usurious and unconscionable contracts, recently affirmed by the California legislature and a constant creature of judicial decisions in every jurisdiction in the United States.  These historic intellectual edifices stand together in defense of the poor, the desperate, and the easily exploited; individuals who in many senses have never been more greatly in need of the protection of their elected representatives by passing protective laws, and courts by enforcing them, than this moment.

On the other side, are "grey market" moneylenders such as Opploans.  While such lenders like to portray themselves as something new, preferring the glamor of terms such as "FinTech" to the more familiar "Loan Shark," they are as old as – indeed, even older than – the aforementioned historic protective structures which have been erected to thwart them.  In an age in which everyone from drug dealers to traders in illegal weapons have moved online, it is unsurprising that such professions as these are joined by the moneylenders, believing they have found – for now – a temple from which they cannot be expelled, by the people or their chosen representatives.  Of course, merely moving online would never be enough to avoid regulation; there being no exemption from the law for online businesses.  Rather, as state governments heeded the call from nonprofits, advocates, and their constituents, to more tightly regulate these new-yet-old enterprises, the moneylenders, seeing that the tide was turning, were already looking for a way out.

Enter the "rogue bank."  These banks, entities which most people have never heard of, saw an opportunity to provide the subterfuge that the moneylenders desperately sought, for a price.  Thus, like

a leech upon a leech, these banks and moneylenders together devised the enterprise known as "rent-a-bank." The concept is simple enough. In essence, to avoid comprehensive regulatory structures such as those which exist in California – by far the largest market in the country for usurious loans – the moneylender (here Opploans) contracts with a state-chartered bank, ideally located in a state with a less comprehensive regulatory structure – such as Utah – to create a system in which the moneylender undertakes all or almost all risk and actual lending operations – applications, underwriting, servicing, collections, correspondence, customer service, maintenance of web portals and, of course, marketing and origination – in exchange for the bank (here FinWise) putting its name on the lending agreement and effecting a form of theoretical funding and transfer, in which the loan is *technically* owned by FinWise for some period, before being assumed by Opploans.

There is a certain elegance to this device. The California Constitution's usury provisions does specifically exempt certain classes of lenders, and state banks are among them. Thus it seems at first blush that simply by effecting an instantaneous online transfer of code and putting a bank's name on the loan agreement together with its own, Opploans succeeded in thwarting the California legislature, Supreme Court, and Department of Financial Protection and Innovation ("DFPI"). But, as with most aspects of the "grey market," the first impression is unreliable. Fortunately, these enterprises made two fatal miscalculations.

First, they mistook states such as Utah as some kind of lawless international waters; a haven and home from which to plan and execute the exploitation of citizens and violation of laws of states across the union. While Utah's approach to consumer regulation has followed a different path to that of California, preferring a quasi-libertarian market regulation of consumer contracts with statutory backstops for the most egregious unconscionability and excess charges, it has not discarded the moral foundations which undergird the common law of unconscionability, and has in fact codified the principle into its consumer credit law. The fact that the state has stripped its consumer regulations to the minimum, and yet has nonetheless codified the unconscionability standard – indeed, even providing for remedies not seen in California, such as statutory damages – hardly bespeaks of a democratic or legislative abandonment of the desperate debtor. Indeed, as Defendants' almost point out, the legislature could have, and did not, "fix" the decisions of Utah's own Supreme Court finding loans less egregious

OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

than Defendants' to be unconscionablef as a matter of law.  Utah may have taken another path with its consumer credit regulation, but it is no Wild West.  Indeed, the situation at present is somewhat analogous to that of California prior to the passage of the Fair Access to Credit Act, AB 539, before which the California Supreme Court held that even absent a *statutory* rate cap or *usury* limit, an interest rate, as a price term, could be found unconscionable.  *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 993 (2018).

Second, the moneylenders and rogue banks underestimated the determination of the legislature of their largest market.  Even before the effective date of AB 539, legislatures across the nation, including the California legislature, were well aware of the existence of rent-a-bank schemes.  They had previously been employed decades earlier, before fading out of view in a flurry of arrests and prosecutions.  FAC ¶ 68-71. Fortunately, the California Finance Lenders Law – applicable to Opploans and FinWise as discussed *infra* – was prepared for its resurgence, and perfectly comprehends both the likelihood and the nature of its own evasion, containing anti-subterfuge and anti-evasion measures which apply squarely to Defendants' conduct.

Defendants' Motion is the clearest statement of their goals.  They will not be satisfied until they can operate with total freedom from liability, accountability, or meaningful regulation of any kind.  They know that the world they need is not the world which the people and their representatives have created, and so they ask this Court to remake it.  For the sake of the tens of thousands of borrowers who are similarly situated to Mr. Sims, we urge this Court to refuse their entreaty.

## II.  <u>STATEMENT OF FACTS</u>

Plaintiff, a disabled veteran of the United States Army, living in Oakland on a fixed income of pension, social security and/or disability benefits, obtained a $1,500 loan on or around February 14, 2020, carrying an interest rate of over 160%.  Plaintiff's First Amended Complaint ("FAC") ¶ 3.  The loan was obtained through the Opportunity Financial, LLC "Opploans" ("Opploans") website (FAC ¶¶ 24, 72-75, 92-97, 126, 141, 152, 173, 176), in reliance on various representations by Opploans which led Plaintiff to reasonably believe that Opploans would be his lender, and they treat "customers like family." FAC ¶ 73.  Throughout the entire process, Plaintiff never dealt with anyone but Opploans.  At all relevant times, Opploans has been and has disclosed the fact that it is a licensed Finance Lender

(FAC ¶¶ 17, 36, 74) which must comply with the California Finance Lenders Law ("CFL"), including the provisions barring unconscionable contracts, prohibiting subterfuge and evasion, and setting interest rate caps at less than 30%, well below the 160% charged Mr. Sims. Cal. Fin. Code § 22000 *et seq.* (the "CFL"). FAC ¶¶ 3-4, 6, 92, 96, 135, 152, 170, 172.

Instead of complying with the law, Opploans contracted with Defendant FinWise Bank ("FinWise") to attempt to evade the law by placing FinWise's name on the loan agreement alongside Opploans' name without informing Plaintiff of the material fact that, if left unchallenged, the consequence would be to "allow" Opploans to charge many multiples of the rate cap. FAC ¶¶ 6, 72-78, 94-96, 173, 201-04. While on the loan agreement the name "FinWise Bank" does appear in the box entitled "Lender" on the loan agreement next to Opploans' name, the nature of the relationship, the identity of FinWise, and most importantly the adverse consequence of adding FinWise, an entity with which Plaintiff never had direct contact, is never explained. FAC ¶¶ 6, 24. Rather, the loan agreement describes a situation more-or-less consistent with what Plaintiff expected based upon Opploans' representations: that Opploans would conduct all lending functions. Exh. A to FAC. While the exact nature of the deal between Opploans and FinWise (collectively the "Defendants") is not publicly available, Plaintiff has alleged on the available information that the Defendants have some species of prearranged deal by which FinWise appears as the nominal lender but puts no actual money at material risk, conducts no lending functions, such as origination, underwriting, servicing, marketing, or collections, and owns no material portion of the loan or the profits therefrom, rather obtaining some kind of per-loan fee to borrow their name and charter to effect the attempted evasion of the law. FAC ¶¶ 22-24, 67, 76, 77. Plaintiff has alleged that the entire purpose of this deal is to evade and violate the law for anti-consumer and unfair competition purposes. FAC ¶¶ 25, 70, 80, 86, 90, 141, 173, 191. Plaintiff has additionally alleged that, as a matter of fact and notwithstanding the representations to the contrary in the text of the loan agreement, Defendants condition the extension of credit upon the preauthorization of electronic transfers in violation of the Electronic Funds Transfer Act, 15 U.S.C. § 1693k(1) (the "EFTA"). FAC ¶¶ 86, 100, 105, 180-82, 229-35.

1

### III.   ARGUMENT

2

**A.   Legal Standard**

3      In a motion to dismiss, the complaint is construed in the light most favorable to the plaintiff, and

4   all material allegations in the complaint, as well as any reasonable inferences to be drawn from them,

5   must be accepted as true.  *See Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005).  While a

6   plaintiff may not simply rest on conclusory assertions as a substitute for facts, to survive dismissal there

7   only need be sufficient facts "to state a claim for relief that is plausible on its face." *Bell Atl.  Corp. v.*

8   *Twombly*, 550 U.S. 544, 555-57 (2007).   Courts should not dismiss a complaint "unless it appears

9   beyond doubt that [the] plaintiff can prove no set of facts in support of his claim which would entitle

10  [him] to relief." *Moore v. City of Costa Mesa*, 886 F.2d 260, 262 (9th Cir. 1989) [internal citations

11  omitted].  "The Twombly plausibility standard ... does not prevent a plaintiff from pleading facts alleged

12  upon information and belief where the facts are peculiarly within the possession and control of the

13  defendant or where the belief is based on factual information that makes the inference of culpability

14  plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (citing *Arista Records, LLC v.*

15  *Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) and *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995)

16  ("[W]e relax pleading requirements where the relevant facts are known only to the defendant.")).  When

17  the "true lender" of a loan is disputed, the identity of the "true lender" for preemption purposes is a

18  "reasonable inference" which must be drawn in favor of the plaintiff. *Eul v. Transworld Sys.*, No. 15 C

19  7755, 2017 WL 1178537, at *7 (N.D. Ill.  Mar.  30, 2017); *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190,

20  1203 (N.D. Cal. 2012) ("At this early pleading stage, where Plaintiff contends that the national bank

21  may have retained no significant interest in her student loan, presenting a factual dispute over the identity

22  of the actual lender, the Court will permit Plaintiff to conduct discovery on this limited issue to determine

23  whether her de facto lender theory has factual support.").

24

**B.   Defendants' Motion Is a Partial Motion to Dismiss Only**

25      As a preliminary matter, Defendants only make four actual challenges to Plaintiff's FAC: 1) that

26  claims pertaining to excessive, unlawful, unconscionable, and usurious interest rates are preempted

27  (Motion at 6-26); 2) that the CFL does not apply to either Defendant (Motion at 27-33); 3) that Plaintiff's

28  California claims fail because Utah law governs (Motion at 26-27); and 4) that Plaintiff has failed to

state a claim for violation of the EFTA (Motion at 37-39).  The bulk of Defendants' Motion is dedicated to the first argument, and encompasses only Plaintiff's claims which depend entirely on a finding of an unlawful or unconscionable interest rate, and not those claims premised on false or deceptive representations, violations of the EFTA, or other unconscionable and anti-consumer conduct.  Motion at 6-26.[1]  As such, certain claims are left substantively unchallenged except as to the choice of law issue, including:

1) All Unfair Competition Law (Bus. & Prof. Code §§ 17200 *et seq.*, the "UCL") claims arising under the False Advertising Law (Bus. & Prof. Code § 17500, the "FAL") (FAC ¶¶ 175-179);

2) Those UCL claims arising under the fraudulent prong of the UCL (FAC ¶¶ 195-207); and

3) Those UCL claims arising under the Unfair prong of the UCL to the extent that the unfairness did not directly relate to the rate of interest charged but rather the other unfair, deceptive, and evasive conduct alleged.

Thus, a finding that California law applies to Plaintiff's UCL claims is sufficient to defeat Defendants' Motion as to these counts as they have waived other challenges.  Plaintiff's claim under the UCL Unlawful prong for violation of the EFTA as well as Plaintiff's standalone EFTA claim are not subject to any preemption arguments, and the latter does not turn on the choice of law determination, and is challenged only on typical Fed. R. Civ. P. 12(b)(6) bases.  Plaintiff pleads Utah claims against FinWise and in the alternative only, in the event that this Court finds FinWise to be the "true lender."

---

[1] Defendants falsely portray Plaintiff as attempting to "evade" preemption.  *See, e.g.,* Motion at 1. Indeed, Defendants misrepresent the presumption *against* preemption generally, and particularly where matters of state police power and consumer protection are implicated.  *See, e.g., Black v. Fin. Freedom Senior Funding Corp.*, 92 Cal. App. 4th 917, 926 (2001)[collecting cases].  While certain courts have found no presumption in cases concerning a *national* bank, due to the history of federal presence in the national banking sphere (*Bank of Am. v. City & Cty. of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002), as amended on denial of reh'g and reh'g en banc (Dec.  20, 2002)), the Supreme Court has noted the divergent treatment of *state* banks under the "dual banking system."  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 15 n.7 (2007).  Notably, even with regards to *national* banks, such banks are subject to generally applicable state contract principles to the extent such laws do not conflict with the letter or general purpose of the National Bank Act.  *Id.* at 11.  Additionally, the Supreme Court has recently confirmed that the presumption against preemption applies "[i]n all pre-emption cases, and particularly those in which Congress has 'legislated . . . in a field in which the States have traditionally occupied." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) [internal citations omitted].  State banking is such a case. *See, e.g., Nat'l State Bank v. Long*, 630 F.2d 981, 985 (3d Cir. 1980); *see also First Nat'l Bank v. Kentucky*, 76 U.S. 353, 362 (1869).

1

2

**1.   Defendants Fail to Challenge Plaintiff's UCL Claim Regarding Surprising Mr. Sims with an Unknown Lender**

3       Specifically and most importantly, Defendants leave unchallenged the claim that by engaging in

4   a "bait and switch" as to the *stated* lender of the loan without disclosing the effects of substituting

5   FinWise in terms of the maximum rate "allowed," i.e. the quintupling of the interest rate, Defendants

6   violated the UCL.   FAC ¶¶ 185-194; s*ee generally* Motion.   Defendants also fail to challenge the

7   materiality of this, i.e. the fact that reasonable consumers/borrowers like Plaintiff would want to know

8   at the time of the transaction and would cause them to act differently (e.g., by rationally demanding a

9   lower interest rate).   The critical fact that by substituting FinWise Bank for Opportunity as the nominal

10  lender on the transaction's Promissory Note at the last minute (or adding in a confusing manner "Lender:

11  FinWise Bank C/O Opportunity"), when Opportunity is the finance lender conducting all lending and

12  processing functions with borrowers on the opploans.com website or otherwise, causes a significant

13  interest rate change (from 30% to 160%) is not disclosed nor explained to borrowers like Plaintiffs, to

14  their financial detriment, and is in fact disguised through *inter alia* design elements and misleading

15  representations.   FAC ¶¶ 72-73.

16  **C.   Federal Banking Law Does Not Preempt Plaintiff's State Law Claims**

17      Defendants ask this Court to read *very* deeply between the lines of scant authority, to fashion a

18  preemption which does not exist.   Crucially, Defendants' arguments depend, in a circular fashion, on

19  certain key false assumptions. First, Defendants misrepresent the status of the law as it applies to Section

20  27 of the Federal Deposit Insurance Act (12 U.S.C.   § 1831d, "Section 27").   Defendants' Motion

21  mistakes the nature and effect on preemption of what has become known as the "true lender" analysis.

22  (Also referred to as the "de facto" lender analysis.   *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1202

23  (N.D. Cal. 2012)).   It is axiomatic that Section 27 does not preempt claims against non-banks (and

24  Defendants do not argue otherwise), and thus determining the "true lender" is crucial.   Courts in this

25  circuit and nationwide take the analysis seriously, and do not defer to the text of the loan document,

26  which is itself ambiguous in this case.   *See Ubaldi*, 852 F. Supp. 2d at 1203.

27      Second, Defendants misrepresent the fundamental nature of their own transaction, seeking to

28  portray FinWise as the lender and Opploans merely as some sort of technical enabler or lead originator.

Let there be no mistake: FinWise assumes none of the risk, none of the control, none of the traditional lending functions, and – besides a kickback for the use of its name and charter – none of the real profits on these transactions.  It is not the "true lender."  Fortunately, the law is equipped to pull back the curtain on these transactions and see through the absurd façade suggested by Defendants.  Indeed, the fact that Defendants draw attention to the ongoing (or hypothetical) rulemaking at the Office of the Comptroller of the Currency ("OCC") and Federal Deposit Insurance Corporation ("FDIC") which seeks to *transform* the law as it is into the law as Defendants suggest it is, is itself evidence of the legal reality in which this case exists.  To be absolutely clear, while **the OCC** has recently issued rules applicable to **national banks** governing both the **"valid when made"** analysis[23] *and* the **"true lender"** analysis,[4] **the FDIC** – i.e. the federal agency actually responsible for **state** banking regulation – has only issued rules applicable to **state banks** on the **"valid when made"** analysis[5] and not the **"true lender"** analysis. Speculation as to the effects of a non-existent rule is not legal authority, and Defendants' lengthy discussion of these other inapplicable sources of law is mere distraction. Indeed, Plaintiff might as easily rejoin that the law is almost certain to be subject to challenge under the Congressional Review Act, Administrative Procedures Act, etc., but this – like the effect of an anticipated rule – is not the basis for a court decision.  The parties must work with the law as it is, not as they wish it to be in the future, despite the fact that the likelihood of this rule is highly dependent on the new administration.

Third, Defendants misapprehend the functioning of the CFL.  While certain provisions of the CFL function akin to a constitutional or statutory usury rate by setting a strict ceiling on interest rates (which Defendants violate), the CFL also proscribes a broad swathe of unlawful, unethical, and unconscionable practices that are central to Defendants' business models.

---

[2] OCC, *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 85 Fed. Reg. at 33430-36 (June 2, 2020) (to be codified at 12 C.F.R.  §§ 7.40001(e) and 160.110(d)).

[3] Already subject to challenge by 24 state attorneys general. *California ex rel Xavier Becerra et al. v. Office of the Comptroller of the Currency*, 20-CV-5200 (N.D. Cal. Jul. 29, 2020).

[4] 85 Fed. Reg. at 68742-47. A challenge is anticipated by 24 state attorneys general, based upon their comments in opposition to the rule. *See Letter Re: National Banks and Federal Savings Associations as Lenders (Docket No. OCC-2020-0026)* (Sept. 3, 2020), *available at* https://oag.ca.gov/system/files/attachments/press-docs/09.03.20%20multistate%20comment%20--%20OCC%20true%20lender%20%28FINAL%29.pdf (last visited Nov. 3, 2020).

[5] FDIC, *Federal Interest Rate Authority*, 85 Fed. Reg. 44,146 (Jul. 22, 2020) (to be codified at 12 C.F.R. pt 331). Already subject to challenge by 24 state attorneys general. *California ex rel Xavier Becerra et al.  v. Fed. Deposit Ins. Corp.*, 20-CV-5860 (N.D. Cal. Aug. 20, 2020).

1    Finally, the cornerstone of Defendants' preemption argument is that "federal law (1) authorizes

2    both national and state banks to charge the interest rate permitted in their home state in any state in the

3    country; and (2) preempts state-law usury claims that abridge this right." Motion at 7.  The flaw in the

4    reasoning, however, is that the rates in question are *not* permitted in FinWise's home state of Utah.

5    Defendants seek to overcome this crucial failing by asking this Court to take mutually incompatible

6    positions – that the Utah Consumer Credit Code ("UCCC") *is* a "law of the state" for preemption

7    purposes, but not a "law of the state" such that violation renders the loan not "valid when made."[6]

8        **1.  A Thorough Analysis of the "True Lender" Is Required**

9    A step into reality is instructive at this point.  If Defendants' protestations are taken as true (which

10   they are not in this posture), one would understand the nature of Defendants' business arrangement as

11   being one in which Opploans is some kind of originator, marketer, or servicer for FinWise but paid for

12   its services by owning the underlying loan and collecting the profit.  This is patently absurd.  Fortunately,

13   the Court need not accept this sham, as the law as it is provides a path to clarity and reason.  In *Easter*

14   *v. American West Fin.*, 381 F.3d 948 (9th Cir. 2004), prior to engaging in any of the required Washington

15   state law analysis of "true lender," the court was unequivocal: "[a] lender is one who puts money at

16   risk." *Id.* at 957.  This seems to be obviously true.  While prior to discovery Plaintiff does not have

17   access to precisely the technical means used by Defendants to effect their evasion – i.e. whether it is an

18   immediate sale or assignment, whether the funds are fronted for a minuscule period with immediate

19   reimbursement in a prearranged sham, etc.  – this is immaterial and not required at this stage.  *Soo Park*

20   *v. Thompson*, 851 F.3d at 928.  What is important here is that Plaintiff has pled that FinWise did not

21   "put money at risk" at any time in the transaction.  Thus, under broad Ninth Circuit law, FinWise was

22   and is not the lender.  *See also Ubaldi*, 852 F. Supp. 2d at 1200 ("*Easter* lends some support to Plaintiff's

23

24   [6] If anything, the reverse is true.  Express preemption as to state interest rate limits is found at 12
     U.S.C.A.  § 1735f-7a(a)(2) which states that "[t]he provisions of the constitution or law of any State
25   ***expressly limiting the rate or amount*** of interest which may be charged, taken, received, or reserved
     shall not apply…" However, unconscionability law does not "expressly limit" the rate of interest.  *See*
26   Steven W.  Bender*, Rate Regulation at the Crossroads of Usury and Unconscionability: The Case for*
     *Regulating Abusive Commercial and Consumer Interest Rates Under the Unconscionability Standard*,
27   31 Hous. L. Rev. 721, 811 (1994).  By contrast, Section 27 only allows loans which comply with the
     "*laws* of the state" in which the bank is located, thereby incorporating far more than just usury rates.
28   *See infra* section G.

1  argument that form should not trump substance.").

2          More recently, and more specifically to the rent-a-bank scenario, in *Ubaldi*, this District found

3  that "where a plaintiff has alleged that a national bank is the lender in name only, courts have generally

4  looked to the real nature of the loan to determine whether a non-bank entity is the de facto lender." *Id.*

5  at, 1201. (The court seemed to consider material both "whether and to what extent" the bank partner

6  retained any "significant stake in or control over" the plaintiff's loan. *Id.* at 1202.)  The court found that

7  "where [the] Plaintiff contends that the national bank may have retained no significant interest in her

8  student loan, presenting a factual dispute over the identity of the actual lender," dismissal at the pleading

9  stage was not warranted. *Id.* at 1203.  This is precisely this case, and should be dispositive.  Plaintiff

10  has alleged, *inter alia*, that "Opportunity serves as the 'finance lender'" for these transactions and

11  "FinWise is a mere conduit to launder transactions to make it appear that it is acting as a lender."  FAC

12  ¶ 21-24.  As this uncontroverted allegation must be taken as true at this stage, and as a "factual dispute

13  over the identity of the actual lender" renders a case unfit for dismissal at the pleading stage, Defendants'

14  motion must fail.  *Ubaldi*, 852 F. Supp. 2d at 1203.

15          **2.  The So-Called "Federal Test" Does Not Apply**

16          Defendants use the term "federal test" in an attempt to suggest uniformity of use of their form-

17  over-substance approach.  Motion at 15-18.  In reality, federal and state courts have overwhelmingly

18  eschewed strict formalism and applied a case-by-case, substance-over-form analysis, in accordance with

19  state contract and usury law, in resolving the "true lender."  Courts have rejected claims that nonbank

20  moneylenders were entitled to preemptive immunity via Section 85 or Section 27 simply because they

21  acted as "partners" or "agents" of banks, instead considering several factors including which party held

22  the "predominant economic interest" in the loan, which party bore the greatest credit risk, which party

23  controlled the terms and enforcement, and whether the nonbank moneylender indemnified the bank.[7]  It

24

25  [7] *In re Cmty.  Bank of N.  Virginia*, 418 F.3d 277, 283-85, 294-97 (3d Cir. 2005) (applying Pennsylvania
    law); *Ubaldi*, 852 F. Supp. 2d at 1194-1200 (applying California law); *Eul v. Transworld Systems*, 2017
26  WL 1178537, at *5 –*10 (applying Illinois law); *Goleta National Bank v. O'Donnell*, 239 F. Supp. 2d
    745, 753-58 (S.D. Ohio 2002) (applying Ohio law); *Goleta National Bank v. Lingerfelt*, 211 F. Supp.
27  2d 711, 717-19 (E.D. N.C. 2002) (applying North Carolina law); *CashCall, Inc. v. Morrissey*, 2014 WL
    2404300, at *6 –*8, *14 –*15, *18 (W.  Va.  May 30, 2014) (applying West Virginia); *see also*
28  *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *5 –*7 (C.D. Cal. Aug. 31, 2016)

is well understood that Sections 85 and 27 incorporate the entire usury jurisprudence of the state where the bank is located, and "true lender" laws themselves are part of the usury jurisprudence of many states, including California.  The Supreme Court has observed that:

> [T]he true construction of state [usury] legislation is a matter of state jurisprudence; and, while the right of the national bank springs from the act of congress, yet it is only a right to have an equal administration of the rule established by the state law.  It does not involve a reservation to the national courts of the authority to determine adversely to the state courts what is the rule as to interest prescribed by the state law, but only to see that such rule is equally enforced in favor of national banks.

*Union National Bank v. Louisville, N., A. & C. Ry. Co.*, 163 U.S. 325, 330 (1896).

Indeed, the Supreme Court has held that in determining the preemptive scope of "a federal statutory regulation that is comprehensive and detailed" like the Federal Deposit Insurance Act (12 U.S.C. § 1831d, "FDIA") and National Bank Act (12 U.S.C § 85, "NBA"), "matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law."  *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1993).  Likewise, recent decisions have confirmed that these sections incorporate the entire corpus of state usury jurisprudence, not merely the numerical rate of a statutory usury provision.  *See First National Bank of Mena v. Nowlin*, 509 F.2d 872, 878 (8th Cir. 1975).  For California, this not only means application of the aforementioned thorough analysis of "true lender," but also the statutory definition of the "business of" lending (i.e. "true lender") for the purposes of the CFL, discussed more fully *infra* at section E.

Rather than follow common sense and applicable law, Defendants' suggest this Court apply the so-called "federal test," a standard of unclear origin and at best inconsistent application.  The justification appears to be stitched together primarily from the recent OCC "true lender" rule, the hypothetical FDIC counterpart, cases interpreting the Truth in Lending Act (15 U.S.C. § 1601, *et seq.*), and an unpublished case from Indiana disapproved by more recent and analogous decisions in this circuit.  *Hudson v. Ace Cash Express, Inc.*, No. IP 01-1336-C H/S, 2002 WL 1205060 (S.D. Ind. May 30, 2002) (Defendant's contention that Indiana's *Hudson* is "better reasoned" than the contrary Ninth Circuit and Northern District cases which disapprove it is neither here nor there (Motion at 16)).  While

_____

(applying the laws of 16 states in which the borrowers resided, and determining that the nonbank was the "true lender" rather than its partner, a "tribal lending entity").

Defendants optimistically expect rulemaking from the FDIC on the "true lender" question, no such rule currently exists.[8]  Rather, the FDIC in its rulemaking as to the "valid when made" doctrine specifically does not address the "true lender" issue (as Defendants note in their Motion at 10 n.6) and notes that "the FDIC continues to support the position that it will view unfavorably entities that partner with a State bank with the sole goal of evading a lower interest rate established under the law of the entity's licensing State(s)" (which Defendants do not note in their Motion). 85 Fed. Reg. at 44147.  Additionally, the FDIC interpreted its own "valid when made" rule such that "[t]he FDIC believes that the text of the proposed regulation cannot be reasonably interpreted to foreclose true lender claims." *Id.* at 44153.  It is hard to read this to suggest that the FDIC believes that true lender claims are *currently* foreclosed, and speculation as to the acts of the agency in the future is just that.

### i.    *Relevant Caselaw Does Not Support Application of the So-Called "Federal Test"*

As the unpublished *Hudson v. Ace Cash Express, Inc.*, 2002 WL 1205060, at *5, and *Krispin v. May Dep't Stores Co.*, 218 F. 3d 919 (8th Cir. 2000) constitute the primary tools by which Defendants seek to break new ground on this issue (Motion at 16), they bear some analysis here.  Fortunately, however, most of this work has already been done by the *Ubaldi* court, and the cases are otherwise easily distinguishable such that their persuasive authority is diminished to nothing.

In *Hudson*, the bank originated the loan before selling 95% of it to a nonbank servicer.  Motion at 16.  The details of this inter-entity transaction were before the court, as the defendants there attached the "Master Agreement" to their motion, allowing the court to probe the details of that complaint to conduct its "true lender" analysis.  *Hudson v*, 2002 WL 1205060, at *2.  And, contrary to Defendants' suggestion, even this court *did* conduct such an analysis, before finding that based on the pleadings *and the "Master Agreement,"* the "true lender" analysis showed that the lender identified by the plaintiff was not the "true lender." This is not that case: Defendants have not attached evidence to rebut Plaintiff's "true lender" assertions which, taken as true, preclude a granting of Defendants' motion.  The *Ubaldi* court found that, "among other things," the plaintiff's not alleging that the nonbank retained any

---

[8] And should it materialize it will almost certainly be subject to challenge, as was the OCC version not applicable here. *People of the State of California ex rel Xavier Becerra et al. v. Office of the Comptroller of the Currency*, 20-CV-5200 (N.D. Cal. Jul. 29, 2020).

ownership interest in the loan factually distinguished it from *Hudson*, and the Court should find the same in this case.  852 F. Supp. 2d at 1202.  Finally, the *Ubaldi* court "decline[d] to dismiss at this early stage of the proceedings where, among other things, and unlike *Hudson*, it is not clear whether or to what extent [the bank] retained any significant stake in or control over the Plaintiff's loan." *Id.*  Plaintiff has alleged that FinWise holds no real stake and exercises no real control over Plaintiff's loan, this Court should likewise decline to dismiss on these grounds.

*Ubaldi* distinguished *Krispin* on similar grounds, making Defendants' reliance on *Krispin* unusual.  The *Krispin* court, like *Hudson*, refused to take the loan agreement at face value, as Defendants' suggest, instead analyzing which party was the "real party in interest."  *Id.* at 1201.  In *Krispin*, that process revealed that "the store's purchase of the bank's receivables does not diminish the fact that it is now the bank, and not the store, that issues credit, processes and services customer accounts, and sets such terms as interest and late fees.  Thus, although we recognize that the NBA governs only national banks . . . in these circumstances . . . it makes sense to look to the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the NBA applies.  *Krispin*, 218 F.3d at 924 [internal citation omitted].  Thus, both of these cases actually lend weight to the proposition that a court should not be satisfied by the self-serving categorization of the loan agreement, but must look beyond the agreement to the facts of the transaction.  Indeed, in *Krispin* the parties did not actually dispute whether the bank issued the credit and processed and serviced the account, a fact which the *Ubaldi* court considered in determining that the cases were distinguishable from its own facts in which, as here, the plaintiff claimed that those rights were not retained by the bank.  *Ubaldi*, 852 F. Supp. 2d at 1201; *Krispin*, 218 F.3d at 923.

Thus, the rule articulated by *Ubaldi* is that "***among other things***" the bank must retain "***significant*** stake in or control over" the loan in order to extend its purported preemptive immunity to claims against the nonbank lender.  *Ubaldi*, 852 F. Supp. 2d at 1202 (emphasis added).  Plaintiff has alleged precisely the reverse: that FinWise retains *no* significant stake in or control over the loan, and all "other thing" point towards Opploans being the true lender.  Drawing reasonable inferences in favor of Plaintiff, the Court should find Opploans to be the "true lender" and not subject to preemption.

### ii.     The OCC and FDIC Rules Regarding Section 27 and 85 Are Entitled to Little Deference

The OCC suggests in its inapplicable final "true lender" rule that there is a "growing body of case law [that] has introduced divergent standards" for determining the "true lender." 85 Fed. Reg. at 68742. While this contradicts the clarity Defendants appear to see in the law, in reality the substance-over-form approach endorsed by this Circuit is nearly universally accepted, including by federal courts of appeal and in cases assessing who the true lender is for purposes of application of the NBA and other federal banking laws. *See supra* section B(2). To the extent there is variety, it is simply a creature of the variety of "contrivances" such as Defendants' which have emerged to evade regulation (*Scott v. Lloyd*, 34 U.S. 418, 447 (1835)) and the cases "only vary as they follow the detours through which they have had to pursue the money lender." *De Wolf v. Johnson*, 23 U.S. 367, 385 (1825). The cases are consistent in their rejection of the strict formalism suggested by Defendants. *See supra* section B(2). In short, Defendants' position that the name on the loan agreement is determinative has been soundly rejected by the majority of courts which have considered it, and often in strong terms.[9]

The OCC has erroneously claimed that *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 837, 843 (1984) entitles it to "resolve ambiguities" in the NBA. 85 Fed. Reg. at 44224. However, as shown, there is no ambiguity to resolve, and the Ninth Circuit has categorically held that only the deference of *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) applies, and "the OCC's regulation [as to preemption] would have been entitled to little, if any, deference" even before the Dodd Frank Act, and that today "the OCC's conclusions [as to preemption] are entitled to little, if any, deference." *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1194 (9th Cir.), cert. denied, 139 S. Ct. 567 (2018). The same is true as to any speculative future analysis of "true lender" by the FDIC. Creating an entirely new law – that regardless of reality, the name on the contract is the lender – in defiance of settled jurisprudence and in violation of state sovereignty, is not the type of conduct that falls within *Chevron* deference.

---

[9] *See, e.g., CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300, at *15 (W. Va. May 30, 2014) ("The 'federal law test' advocated by CashCall examines only the superficial appearance of CashCall's business model. Further, if we were to apply the 'federal law test' . . . we would always find that a rent-a-bank was the true lender of loans such as those at issue in this case. Therefore . . . we find that the circuit court did not err in applying the "predominant interest test" as a means of examining the substance, and not just the form, of [the marketing] agreements.").

1   Indeed, given that the agency would be seeking to preempt state law as to nonbank entities such as

2   Opploans who are not subject to OCC or FDIC oversight, their analysis is not even entitled to *Skidmore*

3   deference, both because the OCC and FDIC lack statutory authority to interpret state law, and "true

4   lender" analysis is in large part a creature of state law, particularly where, as in California, there are

5   specific statutory provisions which bear on related analyses (Cal. Fin. Code § 22324), and because the

6   OCC has so far failed to provide a persuasive rationale for its interpretation.  *See Lusnak*, 883 F.3d at

7   1193.  Regardless, the OCC rule does not apply, and the FDIC "rule" literally does not exist.  As such,

8   they provide no reason to disregard over a century of settled law which holds that "[u]sury is a mortal

9   taint wherever it exists, and no subterfuge shall be permitted to conceal it from the eye of the law; this

10   is the substance of all the cases, and they only vary as they follow the detours through which they have

11   had to pursue the money lender."  *De Wolf v. Johnson*, 23 U.S. at 385.

### 3.   Far From Creating Certainty, Defendants' Approach Produces Unfair Surprise

13         Defendants' Motion is largely comprised of policy arguments rather than legal authority, and it

14   is perhaps unsurprising that in their arguments that the "federal test" creates "certainty" in the

15   marketplace (Motion at 15), Defendants ignore the part of the marketplace most directly and profoundly

16   affected:  borrowers like Mr. Sims.  Mr. Sims and other members of the general public were not granted

17   "certainty" when, at the eleventh hour, they were confronted with an unknown entity as their supposed

18   "lender," despite having been enticed into the deal by Opploans, assured of the credentials and

19   trustworthiness of Opploans, perhaps even directly marketed to by Opploans.  They were not granted

20   "certainty" when, through this last-minute attempted façade of a substitution, they found themselves

21   supposedly suddenly bereft of the consumer protections of their state.

22         To preach the merits of a drastic change in the law on the basis that it provides "certainty" to

23   FinTech companies, moneylenders, and banks, while ignoring the surprise and deception the underlying

24   scheme works upon the myriad borrowers, is simply callous.  Mr. Sims is part of the marketplace, and

25   he deserves "clarity and certainty" as much as any "rogue bank" or moneylender.  Motion at 17.  Thus,

26   as a matter of public policy and basic morality as well as applicable law, the so-called "federal test"

27   should not be dragged into this circuit.  *See De Wolf v. Johnson*, 23 U.S. at 385.

**D.      Opploans Is Clearly the "True Lender" for Plaintiff's Loans**

As Section 27 applies only to state banks, not nonbank moneylenders such as Opploans, the only way in which Defendants' creative preemption arguments succeed is if this Court finds, against all the evidence, that FinWise is the true lender on Opploans loans. At this stage, such a finding requires improper reversal of the pleading standard in that it requires this Court to ignore Plaintiff's allegations that the loan document is a fraud and that the inclusion of FinWise on that document is merely an instrument of that fraud.  The court in *Eul v. Transworld Sys.*, 2017 WL 1178537, at *7 analyzed the relationship between the pleading standards and true lender claims in a rent-a-bank situation:

> To disregard Plaintiffs' express allegations in favor of the lender listed on the face of the loans would require the Court to draw a factual inference against the Plaintiffs—that Chase was in fact the originator of the loans—which it may not do at the pleading stage. Because Plaintiffs allege that Chase was not the true originator of their loans, the Court is not persuaded that NBA preemption applies here.

*Id.* (citing *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016) and *Ubaldi*, 852 F. Supp. 2d at 1194-95).

This is the same case.  Indeed, here the case is far stronger against preemption as:  a) Opploans is not only listed in the name/address portions of the agreement but also designated as the party performing all traditional lending functions, providing in-document evidence of Plaintiff's allegation, and b) this case arises in the same district as *Ubaldi* and under almost identical relevant facts. Defendants describe Plaintiff's request as being that "this Court ignore his loan agreement (and allegations regarding the sale of his loan)."  Motion at 14.  To the extent that this reflects that the analysis does not begin and end at "Lender: FinWise Bank" this is accurate.  FAC Exh. A at 1.  However, Plaintiff has pled in detail much more than this, and further argues that the loan agreement itself is strong evidence of the fact that Opploans is the lender on Plaintiff's loan.

**1.  The Text of the Loan Agreement Actually Provides Evidence that Opploans Is the Lender**

Opploans is listed in the box entitled "Lender" on Plaintiff's loan agreement.  FAC Exh. A. Further, the relationship between the columns for "Lender" and "Borrower" is one in which bolded font is used to identify the party, and then unbolded full caps is used to list their address.  FAC Exh. A at 1. Thus, basic principles of reading comprehension lead a reasonable person to believe that the lender is

the entity that resides at Opploans' address: Opploans.  Additionally, the term "lender" is actually defined to include Opploans as "any of its direct or indirect assignees."  Loan Agreement at 1.  Notably, both the *Ubaldi* and *Eul* courts refused to find that the named lender was the "true lender" such that preemption applied and state law claims were subject to dismissal despite the absence, in those cases, of the loan documents including the alleged lender in the relevant "name" box as is the case here.  *Eul*, 2017 WL 1178537, at *6  (Plaintiffs alleged that "each loan *purported* to be originated in the name of JP Morgan Chase . . .  but . . .  the true lender was . . .  a non-bank entity that acted behind the scenes."); *Ubaldi*, 852 F. Supp. 2d at 1192 ("The Stillwater National Bank and Trust Company ('Stillwater'), a national bank located in Stillwater, Oklahoma, is identified as the lender on Plaintiff's application form.").

Against this, Defendants (while not actually quoting in full the text) essentially rely on the use of "C/O."  While attorneys and financiers are well familiar with this shorthand, defined in *Black's* as simply "*abbr* (1889) Care of," (C/O., Black's Law Dictionary (11th ed. 2019)) the meaning is not immediately apparent to an average borrower of such loans.  Such a borrower might consult a non-legal dictionary such a Merriam Webster, which defines the term as "at the address of." ("Care of.", Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/care%20of (last visited Oct.  9, 2020).) Thus, the effect on the loan agreement is to state that the lender is the entity at the address of Opploans.  A more likely result, of course, is that the average borrower will simply brush over this hitherto unseen name of "FinWise," see "Opportunity Financial, LLC" – the only entity with whom they have dealt at every point in the transaction so far (and will deal at every point thenceforth) – in the box, and either ignore it or assume it is simply some kind of d/b/a of Opploans.  *See Williams v. Gerber Prod. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) (no requirement for consumers to review fine print which contradicts prominent misleading representations).  Certainly, at no point was the consequence of adding FinWise (i.e., quintupling the interest rate) ever disclosed.  While these reasonable interpretations appear from plain meaning, they do not exist in a vacuum, as by this point the borrower has already been subjected to pages of marketing materials on Opploans' website, rife with personal assurances as to Opploans' control over the transaction.  FAC ¶ 73.  Opploans falls over itself in demonstrating its own role in the lending operation, mentioning FinWise (but never the effect of using

their charter) only in small print and buried deep.  *Id.* Putting these positive representations, consistently portrayed in bold font across pages of the website, up against the two mentions of FinWise in the entire loan agreement (Opploans and its contact information are mentioned many times more frequently), any reasonable borrower would assume that the contract for the loan is between themselves and Opploans – which is true.  FAC ¶¶ 72-76.

Plaintiff contends that even if the ambiguity is resolved in Defendants' favor, the reasonable inference that it is a self-serving sham cannot be.  *Eul*, 2017 WL 1178537, at *7.  Besides, the loan agreement itself demonstrates that Opploans conducts all lending activities.  For example, the address listed is that of Opploans (Exh. A to FAC at 1); and Opploans is to be contacted to: adjust final payoff payments (*Id.* § 4), change payment method (*Id.* § 5), terminate ACH authorization (*Id.*), receive advance notice of ACH debits (*Id.*), correct errors in payment processing (*Id.*), answer questions about check conversion (*Id.* § 10), or ask questions about, initiate, or opt out of arbitration (*Id.* § 22).  Thus it is clear from the face of the document that Opploans conducts literally every lending function.  However, as discussed, the Court is not bound to the (mis)representations of the loan agreement.  *Eul*, 2017 WL 1178537, at *7.

### 2.  Factually Opploans Exercises All Control Over, and Bears All Risk from, the Loans

In reality, of course, behind the document the passivity and effective irrelevance of FinWise to the operation is more absolute.  Of the $1,500.00 financed, FinWise bears the maximum risk of $0.00.  Likewise, of the $979.74 that Plaintiff was charged for his loan, on information and belief, FinWise stood to earn only a kickback for the temporary use of its name and charter while Opploans, as the lender, retained rights to actual profits.  FAC ¶¶ 21-24.  Beyond the fundamental lending arrangement, in which Opploans simply rents FinWise's charter for attempted evasion purposes, it is also clear from the loan agreement and Opploans' website that Opploans conducts 100% of the marketing for its loans, as well as all origination and client communication on the front-end, and all collection efforts on the back-end, and more.  Plaintiff has sufficiently alleged that Opploans is the true lender on his loan.  As this is a material component of Plaintiff's claims, not least due to its potential effect on preemption analysis, this is sufficient to survive dismissal at this stage.  *Ubaldi*, 852 F. Supp. 2d at 1203.

1

**E.     Opploans Is a "Finance Lender" and Must Obey the CFL**

2

Quite apart from whether Opploans is the "true lender" for the purposes of federal banking law,

3

there is no doubt that it committed conduct that violates the California Finance Lenders Law, Cal Fin.

4

Code §§ 22000 *et seq.* (the "CFL"), including by lending at rates in excess of the cap.  Cal. Fin. Code

5

§ 22303.  The CFL specifies the legislative intent that it be broadly construed to promote its specified

6

purposes, stating that it "shall be liberally construed and applied to promote its underlying purposes and

7

policies, which" include "(4) To protect borrowers against unfair practices by some lenders, having due

8

regard for the interests of legitimate and scrupulous lenders" and "(5) To permit and encourage the

9

development of fair and economically sound lending practices.  Cal. Fin. Code § 22001(a).

10

The CFL covers "Finance Lenders," defined to include "any person engaged in the business of

11

making consumer loans."  Cal. Fin. Code § 22009.  Plaintiff assumes that, notwithstanding its searching

12

arguments that it is not the "true lender" for the purposes of Section 27, Opploans would not argue that

13

it is not "engaged in the business of making consumer loans." Regardless, this is clearly alleged in the

14

FAC and is obviously true.  The CFL defines "the business of making consumer loans" very broadly, to

15

encompass all types of lending activities.  *See* Cal. Fin. Code § 22009.[10]  Clearly, without regard to the

16

outcome of the "true lender" analysis, Opploans is a "Finance Lender" under this definition particularly

17

with regard to the liberal construction required by the CFL. (Indeed, while FinWise is not a Finance

18

Lender as it is a state-chartered bank, by engaging in certain conduct in regard to Opploans loans, it is

19

covered by the CFL (Cal. Fin. Code § 22324)).  Regardless, Opploans has been licensed as a Finance

20

Lender by the California DFPI (formerly the Department of Business Oversight) at all relevant times,

21

and Defendants have not disputed Plaintiff's characterization of Opploans as a Finance Lender and

22

licensee under the CFL.  *See generally* FAC.  Thus, there is no reasonable dispute that Opploans is a

23

Finance lender, and that its *status* as such places it within the scope of the CFL and subjects it to liability

24

for violations of the CFL regardless of the details of any particular transaction.

25

26

[10] While this provision has received minimal interpretation, the Office of Administrative Hearings and
a bankruptcy court have approved an appropriately expansive reading of the statute, albeit in the context

27

of commercial lending.  *See generally In re Fin. Serv. Enter.*, 2016 WL 7840137; *See also In re Rose*,
266 B.R. at 193 (construing the law as clearly covering an entity that has made five loans in the space

28

of ten years and more than two commercial loans within one year).

**3.   Opploans Violates the CFL Through its Unlawful Lending *And* its Attempted Evasion**

Between pages 27 and 33 of their Motion, Defendants employ several tricks to divert attention from the arguments actually made by Plaintiff in the FAC, and set out a passionate case for the inapplicability of California's constitutional usury provision, the violation of which is not pled by Plaintiff.  First, Defendants rehash their "true lender" argument, in the hope of persuading this Court that it has any bearing whatsoever on Plaintiff's CFL claims.  It does not.  An individual or entity's status as a Finance Lender is just that – a status, and a licensed and official status at that.  Just as there is conduct which a typical citizen may perform which subjects an attorney to liability, there is conduct which – when performed by a Finance Lender – is unlawful and liable, and it is axiomatic that licensed Finance Lenders must not violate the Finance Lenders Law.  Again, these claims would be literally unaffected even if Defendants were correct that Opploans was not the true lender; Opploans has violated multiple provisions of the CFL, and in doing so it broke the law and harmed Plaintiff and the general public.

Second, as mentioned, Defendants seek to portray Plaintiff's claims as claims for violation of the California Constitution's prohibition of usury.  Cal. Const. art. XV § 1.  They are not.  Plaintiff does not question that, as a Finance Lender, Opploans is specifically exempted from constitutional usury cap, and did not bring constitutional claims for usury.  Cal. Fin. Code § 22002; *see generally* FAC.  Rather, in addition to claims for violation of California's statutory and common law unconscionability rules (themselves imported into the CFL by way of Cal. Fin. Code § 22302 as recognized by *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 977 (2018)), Plaintiff brought UCL claims premised upon Defendant Opploans' violation of the CFL.  *See* FAC ¶¶ 161-74.

Third, Defendants attempt to conflate Opploans' exemption from the unpled usury violations with an exemption from the CFL itself.  In other words, Opploans would have this Court believe that a) it is exempt from the Constitutional usury provision due to its status as a Finance Lender (a status created precisely for the purpose of creating a body of financial regulation parallel and apart from constitutional usury), and yet b) it is exempt from the CFL itself for the same reason.  This is despite the fact that Defendants acknowledge that "[f]or this class of lenders, which previously were subject to the California Constitution's 10% interest rate cap, the CFL allows them to lend at a higher rate *so long as they comply*

1   *with its provisions*." Motion at 28 [emphasis added].

2       **4.  Opploans Loans Violate the Applicable Interest Rate Cap**

3       The CFL does not simply regulate lending money, but reaches broadly to regulate many forms

4   of related conduct to ensure the impossibility of technical evasions of the type whose judicial

5   endorsement is sought by Defendants in this Motion.  Consider the pertinent interest rate cap:

6       Every licensee who lends any sum of money may contract for *and receive* charges at a
        rate not exceeding the sum of the following [setting forth rates based on principal lent."].

7   Cal. Fin. Code § 22303.

8   Next, consider the effective enforcement provision applicable to such rates:

9       No amount in excess of that allowed by this article shall be **directly or indirectly
        charged, contracted for, or received by any person**, and the total charges of the finance
10      lender and broker and any other person in the aggregate shall not exceed the maximum
        rate provided for in this article.

11  Cal. Fin. Code § 22306.

12      Thus, even if Defendants' description of the nature of their scheme was accurate, it would still

13  violate the CFL as it would be, by definition, either "directly" or "indirectly" charging, contracting for,

14  *or receiving* amounts in excess of the rate cap of section 22303.  This is untenable for Opploans; either

15  they are the "true lender" and they "directly" charged, contracted for, or received unlawfully high rates,

16  or they are not and they "indirectly" did the same.  The CFL penetrates Defendants' scam and cares

17  nothing for their artifice.  If FinWise is the true lender, then by FinWise making Plaintiff's loan "C/O

18  Opportunity Financial," and allowing Opploans to charge, contract for, and receive interest in excess of

19  the cap, it placed Opploans in jeopardy.  If – as is really the case – Opploans is the true lender, it placed

20  itself in jeopardy by undertaking the same.  Further, this definitively cannot be preempted as it is

21  undisputed that the CFL does not apply to FinWise and the FDIA does not apply to Opploans.

22      **5.  Opploans Loans Are Unconscionable Under the CFL**

23      While much of the CFL may pertain to unlawful conduct without regard to particular loans,

24  section 22302 expressly incorporates the unconscionability provisions of California Civil Code, stating

25  that a "loan found to be unconscionable pursuant to Section 1670.5 of the Civil Code shall be deemed

26  to be in violation of this division and subject to the remedies specified in this division."  Importantly,

27  Plaintiff has pled multiple bases for a finding of unconscionability, including not only various forms of

28

severe procedural unconscionability such as deception, high pressure sales tactics, and exploitation of vast power differentials, but also multiple forms of substantive unconscionability.  *See generally* FAC. While one of the primary bases for a finding of substantive unconscionability is the interest rate itself, Plaintiff has alleged other serious forms of substantive unconscionability, including the serious matter of the attempted waiver of claims for public injunctive relief under the CLRA, UCL, and False Advertising Law (FAC ¶¶ 111-12).  In addition, unlike a usury claim, a claim of unconscionability in a lending situation necessarily considers the situation and obligations of the lender – in other words, there must necessarily be a consideration of both "sides" to support a finding of "one sidedness."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 340 (2011) (citing *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000)).  While this analysis will be identical for every borrower of Opploans, the analysis necessarily considers aspects of Opploans' business practices and business needs, and comparison of what it "gives" in the contract with what it "takes."  Here, whether a loan of $1,500 in exchange for $979.74 and a waiver of public injunctive relief is sufficiently one-sided as to "shock the conscience" (*Id.*) cannot be determined at this stage, but if it is then Opploans has violated section 22302 regardless of whether it was either the initial signatory or the "true lender."

### 6.   Opploans Violates the Anti-Evasion and Anti-Subterfuge Provisions of the CFL

Obviously expecting devious attempts to circumvent its clear and broadly stated rules, the drafters of the CFL had the foresight to specifically provide for violations based on attempted evasion and subterfuge:

> No person, except as authorized by this division, shall directly or indirectly charge, contract for, or receive any interest, discount, or consideration greater than the lender would be permitted by law to charge if he or she were not a licensee hereunder, upon the loan, use, or forbearance of money, goods, or things in action, or upon the loan, use, or sale of credit.  This section applies to any person, who by any device, subterfuge, or pretense charges, contracts for, or receives greater interest, consideration, or charges than is authorized by this division [i.e. the CFL] for any loan, use, or forbearance of money, goods, or things in action or for any loan, use, or sale of credit.

Cal. Fin. Code § 22326.

This is clearly designed to thwart Defendants' precise arguments in this case.  Again, this cannot be preempted because violation of this section in no way depends on a finding of violation of the Constitutional prohibition on usury, which Defendants point out does not apply to them, and only applies

to Opploans, which is undisputedly not subject to Section 27 as a nonbank.  Thus, regardless of whether this Court overrules *Ubaldi* and *Easter* and finds that FinWise is the true lender as a matter of law, Opploans is still liable for violation of this statute due to the very means it employs to evade it.

Equally applicable to Defendants' conduct is section 22324 of the CFL which states that: "Any person who contracts for or negotiates in this state a loan to be made outside the state for the purpose of evading or avoiding the provisions of this division is subject to the provisions of this division."  Cal. Fin. Code § 22324.  Again, a finding of violation here does not turn on "true lender" as a legal fiction, but on the factual question of whether Opploans "contract[ed] for or negotiate[d] in this state a loan to be made outside the state for the purpose of evading or avoiding the provisions of this division."  If the answer is yes, as Plaintiff has alleged, then Opploans is "subject to the provisions of" the CFL and by and through the conduct described is in violation thereof not only due to the violation of the rate cap, but also through unconscionable conduct and engaging in evasion and subterfuge.

### 7.  As Defendants' Loan Agreements Violate the CFL, They Are Void

Under section 22750, "if any provision of this division is violated in the making or collection of a loan, whether by a licensee or by an unlicensed person subject to this division, the contract of loan is void, and no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction."  Cal. Fin. Code § 22750; *See also*, Civil Code §§1608, 1670.5.  As described, numerous provisions of the CFL have been violated by Defendants in their making of loans to California residents.  As such, all such loans are void.  Defendants' reaching arguments that the CFL do not apply because "the CFL is an integrated component of California's usury law"[11] and "the CFL was enacted to create additional exemptions to the constitutional usury prohibition, not to eliminate existing exemptions" (Motion at 32-33) are either confused or disingenuous.  If Defendants were correct, then a lender's status as a Finance Lender would both a) exempt that entity from the constitutional usury provision, *and* b) exempt it from the CFL itself, rendering the entire CFL a dead letter as to the very licensees it purports to regulate.  Of course, this is not the case, and the CFL's true purpose is specifically stated.  Cal. Fin. Code § 22001(a).

---

[11] Note the conflict between Defendants' portrayal of the CFL as an "integrated portion of the usury law" with their portrayal of the UCCC as being utterly unrelated to usury.  *See infra* section G.

In summary, it is not possible to both function as a moneylender to California residents and contract oneself out of the coverage of the CFL, and Defendants' conduct brings them squarely within its coverage irrespective of "true lender" status or licensure.  Cal. Fin. Code §§ 22324, 22326.  The CFL provides for liability irrespective of "true lender" status and thus cannot even be arguably preempted, particularly as a) the CFL can be violated without regard to any particular interest rate, and b) Opploans is not a bank and so not covered by Section 27 in any way.  Clearly, simply because conduct surrounds a lending transaction and/or a state bank does not exempt that conduct from all state law; yet that is precisely what Defendants argue.  California is within its sovereign power to forbid evasive, deceptive, and unconscionable conduct utilized in the service of a moneylending operation, just as it is within its sovereign power to prohibit physical violence in service of the same.  Defendants have violated multiple provisions of the CFL, including by directly *or indirectly* contracting for and receiving interest payments above the rate cap (Cal. Fin. Code §§ 22303, 22306, 22326) and making unconscionable loans.  Cal. Fin. Code § 22302.

## F.     Plaintiff's Remaining California Law Claims Are Valid and Largely Unchallenged

As Defendants' Motion is based entirely on a misguided attempt at avoiding or remaking the law entirely rather than engaging with it, they have chosen not to substantively dispute whether Plaintiff has stated a claim for unconscionability, violation of the CFL, or violations of the UCL deriving from unconscionable or unlawful conduct.  *See generally* Motion.  Nor do they offer any challenge to Plaintiff's UCL claims premised on the violation of California's False Advertising Law, or other deceptive conduct alleged, which is obviously not even touched by any of Defendants' preemption arguments.  *See, e.g.,* FAC ¶¶ 111, 149, 175, 200.  Nor do they challenge Plaintiff's UCL claims based upon their unfair conduct.  *See, e.g.,* FAC ¶ 185-194.  Nor do they challenge Plaintiff's UCL claims based upon their fraudulent conduct.  *See, e.g.,* FAC ¶ 195-207.  Nor do Defendants substantively challenge Plaintiff's arguments that Defendants violated California Civil Code § 1670.5 by their unconscionable conduct.  *See, e.g.,* FAC ¶¶ 1, 119, 174, 191.  Most importantly, Defendants' do not challenge Plaintiff's claims that through engaging in a "bait and switch" by not disclosing FinWise's "involvement" until the last minute thereby quintupling the interest rate, Defendants violated the UCL.  FAC ¶¶ 185-194; *see generally* Motion.  These claims are therefore waived should the Court find

1    Plaintiff's claim not preempted, and irrespective of preemption, Plaintiff's claims based on the FAL and

2    the UCL Deceptive and Fraudulent prongs necessarily survive the Motion.

3    **G.      Even if FinWise Was the "True Lender" the Loans Were Not "Valid When Made"**

4            Preemption under Section 27 in a rent-a-bank scenario requires two findings.  First, it requires a

5    finding that, despite all evidence to the contrary, the state bank – here FinWise – is the "true lender," as

6    nonbanks are not subject to FDIA regulation.  Second, the Court must find that the loan was "valid when

7    made," such that it will remain enforceable and valid when transferred or "exported" to a nonbank

8    lender.  As demonstrated, the loan would not be "valid when made" if California law applies, as it

9    should.  However, in this case the loan would not even be "valid when made" under the laws of the state

10   of Utah.   Again, Plaintiff has demonstrated that in reality, and under applicable law, the lender is

11   Opploans and California law applies, but it is notable that in their race to evade California law,

12   Defendants' scheme failed to actually bring their loan into compliance with the laws of Utah despite

13   seeking to use that state as both a smokescreen and a shield.  Section 27 provides that:

> [A] State bank . . . may . . . take, receive, reserve, and charge on any loan . . .  interest
> at a rate of not more than 1 per centum in excess of the discount rate on ninety-day
> commercial paper in effect at the Federal Reserve bank in the Federal Reserve district
> where such State bank or such insured branch of a foreign bank is located or at the rate
> allowed by the laws of the State, territory, or district where the bank is located, whichever
> may be greater.

17   12 U.S.C.  § 1831d.

18           Assuming *arguendo* that FinWise does "take, receive, reserve [or] charge" at all, Plaintiff's

19   alternative Utah law claims are not preempted as: a) they do not conflict with Section 27 (which

20   specifically grants plaintiffs the ability to bring a claim under Section 27 on the basis that the state bank

21   did "take, receive, reserve [or] charge . . .  interest at a rate [not] allowed by the laws of the state" of

22   Utah), and b) a contrary finding would actually *undermine* even Defendants' portrayal of the purposes

23   of the Depository Institutions Deregulation and Monetary Control Act as preventing discrimination

24   against state banks and creating certainty for lenders, as unquestionably a claim against a *national* bank

25   brought under the "parallel" section of the NBA premised upon charging interest in excess of that

26   permitted by the laws of the state of location would be meritorious.

27

28

1

**1.   Section 27 and the Interest Rate Authority Incorporate the "Laws of the State"**

2

It is a strange argument that permits one to pick and choose what portion of the law binds him.

3

*First Nat. Bank of Logan, Utah v. Walker Bank & Tr. Co.*, 385 U.S. 252, 261 (1966).

4

By arguing that "Utah's unconscionability doctrine . . .  does not regulate the rate of interest

5

allowed at all" and that "[r]ather, it is a defense to contract enforcement that may be invoked by a party

6

resisting enforcement" and therefore "it plainly is not a 'law of the State' of Utah setting forth 'the rate

7

[of interest] allowed'" for the purposes of Section 27, Defendants simultaneously misrepresent Utah law

8

and misquote Section 27 in an attempt to invent federal banking law out of whole cloth.  Motion at 19-

9

20.  By going on to argue that – in defiance of the Utah Code's own commandments – only Utah Code

10

§§ 15-1-1 and 70C-2-101 count as such "laws," Defendants reveal their audacious attempt to have their

11

cake and eat it too.  But as with Section 85, here "[t]he federal Act pertaining to this case adopts not

12

only the numerical interest rates set by state statute, but also the entire case law of the state interpreting

13

the state's limitations on usury." *Roper v. Consurve, Inc.*, 777 F. Supp. 508, 513 (S.D. Miss. 1990), aff'd,

14

932 F.2d 965 (5th Cir. 1991); S*ee also First Nat. Bank in Mena v. Nowlin*, 509 F.2d at 876 ("[Section

15

85] adopts the entire case law of the state interpreting the state's limitations on usury; it does not merely

16

incorporate the numerical rate adopted by the state") (citing *Citizens' Nat. Bank of Kansas City v.*

17

*Donnell*, 195 U.S. 369, 374 (1904); *Daggs v. Phoenix National Bank*, 177 U.S. 549, 555 (1900)).  Clearly

18

either Plaintiff's claims for unconscionability and excess interest are "laws of the state," in which case

19

their violation cannot be cured by "exportation" under the Interest Rate Authority, or they are not, in

20

which case they are not preempted by Section 27 at all even as to FinWise.  They simply cannot be both.

21

Importantly, contrary to Defendants' "quotation" of Section 27, it does not speak of a "*law* of

22

the State" in which the bank is located but rather "the *laws* of the State." 12 U.S.C.  § 1831d(a).  This

23

is significant, as many states, such as California, *do* have a single statutory applicable rate for a given

24

loan.  This crafty drafting is enhanced by Defendants' phraseology to suggest that the "law" in question

25

must be one "setting forth 'the rate [of interest] allowed.'"  Motion at 20.  This is simply not what

26

Section 27 says.  There is no part of Section 27 or federal banking law generally which limits the

27

consideration of state law to such laws which operate as explicit rate caps.  The correct approach was

28

clearly stated by the Eighth Circuit: "the primary principle of construction of [Section 85] . . .  is that

the federal Act adopts the entire case law of the state interpreting the state's limitations on usury; it does not merely incorporate the numerical rate adopted by the state." *First Nat. Bank in Mena v. Nowlin*, 509 F.2d at 876.  By contrast, Defendants urge this Court to take mutually incompatible positions as to the effect of Section 27, requiring both that it preempts claims for violation of Utah's statutory unconscionability and excess charges (because those terms regulate the interest rate and thus impermissibly intrude into the realm of Section 27), *and* that such violations do not make a loan not "valid when made" and so unable to benefit from interest rate exportation (because they are not "laws of the State" which govern an allowable interest rate).  Clearly both cannot be true.[12]  Plaintiff's position, by contrast, is simply that Section 27 does not apply to FinWise at all as it is not the lender, and it regardless cannot benefit from the "valid when made" rule because the loans were always already unlawful.

## 2.  Defendants' Expansive Reimagination of Section 27 Is Unsupported

The only case Defendants cite which actually discusses the relationship between unconscionability and usury, *Citibank, S. Dakota, N.A. v. Palma*, 184 N.C. App. 504, 511 (2007), came to a conclusion that – to the extent the case has any bearing here whatsoever – it is not favorable to Defendants.  There, the *defense* of unconscionability was interpreted (apparently without authority) as "in the nature of a defense of usury" because, unlike here, the "proposed defense only challenged the fees and charges." *Id.*  The court in *Palma* found that the text of the South Dakota usury law – markedly different from that of Utah meant that the unconscionability claim could not succeed. *Id.; compare* S.D. Codified Laws § 54-3-1.1 *with* Utah Code § 70C-2-101.  In the present case, not only does relevant Utah law actually provide courts with the tools and remedies for unconscionable rates, but Plaintiff's claims attack the loan agreements based on *multiple grounds* for unconscionability, not simply for excessive interest.  The fact that the court was willing to consider unconscionability as being a related claim to usury suggests that where, as here, both concepts are interlocked as part of a comprehensive consumer

---

[12] In fact, it seems likely that the reverse is true as unconscionability laws do not "expressly" limit the interest rate, and application of the unconscionability standard to such loans would "further [DIDCMA's] purpose by validating market rates reflecting inflationary risks, while prohibiting abusive rates charged without relation to risks as costs."  Steven W.  Bender, *Rate Regulation at the Crossroads of Usury and Unconscionability: The Case for Regulating Abusive Commercial and Consumer Interest Rates Under the Unconscionability Standard*, 31 HOUS. L. REV. 721, 811 (1994).

credit regulation, at a minimum statutory unconscionability and excess charges claims should be considered as "laws of the state" for "valid when made" analysis.[13]

None of Defendants' cases discuss the applicability of aspects of consumer credit regulation, other than strict rate caps, on the Section 27 analysis of the rate allowed by the "laws of the state" in which the bank is located, as does Plaintiff's claim, and none involved unconscionability, as does Plaintiff's claim.  That an "unconscionability *defense* to contract enforcement" existed in some form in each of these states is irrelevant.  Motion at 21; *see generally* Steven W. Bender, *Rate Regulation at the Crossroads of Usury and Unconscionability: The Case for Regulating Abusive Commercial and Consumer Interest Rates Under the Unconscionability Standard*, 31 Hous. L. Rev. 721, 811 (1994) (discussing unconscionability as both a state and federal common law claim).

### 3.  The UCCC Is a Cohesive Body of Credit Regulation

Finally, as discussed *infra*, Defendants' position fundamentally misunderstands the nature of the Utah Consumer Credit Code, its relationship to Utah Code Title 15, and, most importantly, the scope of analysis and remedy available under Utah law for unconscionably high interest rates.  To pluck out the only two sections of the Utah code which favor their position and disregard the legal status of those items as parts, particularly in the case of Utah Code § 70C-2-101, of an interlocking regulatory scheme on the business of consumer credit, is highly questionable, and is not an approach actually followed by Utah courts facing claims of unconscionability in a consumer credit contract.  *See infra* section G(8); *see also* Utah Code § 70C-1-102 (purpose and construction).  Plaintiff's theory is not only that "because the loan's interest rate purportedly violates Utah's unconscionability doctrine" Section 27 exportation is not allowed (Motion at 19), it is also that the rates violate the UCCC which can only logically be

---

[13] Defendants' other cases are simply inapposite as they either do not discuss the role of unconscionability, rely on states with drastically different consumer credit laws, or both.  *In re Rent-Rite Superkegs W., Ltd.*, 603 B.R. 41, 63 (Bankr. D. Colo. 2019); *Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 394 (6th Cir. 1996); *Stoorman v. Greenwood Tr. Co.*, 908 P.2d 133, 136 (Colo. 1995); *Peterson v. Chase Card Funding, LLC*, No. 19-CV-00741-LJV-JJM, 2020 WL 5628935, at *8 (W.D.N.Y. Sept. 21, 2020); *Basile v. H & R Block, Inc.*, 897 F. Supp. 194, 199 (E.D. Pa. 1995); *Riley v. Wells Fargo Bank*, N.A., No. 16-CV-157-JMH, 2017 WL 2240570, at *4 (E.D. Ky. May 22, 2017) and *Green v. Wells Fargo Home Mortg., Inc.*, No. 4:07CV01055-WRW, 2009 WL 10711721, at *3 (E.D. Ark. Jan. 15, 2009). In *Pruitt v. Wells Fargo Bank, N.A.*, No. CV DKC 15-1308, 2015 WL 9490234, at *5 (D. Md. Dec. 30, 2015) plaintiff did not even allege the location of the national bank or whether the rate charged exceeded that of the state in which it was located and unconscionability was not mentioned.

interpreted as a cohesive and interlocking body of regulations that apply to the "rate allowed" by the "laws of the state."[14]  12 U.S.C. § 1831d(a).  Because Defendants' loans never complied with Utah law, they are not "valid when made" and are unlawful even if this Court finds that FinWise is the "true lender," and that Utah law somehow governs.

### 4.  The UCCC Incorporates Common Law and Has No "Safe Harbor" for Interest Rates

The Utah Code is clear that it cannot be read to impliedly displace standard contract claims, whether sounding in law or equity:

> (1) Unless displaced by the particular provisions of this title, the Uniform Commercial Code and the principles of law and equity, **including without limitation** the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, and bankruptcy shall supplement its provisions.

> (2) A charge or fee described in Section 70C-1-106 assessed by a depository institution as defined by Section 7-1-103 **in accordance with this title** may not be considered void as a penalty or otherwise unenforceable under statute or common law.

Utah Code § 70C-1-103.

Plaintiff's Utah claims are brought under both statutory and common law unconscionability standards.  FAC ¶214-227.  The Utah Code specifies that, where assessed by a depository institution, a finance charge (defined broadly in Utah Code § 70C-1-106) which is "***in accordance with [the UCCC]*** may not be considered void as a penalty or otherwise unenforceable under statute or common law." Utah Code § 70C-1-103 (emphasis added).  Given that Utah courts in practice conduct a searching analysis of unconscionability claims, clearly this section does not immunize an interest rate from these standard common law and statutory attacks.  *See infra* section G(8).  Indeed, the provisions in Utah Code § 70C-7-201 (allowing for penalties for the payment of "a charge in excess of that allowed by this title" and making specific reference to penalties of ten times the amount of the "excess charge"), and Utah Code § 70C-7-106 (requiring courts allow an opportunity to present evidence to aid in the determination of unconscionability, and allowing statutory damages if "any part" of a consumer credit agreement is unconscionable) command precisely the opposite.  The UCCC not only does not *preclude*

---

[14] Indeed, even where Utah courts are specifically contemplating claims for usury itself, they take a broader view of the claim than mere conformity with an interest rate statute.  For example, the Supreme Court of Utah has stated that "[c]ourts should be alert to examine carefully any suspicious transaction to determine whether the contract is in its entire aspect usurious.  All of the surrounding circumstances existing at the time of the making of the agreement must be taken into consideration."  *United Am. Life Ins. Co. v. Willey*, 21 Utah 2d 279, 282 (1968) (discussing the impact of contingency payments).

claims such as Plaintiff's, but specifically provides robust means of analysis and remedy in conjunction with incorporated common law.  Utah Code § 70C-1-103.  As such, it is highly unlikely that the legislature adopted Defendants' position that consumer credit contracts and their terms are immune from unconscionability analysis such that dismissal is appropriate at this stage.

As acknowledged by Defendants, consumer credit contracts agreements are subject to scrutiny under both the UCCC and Title 15 of the Utah Code ("Title 15") pertaining to "Contracts and Obligations in General."  Title 15 states in pertinent part that:

> (1) The parties to a **lawful** written, verbal, or implied contract may agree upon any rate of interest for the contract, including a contract for services, a loan or forbearance of any money, goods, or services, or a claim for breach of contract.
>
> (2) Unless the parties to a lawful written, verbal, or implied contract expressly specify a different rate of interest, the legal rate of interest for the contract, including a contract for services, a loan or forbearance of any money, goods, or services, or a claim for breach of contract is 10% per annum.

Utah Code § 15-1-1. Whereas, the UCCC states:

> **Except where restricted or otherwise covered by provisions of this title**, the parties to a consumer credit agreement may contract for payment by the debtor of any finance charge and other charges and fees.

Utah Code § 70C-2-101.

Contrary to Defendants' statement, the section does not provide that "unless a finance charge is **expressly** 'restricted' by the Utah Consumer Credit Code" then any rate may be contracted for.  Motion at 12.  However, the code does use the term "expressly" in other contexts, including most notably in its unconscionability definition, where it states that "[f]or the purposes of this section, a charge or practice **expressly permitted** by this title is not **in itself** unconscionable."  Utah Code § 70C-7-106.  (It also bears noting that § 70C-2-101 admits of an interpretation that it stands for the proposition that finance and other charges may be assigned to the borrower by contract, not that any rate or amount of such charges and fees may be so assigned.  This is likely the true meaning of this section given the rigorous analysis of claims of unconscionable interest rates undertaken by Utah courts.)  Regardless, considering the rules of construction adopted by the legislature, sections 70C-2-101 and 70C-7-106 should be read together as stating that parties may contract for any finance charge so long as the contract does not run afoul of other provisions of the UCCC, but an otherwise unconscionable consumer credit contract may be saved outright from a finding of unconscionability only if the charge or practice is "expressly

permitted by this title." *Id.*  As such, Title 15 cannot serve to justify a practice, such as the use of unconscionable contracts, that is prohibited by the UCCC, a title that explicitly incorporates common law "principles of law and equity," making no exception for such principles in application to unconscionability.  Utah Code § 70C-1-103.

The UCCC does not grant *carte blanche* to lenders when it comes to interest rates or any other term, and provisions in other titles, such as Title 15, cannot rescue a contract out of compliance with the UCCC and common law principles of law and equity.  The seriousness with which Utah courts treat this analysis is visible even in Defendants' best caselaw.  *See, e.g., Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 461–62 (Utah 1983).

### 5.  The UCCC Provides Remedies for Unconscionability and Excessive Interest of a Loan

The UCCC recognizes and affirmatively incentivizes claims for unconscionability and excessive interest in several sections:

> (1) With respect to a consumer credit agreement, **if the court finds the agreement or any part of the agreement to have been unconscionable at the time it was made**, the court may refuse to enforce the agreement, or it may enforce the remainder of the agreement without the unconscionable clause if that will avoid any unconscionable result.
>
> (2) If it is claimed or appears to a court that a consumer credit agreement or any part of it may be unconscionable, **the parties shall be afforded** a reasonable opportunity to present evidence as to its setting, purpose, and effect to aid the court in making the determination.
>
> (3) For the purposes of this section, a charge or practice **expressly permitted** by this title is not **in itself** unconscionable.…

Utah Code § 70C-7-106.  And:

> (1) A debtor is not obligated to pay **a charge in excess of that allowed by this title**, and **if he has paid an excess charge he has a right to a refund**…

Utah Code § 70C-7-201.  These sections simply would make no sense if the UCCC allowed moneylenders to set any rate of interest they pleased, regardless of the context of the agreement and the other practices employed.

### 6.  Courts May Find that Loan Agreements Are Unconscionable as a Whole or in Part

Turning first to section 70C-7-106, courts are granted the authority to find an agreement "or any part of the agreement" to be "unconscionable at the time it was made."  Given that the UCCC specifically regulates consumer credit i.e. loans, Defendants' position that a contract to loan money at interest can

never be found unconscionable in Utah would render this entire section meaningless. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). This is reinforced with resort to subpart (3) providing a quasi-affirmative defense that "a charge or practice expressly permitted by this title is not in itself unconscionable." Utah Code § 70C-7-106. Read literally the statute makes perfect sense: the title expressly permits certain charges and practices,[15] and this section clarifies that the *existence* of such a charge or practice will not *"in itself"* render an agreement unconscionable. For example, a plaintiff could not successfully argue that their agreement was unconscionable simply because it included a provision permitting attorney fees in the event of default. *See* Utah Code § 70C-2-105. To be clear, that is not Plaintiff's claim; rather Plaintiff claims that through *many* unconscionable practices, including *inter alia* a vastly excessive interest rate, deceptive marketing, use of schemes to evade regulation, lack of mutuality of remedy, and waiver of claims, Defendants created an unconscionable contract under Utah law.

### 7. A Remedy for Excessive Charges Makes No Sense if Charges Cannot be Excessive

Turning to section 70C-7-201, providing for refunds of excessive charges, once again the statute would make little sense if Defendants' interpretation were applied. As Defendants observe, the UCCC does not set an allowable rate compared with which a given rate might be "in excess." *Id.* Indeed, unlike Title 15 which is not included in "this title," the UCCC does not even set a default interest rate of 10% for contracts that are either not "lawful" or not "written." *Compare* Utah Code § 70C-2-101 *with* Utah Code § Utah Code § 15-1-1. Thus, while it may be that 10% represents Utah's general policy on a reasonable rate of interest, and while courts do reform unconscionable contracts to that rate (*see Danjanovich v. Robbins*, 2005 WL 2457090, at *5) there is no such figure present in the UCCC. The most obvious meaning for the section in the context of a claim for unconscionability is that the "excess" is that above the conscionable rate *for that contract*.

### 8. Utah Courts Undertake Serious Analysis of Unconscionability Claims

The language of the UCCC section pertaining to unconscionability is unambiguous that

---

[15] *See, e.g.,* Utah Code §§ 70C-2-101 (interest rates and other charges and fees), 70C-2-102 (delinquency charges at certain rates), 70C-2-103 (deferral charges), 70C-2-104 (advances to perform covenants of buyer), 70C-2-105 (attorneys' fees for default), 70C-3-103 (finance charges based on unpaid daily balances), and 70C-4-101 (minimum charges on unpaid balances).

dismissal of Plaintiff's Utah unconscionability claims is improper at this stage:

> (2) If it is claimed or appears to a court that a consumer credit agreement or any part of it may be unconscionable, **the parties shall be afforded a reasonable opportunity to present evidence as to its setting, purpose, and effect** to aid the court in making the determination.

Utah Code § 70C-7-106.  This subsection, like the section and the title generally, once again entrusts to courts the essential duty of carefully analyzing the "setting, purpose, and effect" of "a consumer credit agreement or any part of it" when determining if it is unconscionable.  This section was triggered when Plaintiff "claimed" that the contract and its parts were unconscionable.  As such, if this Court determines that Utah law governs, it should "afford a reasonable opportunity to present evidence" and deny the Motion.

Defendants' position as to Utah law is essentially that the mere fact that a contract includes, as a term, money loaned at interest, is sufficient to insulate it from an attack on unconscionability (or other) grounds.  This reading is perverse, and is simply not supported by resort to the Utah Code or Utah common law.  *See, e.g., Carter v. West*, 38 Utah 381, 381 (1911) (60% APR on promissory note lent to an individual with little business experience or literacy unconscionable, and finding a debt fully paid where "the plaintiff received the full amount of money loaned to the defendant and interest at the rate of 15 per cent per annum."); *Engert v. Chadwick*, 40 Utah 239, 239 (1912) (120% APR interest on a private promissory note for $50 "unjust, and unreasonable, and an unconscionable rate" and "against public policy and good morals to hold otherwise and to countenance such transactions"); *Sheedy v. BSB Properties, LC*, No. 2:13-CV-00290-JNP, 2016 WL 6902513, at *5 (D. Utah Mar. 1, 2016) (citing Engert, 40 Utah at 239); *Danjanovich v. Robbins*, No. 2:04-CV-623 TS, 2005 WL 2457090, at *5 (D. Utah Oct. 5, 2005) (finding an interest rate of 100% per month in a loan between sophisticated corporate actors unconscionable and substituting a reasonable rate of 10% per Utah Code § 15-1-1.).

Indeed, even Defendants' own case law demonstrates the depth of analysis undertaken.  To support their clearly false picture of Utah's legislative intent and common law (Motion at 35), Defendants quote *Bekins*, 664 P.2d 455 for the proposition that "even if a lender's rates were 'high by some standards,' they were not unconscionable because they were proportionate to the high degree of risk the lender assumed in extending the loans" (Motion at 35 citing *Bekins* at 462-63).  This selective

quotation is frankly shocking, as the *Bekins* court appeared to go very far out of its way to prevent its very narrow holding from being abused in this way, noting that "in many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power" and asking "[d]id each party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices?" before finally noting that "[t]he test is not simple, nor can it be mechanically applied" as "[t]he terms are to be considered 'in the light of the general commercial background and the commercial needs of the particular trade or case.'" *Bekins,* 664 P.2d at 461–62 (citing *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 449-50 (D.C. Cir. 1965)). The court then analyzes what it characterizes as "additional factors which bear upon unconscionability" which include:

> **1)** "[t]he use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position," […] **2)** excessive price or interest; **3)** phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; **4)** an overall imbalance in the obligations and rights imposed by the bargain; **5)** "exploitation of the underprivileged, unsophisticated, uneducated and the illiterate," […]; **6)** contract terms "so one-sided as to oppress or unfairly surprise an innocent party," […]; and **7)** lack of opportunity for meaningful negotiation, […]. For the most part **these considerations are relevant to consumer loans**, although they may also, to varying degrees, be pertinent to nonconsumer loans.

*Id.* at 462. [internal citations omitted] (emphasis added).

Thus, Defendants have cited a case which offers a compelling definition of unconscionability law as it exists in Utah, including numerous factors which clearly apply to Defendants' conduct in the instant case, yet draw this Court's attention only to the – out of context – quote pertaining to interest rates. It is illustrative to quote that passage in full:

> **In the instant case, we do not deal with a consumer contract.** Both parties were experienced business people. There was no overreaching by use of any of those factors mentioned above. Nor can we say that because Bekins was desperate an unusually high premium or rate of interest evidences unconscionability by itself. Such a view would have the effect of closing off sources of capital to businesses which may need high risk capital to survive.

*Id.* The court then cites as "closely on point" a case from Oklahoma, *Barnes v. Helfenbein,* 548 P.2d 1014 (Okla. 1976), in which the pertinent facts included that the loan was a nonconsumer loan not subject to the UCCC, the loan terms were negotiated and explained by the borrower's attorney, the actual interest rate was 38.5%, and that the borrower was "an astute business woman with extensive

experience" who sought out the loan despite other viable alternatives including the sale of the collateral for "substantial profit." *Bekins*, 664 P.2d at 462 (citing *Barnes*, 548 P.2d at 1021).  Thus, to the extent that *Bekins* had anything to say about consumer credit agreements, it explicitly stands for the principle that the considerations complained of by Plaintiff, including "excessive price or interest," are factors to consider in the application of Utah law.  Were this not enough, the *Bekins* court goes on to provide the foundations for its reasoning – that "[t]he availability of high-risk capital is essential to the functioning of our economic system.  New enterprises with untested products often require high cost capital, as do ventures whose viability is uncertain for whatever reason." *Bekins*, 664 P.2d at 463.  While this may be true, it has literally no bearing on the instant case, and it was deceptive for Defendants to selectively cite the opinion.  Plaintiff is not a "venture" seeking to finance economically productive activity; he is a veteran who sought to finance his bare necessities of living.

At a bare minimum, Defendants should have quoted *fully* the part of the opinion which applies to the rate of interest in that case, which reads "Bekins argues that the finance charges on the loans, amounting to 36.3% on the $200,000 loan and 58% on the $100,000 loan, and the security taken for the loans, were excessive.  Although the finance charges are high by some standards, we do not think they were unconscionable." *Id.* at 463.  That the *Bekins* court, despite considerations not present here, nonetheless found that a rate of 36.3% - less than a quarter the rate charged to Mr. Sims – was high by some standards, does not help Defendants' case.  That the court set out considerations (1-7 in the quote *supra*) that do apply to consumer loan agreement and are universally applicable to the instant case is practically fatal to Defendants' Utah unconscionability defenses.

Defendants' second case is *The Cantamar, L.L.C.  v. Champagne*, 142 P.3d 140 (2006), which they cite as purportedly "recognizing that parties may agree to any interest rate under Utah law and concluding that the challenged interest rate was not unconscionable." Motion at 35.  Once again, this is a questionable reading.  As an initial matter, if this were the holding of the case, and if Defendants were right on the law, there would simply be no need to conduct an unconscionability analysis at all, or at least as to the interest rate.  Instead, as in *Bekins*, the court, stressing the experience of the parties, found that the rate of 30% APR was not substantively unconscionable.  Clearly Utah courts do not consider §§ 15-1-1 and 70C-2-101 as the beginning and end of the unconscionability analysis, and even relatively

1   very low rates compared with Plaintiff's are subject to a searching analysis to determine substantive

2   unconscionability.  Note that the rate found not substantively unconscionable in *Bekins* is barely higher

3   than the maximum lawful rate applicable to Plaintiff's loan under the CFL, and the rate in *The Cantamar*

4   is actually several percentage points lower.  Indeed, these rates are not only several times lower than

5   Plaintiff's, but are even lower than the *delta* between Plaintiff's rate and that listed by the Utah

6   Department of Financial Institutions on the website cited misleadingly by Defendants.  Motion at 36,

7   n.13.[16]  That Defendants consider 120% to be "similar" to 160.5% despite a delta of 40%, and yet urge

8   this Court to find analogy between this case and cases finding that loans of 36% and 30% are not

9   unconscionable, is revealing.

10      Defendants' own cases show that Utah courts take seriously their responsibility to analyze loan

11   contracts for unconscionability, and to afford parties a "reasonable opportunity to present evidence as

12   to its commercial setting, purpose and effect to aid the court in making the determination."  Utah Code

13   § 70A-2-302.  At this stage, these requirements demonstrate the impossibility of Defendants' motion,

14   which should be denied, as Defendants' loan was not "valid when made," and so cannot be transformed

15   into a lawful loan through exportation via the Interest Rate Authority.  85 Fed. Reg. 44,146.

16   **H.      California Law Governs**

17      "A federal court sitting in diversity applies the forum state's choice of law rules." *Bridge Fund*

18   *Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1002 (9th Cir. 2010).  In turn, California

19   courts determine the enforceability of choice-of-law provisions by applying the principles set forth in

20   section 187 of the Restatement Second of Conflict of Laws ("Restatement").  *Nedlloyd Lines B.V. v.*

21   *Superior Court*, 3 Cal.4th 459, 464-65 (1992).  Both the Restatement and California case law call for

22   careful scrutiny of such provisions where, as here, they are presented in a contract of adhesion.

23   *Washington Mut.  Bank, FA v. Superior Court*, 24 Cal. 4th 906, 918 (2001); section 186, Restatement,

24

25   ---

     [16] Defendants' misrepresentation of 'authority' here is again somewhat shocking, as the first sentence
26   of that page states that "Utah law does not specify an interest rate ceiling, but does have an
     'unconscionability' provision (Section 70C-7-106 of the Utah Code)." The rate listed on the website,
27   120% - over 40% lower than Plaintiff's – is simply nothing like an implicit recognition of the non-
     unconscionability of Plaintiff's loan, presented instead for the explicit purpose of "illustrat[ing] the
28   differences in monthly payments and total interest paid if $2,000 is borrowed at rates which are available
     in Utah" and Plaintiff urges the Court to visit the website.

cmt. b.  As applied, these authorities prohibit the enforcement of choice-of-law provisions where *either* the agreements are "unreasonable" or application would result in "contravention of a fundamental California policy."  *Id.*  To determine reasonableness, California law first requires a determination of whether the state named in the choice-of-law provision "has a substantial relationship to the parties or the transaction, or . . .  whether there is any other reasonable basis for the parties' choice of law."  *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1323 (9th Cir. 2012) (quoting *Nedlloyd*, 3 Cal. 4th 459, 466).  This in turn is analyzed under the Restatement test by considering a) the place of contracting (here California); b) the place of negotiation of the contract (here California); c) the place of performance (here California); d) the location of the subject matter (here California); and e) the domicile, residence, nationality, place of incorporation, and place of business of the parties (here California, Utah, and Illinois).  Restatement § 188(1)-(3).  The Restatement further notes that "[i]f the place of negotiating the contract and the place of performance are in the same state (here California), the local law of this state will usually be applied."  *Id.*

Additionally, California has a fundamental policy against unconscionable, usurious interest rates, (Article XV of the California Constitution; Cal. Fin. Code §§ 22000 *et seq.*), a fundamental policy against false and deceptive marketing practices (Cal. Bus. & Prof. Code §§ 17500 *et seq.*), and a fundamental policy in favor of providing its residents with the substantive rights provided consumers (Bus. & Prof. Code § 17200).  That Plaintiff pled Utah as well as California and Federal claims does not change this calculus.  Defendants cite *Medimatch, Inc. v. Lucent Techs. Inc.*, 120 F. Supp. 2d 842, 861 (N.D. Cal. 2000) for a quasi-waiver argument based on the alternative pleading of Utah claims as to FinWise.  However, Defendants, once again, do not cite the sections of that holding immediately preceding and succeeding their quote, including that the court in that case stressed as a precondition of its holding the fact that "[u]nder California law, a choice of law made *by sophisticated commercial parties through arm's length negotiation* will be enforced *unless the chosen law conflicts with a fundamental public policy of California*" and – for the principle that application of New Jersey law did not violate public policy – that "plaintiff's note in their briefing that the New Jersey CFA is intended to be one of the strongest consumer protection laws in the nation."  *Id.*  [citations and internal quotations omitted] (emphasis added).  Obviously, this is not that case.

1   Additionally, Plaintiffs' allegations are sufficient to establish that the choice-of-law clause

2   should not be enforced because to do so would result in a "substantial injustice."  California case law

3   provides that choice-of-law clauses in contracts of adhesion, like the promissory notes in this case, are

4   subject to careful scrutiny and should not be enforced if to do so would result in a "substantial injustice."

5   *See Washington Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 918 (2001).  Finally, Plaintiffs'

6   allegations are sufficient to establish that the choice-of-law clause is not enforceable because it was

7   obtained by improper means.  California case law and section 187 of the Second Restatement of Conflict

8   of Laws, on which it is based, provide that a choice-of-law clause will not be enforced where it was

9   obtained by improper means, including misrepresentation.  Restatement cmt. b; *Washington Mutual*

10  *Bank v. Superior Court*, 24 Cal. 4th 906, 918 n.6 (Cal. 2001).  As every applicable test points to the

11  application of California law, California law should govern this matter.

12  **I.      Plaintiff Has Stated a Claim for Violation of the EFTA**

13          Plaintiff's claim for violation of the EFTA and for violation of the UCL by way thereof is amply

14  stated.  As an initial matter, this is precisely the situation in which "information and belief" charges are

15  necessary, as Plaintiff has alleged that *regardless* of Defendants' misrepresentations in their loan

16  agreements, as a matter of fact Opploans/Defendants' only extend loans to individuals who provide

17  either advance ACH authorization or an "electronic check" which Defendants' use to automatically debit

18  their accounts.  Either Plaintiff is correct about this, or he is not; the answer is known only to Defendants.

19  In either case, Plaintiff has stated his claim.  *Soo Park*, 851 F.3d at 928 ("The Twombly plausibility

20  standard . . .  does not prevent a plaintiff from pleading facts alleged on information and belief where

21  the facts are peculiarly within the possession and control of the defendant or where the belief is based

22  on factual information that makes the inference of culpability plausible.").

23          Whether the preauthorization is effected through a clear-cut ACH authorization or through the

24  creation of an "electronic check" is immaterial for the purposes of the EFTA, as is the fact that the loan

25  agreement disclaims such conditioning.  Motion at 38-39.  *N. Ind. Gun & Outdoor Shows, Inc. v. City*

26  *of S. Bend ("Indiana Gun")*, 163 F.3d 449, 455 (7th Cir. 1988) (while under Fed. R. Civ. P. 10(c) "[a]

27  copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes," it

28  "does not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading

simply because the documents were attached to the complaint."); FAC ¶¶ 231-32 (quoting Opploans' website).  The plausibility needle is nudged even further by the fact that Plaintiff has alleged that Defendants require a checking or savings account, despite the fact that these are not needed for a credit check, the reasonable inference being that this is because Defendants only allow repayment by means of ACH/electronic check transfers.  *Id.* While it may be that Defendants in reality do not require such preauthorization, Plaintiff has alleged as such and supported these allegations to the best of his ability with publicly available information.  This is all that is required.  As such, Defendants' motion to dismiss both Plaintiff's standalone EFTA claim under 15 U.S.C. § 1693k and his UCL – Unlawful Conduct claim premised upon violation of the EFTA should be denied.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Defendants' motion to dismiss be denied.  If the Court rules otherwise, Plaintiffs request leave to amend to address any deficiency identified by the Court.

Respectfully submitted,

ZIMMERMAN REED LLP

Dated: November 18, 2020         By:   <u>/s/ Caleb Marker</u>
Caleb Marker
Flinn T.  Milligan
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
Telephone: (877) 500-8780
Facsimile: (877) 500-8781
caleb.marker@zimmreed.com
flinn.milligan@zimmreed.com

*Attorneys for Plaintiff and the Class*